# EXHIBIT A

-----BEGIN PRIVACY-ENHANCED MESSAGE-----
Proc-Type: 2001,MIC-CLEAR
Originator-Name: keymaster@town.hall.org
Originator-Key-Asymmetric:
 MFkwCgYEVQgBAQICAgADSwAwSAJBALeWW4xDV4i7+b6+UyPn5RtObb1cJ7VkACDq
 pKb9/DClgTKIm08lCfoilvi9Wl4SODbR1+1waHhiGmeZO8OdgLUCAwEAAQ==
MIC-Info: RSA-MD5,RSA,
 DOZ/mzGRaP6Du83KYT46QKj9F+5iisJzEUCSy7mLPmmKCDVVM3p5cgET9tKeE3pd
 1+KT0fPzZrsQbLrqjujvNw==

&lt;IMS-DOCUMENT&gt;0000950135-94-000726.txt : 19941228
&lt;IMS-HEADER&gt;0000950135-94-000726.hdr.sgml : 19941228
ACCESSION NUMBER:          0000950135-94-000726
CONFORMED SUBMISSION TYPE:   10-K
PUBLIC DOCUMENT COUNT:        12
CONFORMED PERIOD OF REPORT:   19941002
FILED AS OF DATE:            19941221
SROS:               NASD

FILER:

        COMPANY DATA:
            COMPANY CONFORMED NAME:           GROUND ROUND **RESTAURANTS** INC
            CENTRAL INDEX KEY:                0000051467
            STANDARD INDUSTRIAL CLASSIFICATION:  5812
            IRS NUMBER:                       135637682
            STATE OF INCORPORATION:           NY
            FISCAL YEAR END:                  0929

        FILING VALUES:
            FORM TYPE:          10-K
            SEC ACT:            1934 Act
            SEC FILE NUMBER:    001-06192
            FILM NUMBER:        94565615

        BUSINESS ADDRESS:
            STREET 1:           35 BRAINTREE HILL OFFICE PARK
            STREET 2:           PO BOX 9078
            CITY:               BRAINTREE
            STATE:              MA
            ZIP:                02184-9078
            BUSINESS PHONE:     6173803100

        MAIL ADDRESS:
            STREET 1:           35 BRAINTREE HILL OFFICE PARK
            CITY:               BRAINTREE
            STATE:              MA
            ZIP:                02184-9078

        FORMER COMPANY:
            FORMER CONFORMED NAME:  GR FOODS INC
            DATE OF NAME CHANGE:    19910626

        FORMER COMPANY:
            FORMER CONFORMED NAME:  INTERNATIONAL PROTEINS CORP
            DATE OF NAME CHANGE:    19900614

        FORMER COMPANY:
            FORMER CONFORMED NAME:  MARINE & ANIMAL BY PRODUCTS CORP
            DATE OF NAME CHANGE:    19700806

```
</IMS-HEADER>
<DOCUMENT>
<TYPE>10-K
<SEQUENCE>1
<DESCRIPTION>GROUND ROUND RESTAURANTS, INC. FORM 10-K
<TEXT>

<PAGE>  1
```

FORM 10-K
SECURITIES AND EXCHANGE COMMISSION
WASHINGTON, D.C.  20549

(Mark One)

[X]     ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES
        EXCHANGE ACT OF 1934
        For Fiscal Year Ended October 2, 1994

[ ]     TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES
        EXCHANGE ACT OF 1934
        For the transition period from _____ to _____

Commission File Number: 1-6192

GROUND ROUND RESTAURANTS, INC.
(Exact name of registrant as specified in its charter)

```
<TABLE>
<S>                                                                  <C>
New York                                                             (I.R.S.
(State or other jurisdiction of incorporation or organization)
```

35 Braintree Hill Office Park, Braintree, Massachusetts 02184
(Address of principal executive offices) (zip code)

Registrant's telephone number, including area code:  (617) 380-3100
```
</TABLE>
```

```
<TABLE>
```
Securities registered pursuant to Section 12(b) of the Act:

```
<CAPTION>
```

| Title of each class | Name of each Exchange on which registered |
| --- | --- |
| - - ------------------ | ------------------------------------- |
| <S> | <C> |
| Common Stock, $ .1667 par value | NASDAQ National Market System |
```
</TABLE>
```

Securities registered pursuant to Section 12(g) of the Act:

None
(Title of Class)

Indicate by check mark whether registrant (1) has filed all reports required to
be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during
the preceding 12 months and (2) has been subject to such filing requirements
for the past 90 days.  Yes [X]  No [ ]

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405
of Regulation S-K is not contained herein, and will not be contained, to the

best of Registrant's knowledge, in definitive proxy or information statements
incorporated by reference in Part III of this Form 10-K or any amendment to
this Form 10-K.  [ ]

On November 30, 1994, the aggregate market value of the voting stock held by
non-affiliates of the Registrant was approximately $47.2 million, based upon
the last reported sale price for a share of the Registrant's Common Stock on
the NASDAQ National Market System.

Number of shares of Common Stock outstanding as of November 30, 1994:
11,114,269.

<PAGE>    2

<TABLE>
                            FORM 10-K INDEX

                                        PART I


<CAPTION>


<S>            <C>
Item 1         Business . . . . . . . . . . . . . . . . . . . . . . . . . .

Item 2         Properties . . . . . . . . . . . . . . . . . . . . . . . . .

Item 3         Legal Proceedings . . . . . . . . . . . . . . . . . . . . .

Item 4         Submission of Matters to a Vote of
                  Security Holders . . . . . . . . . . . . . . . . . . . .

                                        PART II


Item 5         Market for the Registrant's Common Stock
                  and Related Shareholder Matters . . . . . . . . . . . .

Item 6         Selected Financial Data . . . . . . . . . . . . . . . . . .

Item 7         Management's Discussion and Analysis of Financial Condition
                  and Results of Operations . . . . . . . . . . . . . . .

Item 8         Financial Statements and Supplementary Data . . . . . . . .

Item 9         Changes in and Disagreements with Accountants
                  on Accounting and Financial Disclosure . . . . . . . . .

                                        PART III


Item 10        Directors and Executive Officers of
                  the Registrant . . . . . . . . . . . . . . . . . . . . .

Item 11        Executive Compensation . . . . . . . . . . . . . . . . . .

Item 12        Security Ownership of Certain Beneficial
                  Owners and Management . . . . . . . . . . . . . . . . . .

Item 13        Certain Relationships and Related
                  Transactions . . . . . . . . . . . . . . . . . . . . . .

PART IV

Item 14        Exhibits, Financial Statement Schedules, and
               Reports on Form 8-K . . . . . . . . . . . . . . . . . .

</TABLE>

                                    (i)

<PAGE>   3
                                  PART I

ITEM 1.   BUSINESS

RECENT EVENT

On August 23, 1994, the Company announced that it had entered into a definitive
merger agreement (the "Merger Agreement) to be acquired at a cash purchase
price of $9.00 per share (the "Merger Consideration") by a new company formed
by institutional investors led by 399 Ventures, Inc.  Stockholders in the
acquiror will include members of senior management of the Company.  Completion
of the transaction, which will be effected by a statutory merger, is subject to
receipt of financing as well as customary closing conditions.  At the time the
Merger Agreement was signed, the acquiror delivered to the Company a letter
that it had obtained from Bear, Stearns & Co., Inc., ("Bear Stearns") indicating
that, based on then-current market conditions and subject to a number of
material financial conditions, Bear Stearns was highly confident of its ability
to place debt securities constituting a substantial portion of the proposed
financing.  Approval of the merger requires a two-thirds vote of the Company's
stockholders.

On November 16, 1994, the Company announced that it had agreed to extend until
January 31, 1995 the termination date of the Merger Agreement in order to allow
the acquiror more time to arrange financing for the transaction.  The Company
announced that it had been advised by the acquiror that the acquiror had
received advice from Bear Stearns regarding the deterioration of conditions in
the high-yield financing market and that, as a result, the acquiror did not
believe that the financing necessary to consummate the proposed merger will be
available on the terms contemplated at the time of the original Merger
Agreement.  As a result, the acquiror has advised the Company that it is
pursuing alternative financing structures to complete the transaction.  Under
the Merger Agreement, the acquiror is obligated to use its best efforts to
obtain financing on terms contemplated at the time of the original Merger
Agreement that would permit it to consummate the merger for the Merger
Consideration.  There can be no assurance that the financing can be obtained on
such terms and, therefore, that the merger can be completed.

The amended Merger Agreement entitles either party to terminate the agreement
if the merger does not occur on or before January 31, 1995, provided that the
party electing to terminate is not in material breach of the Merger Agreement.
If the Merger Agreement is terminated, the Company will not be obligated to pay
any fees of the acquiror under the Merger Agreement other than to reimburse the
acquiror's expenses up to a maximum of $1.5 million under certain
circumstances, including termination of the agreement to accept an offer from a
third party.  The Company may furnish information to and negotiate with parties
making unsolicited inquiries, accept an offer received from a third party, and
terminate the amended Merger Agreement.

OVERVIEW

The Company operates and franchises family-oriented, full-service, casual

dining restaurants in 23 states in the Northeast, Mid- Atlantic and **Midwest** regions of the United States and franchises one restaurant in Canada.  **Ground Round** restaurants offer a broad selection of high quality, moderately-**priced** menu items, including a choice of appetizers, entree salads, specialty sandwiches, the one-half pound THE GROUND ROUNDER(R) hamburger and **entrees** featuring seafood, baby back ribs, steak, chicken and pasta, as well **as full** liquor service.  A specialty section of the menu, "Just for Kids," **offers** pizza, hot

-1-

<PAGE>   4
dogs and grilled cheese sandwiches at reduced prices.  On Tuesdays **or** Thursdays, KIDS PAY WHAT THEY WEIGH(R) at JUST A PENNY A POUND(R) **for any item** selected from the children's section of the menu.  As of October 2, **1994,** the end of the Company's most recent fiscal year, there were 205 **restaurants** system-wide, 164 of which were Company-operated and 41 of which **were operated** by franchisees.

STRATEGY

The Company's objective is to become the premier family-oriented, **full service,** casual dining restaurant in the industry.  The key elements of the **Company's** strategy include the following:

- - -- emphasizing a "no compromise" dining experience by creating **an atmosphere** WHERE KIDS CAN RELAX...AND GROWN-UPS CAN HAVE FUN(R);

- - -- offering customers an excellent price-to-value alternative **to other casual** dining restaurants;

- - -- revitalizing the menu to offer items that are more appealing **to the** Company's target customers;

- - -- implementing a new compensation plan designed to motivate **each restaurant** general manager by tying financial rewards to the operating **profits of the** manager's restaurant;

- - -- remodeling older restaurants to improve their exterior and **interior** appearance to provide continuity throughout the Ground Round **system;**

- - -- selling or closing certain restaurants for which renovation is not economically justifiable; and

- - -- accelerating the rate at which the company opens new restaurants.

No Compromise Dining.  The Company seeks to create an atmosphere WHERE KIDS CAN RELAX...AND GROWN-UPS CAN HAVE FUN(R).  Each restaurant typically has two distinct dining areas, a main dining room for families with children and a smaller dining and bar area for adults.  In the main dining room, children can enjoy a special selection of kids' meals while watching cartoons, coloring in books, playing games or being entertained by periodic visits from BINGO THE CLOWN(R).  Adults dining without children or families seeking a more mature ambiance can enjoy light snacks and complete meals in the second dining area.  By offering two distinct dining atmospheres, the Ground Round restaurants cater to a large customer base, which the Company believes has contributed to the

resiliency of the Ground Round concept over the past 25 years.

Excellent Price-to-Value Relationship.  The Company believes it offers its customers an excellent price-to-value alternative to other casual dining restaurants.  By offering sandwiches and entrees that range in price from $3.79 to $12.95 and a children's menu with lower prices, the Company targets both families and adults dining without children seeking a value oriented full-service, casual dining experience.  In fiscal 1994, the average guest check in Company-operated restaurants was approximately $8.29 (including alcoholic beverages).  Alcoholic beverages have accounted for approximately 22% of restaurant sales during the last three fiscal years.

-2-

<PAGE>   5

Revitalized Menu.  The Company continues to refine its menu by developing new products, which are perceived to be of higher quality and which reflect changes in guest preferences.  Examples include chicken quesadillas, sauteed dishes, such as tomato and basil pasta and chicken alfredo, sizzling fajitas, a 12-ounce, center-cut sirloin steak and cajun swordfish.  Several unique desserts, such as CINNAMON DIPPERS(R), CHAOS(R) pie and peanut butter pie, have also been added.  Additionally, the Company is reducing the number of menu items to enhance restaurant performance by simplifying execution.

Motivated General Managers.  The Company believes that by sharing the restaurant's operating profits with its managers, the Company will foster a feeling of ownership in its managers and encourage entrepreneurship.  The Company recently began implementing its Managing General Partner program, which allows each selected general manager to share in the success of the manager's restaurant.  A participating general manager will receive 2.5% of the monthly operating profit and 15% of the increase in the quarterly operating profits of the manager's restaurant.  Additionally, each participating general manager will receive a bonus of 10% of the total profit of the restaurant in the managers's fifth year in the program.  The Company expects that within the next several years, all restaurant general managers will participate in the Managing General Partner program.  Currently, each restaurant manager not participating in the Managing General Partner program receives incentive compensation based upon the operating profits of the manager's restaurant.  By providing its general managers with a significant participation in the operating profits of their restaurants, the Company believes that it will attract and retain highly motivated managers.

Remodeling Program.  The Company currently is in the process of remodeling older restaurants to provide continuity throughout the entire Ground Round system and preserve the integrity of the Ground Round concept.  In 1992 and 1993 the Company remodeled 29 restaurants at an average cost of approximately $275,000 per restaurant.  In fiscal 1994, the Company remodeled 49 restaurants at an average cost of approximately $147,000 per restaurant.  The Company has an additional nine restaurants undergoing remodeling.  By the end of fiscal 1995, the Company plans to remodel substantially all remaining restaurants which are economically justifiable to remodel, through which the Company can achieve an adequate return through increased sales.

Divestiture Program.  During fiscal 1994, the Company determined that it would sell or close locations for which remodeling was not economically justifiable. During fiscal 1994, the Company closed four locations and sold seven

Company-operated restaurants generating cash proceeds of approximately **$4.4** million and has agreed to sell, subject to the fulfillment of certain **closing** conditions, six Company-operated restaurants, which in the aggregate **will** generate additional cash proceeds of approximately $3.6 million. **The Company** intends to sell or close an additional 27 restaurants by the end of **the second** quarter of fiscal year 1996. The disposal of some or all of these **resturants** is not expected to have a material effect on the Company's operating **profit.** In addition to the cash proceeds expected by the Company from the **sales of the** remaining targeted restaurants, the Company should also realize **significant** economic benefits through improved utilization of assets and decreased management-supervision time.

Expansion Program. Management recently accelerated its expansion **program by** opening five newly-constructed, Company-operated restaurants during **fiscal 1992** and eight newly-constructed, Company-operated restaurants during **fiscal 1993.** The Company-operated restaurants that were opened in fiscal 1992 **recorded** average sales of approximately $1.9 million in fiscal 1993 (a 53-**week year),** compared to $1.4 million average sales recorded by comparable **Company-operated** restaurants in fiscal 1993. The eight Company- operated restaurants **opened** during the fourth quarter of fiscal 1993 recorded average annualized **sales of** approximately $1.8 million for fiscal 1994. The Company opened nine Company-

-3-

<PAGE> 6

operated restaurants in fiscal 1994 and anticipates opening 10 to 20 Company- operated restaurants in fiscal 1995.

THE RESTAURANTS

The Company's restaurants are divided into 20 geographic regions, **managed by an** Executive Vice President, a Senior Vice President and a Director of **Operations.** Each region has a Regional Director who typically oversees between **five and 16** Company-operated restaurants and one to five franchise restaurants. **The** day-to-day operation of each restaurant, including personnel management, **food** procurement, inventory control, guest relations and local marketing, **is the** responsibility of a general manager who reports to the appropriate **Regional** Director.

Ground Round restaurants are located primarily in the Northeast, **Mid-Atlantic** and Midwest regions of the United States. Most restaurants are in free-standing buildings along commercial roadways with high traffic counts. Many of the restaurants are located near a retail shopping area or **in major** shopping malls.

Ground Round restaurants average approximately 5,600 square feet and 210 seats. The family dining room averages approximately 2,800 square feet in size and has approximately 140 seats. The adult dining room, which includes a bar and lounge, generally averages 1,400 square feet with 70 seats. The Company has developed a restaurant facility prototype for its new restaurants and is remodeling its existing restaurants to make their physical appearance consistent with this prototype. The exterior of the new and remodeled restaurants features a green and yellow striped backlit awning, new illuminated signage and attractive landscaping. The design of Ground Round restaurants is flexible and can be adapted to local architectural styles and varying floor plans. The Company is, therefore, able to convert existing buildings to the Ground Round concept.

The Company estimates that the investment required to open a typical

Company-operated restaurant (excluding occupancy costs, such as rent and taxes) currently ranges from approximately $900,000 to $1.3 million, assuming the Company does not purchase the land. The Company currently anticipates that it will lease the land and buildings for substantially all new Company-operated restaurants. Costs for construction of leasehold improvements vary based upon such factors as size, location, condition and type of property. The cost of furniture, fixtures and equipment, initial inventory and supplies and other pre-opening expenses, including liquor licenses, are included in the range set forth above and are incurred whether a restaurant is leased or owned. The Company does not have any exclusive arrangements with contractors or designers.

The Company believes that location is a key factor in a restaurant's ability to operate profitably. The Company studies area demographics, such as household size, density of population and average household income, and site characteristics, such as traffic volume, visibility, accessibility, parking availability, proximity to a major shopping center and proximity to other restaurants. Based on analysis of its most profitable restaurants, the Company seeks sites in areas that have populations in excess of 50,000 persons within a three-mile radius and an average household incomes of approximately $35,000.

The Company intends to locate its new restaurants primarily within or near markets in which existing Ground Round restaurants are concentrated to benefit from marketing and operating efficiencies. Of the new restaurants opened in fiscal 1994, three are in Maryland, two are in Massachusetts, two are in Ohio, and there is one in each of Minnesota and Pennsylvania. The two new franchised restaurants opened in fiscal 1994 are in North Dakota and Pennsylvania.

-4-

<PAGE>  7
The Company periodically evaluates the prospects of existing Company-operated restaurants and will, from time to time, sell or close individual restaurants. See " --Strategy--Divestiture Program" above. Similarly, franchised restaurants have closed in the past and may close in the future. During fiscal 1994, eleven Company-operated and five franchised restaurants were closed. Four franchised restaurants were terminated for cause. Four of the five franchised restaurants that ceased operating during fiscal 1994 were in the bottom 30% in annualized sales among all franchised restaurants.

RESTAURANT OPERATIONS

Hours of Operation. All Ground Round restaurants are open seven days a week, for lunch and dinner, with typical operating hours of 11:30 a.m. to midnight. In most locations, dinner accounts for approximately 60% of sales, with lunch and late night dining accounting for the remaining 40% of sales. Ground Round restaurants are operated in accordance with the Company's uniform operating standards and specifications, which are applied on a system-wide basis. These standards and specifications relate, among other things, to the quality, preparation and selection of menu items, furnishing and equipment, maintenance and cleanliness of restaurant premises and employee service and attire. The Company stresses efficient, courteous and responsive service.

Purchasing. The Company's purchasing department coordinates purchases of most food products and most non-alcoholic beverages used in both Company-operated and franchised restaurants. The nature of the Company's standing purchase order arrangements with its suppliers enables it to anticipate and better control its food costs. The Company purchases beef (other than ground beef), chicken and fish under forward purchase contracts generally having a term of one year, which are designed to assure the availability of specific products at a constant price throughout the year. The Company has a coordinated purchasing

system, which offers the same prices to both Company-operated and franchised restaurants. All franchisees are required to purchase food, equipment and smallwares from suppliers approved by the Company. This enables the Company to assure that the items sold in all Ground Round restaurants meet the Company's standards and specifications for uniform quality. Although not required to do so, virtually all franchisees purchase through the Company's purchasing department to capitalize on the strength of the Company's purchasing power. Beer, alcoholic beverages, produce and certain dairy products are purchased by restaurant general managers on a local basis.

Training. The Company emphasizes the training of both new and existing employees. Training is an integral part of both Company-operated and franchised new restaurant openings. A specialized training team works on-site to implement an extensive training program for each hourly employee in a new restaurant prior to and for several weeks after its opening. In addition, the Company has implemented a system-wide training program to achieve standardization of food preparation and operational procedures and efficient, courteous and responsive service.

All managers also are required to complete successfully an eight-to-ten week course in basic skills and management training. A written test and skill demonstration to a supervisor are required to complete the course. In addition, the Company requires that its hourly restaurant employees undergo training relevant to their positions and be certified by a supervisor, based upon a demonstration of the skills necessary for the position and a written test.

As part of its Managing General Partner program, the Company has developed a comprehensive training course which all participating restaurant managers are required to complete successfully. The course includes a workshop on leadership training and covers virtually all aspects of restaurant operations, such as techniques to increase sales, local restaurant marketing, management information systems,

-5-

<PAGE>    8

understanding the law as a means of risk management, facilities management, food and beverage purchasing and managing employees.

Restaurant Reporting. During fiscal 1993, the Company completed installation of a point of sale system in its restaurants. Through this system, the Company collects sales information and cash balances on a daily basis from each restaurant. The Company also receives payroll and other operating information on a weekly basis from its restaurants. The point of sale system also provides real-time information to restaurant managers which allows them to track sales by menu item, prepare daily cost and sales reports and prepare weekly and monthly profit and loss statements. The Company's goal is to use the information generated by the point of sale system to facilitate planning activities at both the corporate and restaurant levels. In addition, the time required to assemble and report restaurant information should be decreased, allowing the restaurant manager to focus on other aspects of operations.

Marketing. Historically, the Company's marketing strategy was to use media-based advertising focused on discounts. In 1993, the Company shifted its strategy to focus on building long-term consumer loyalty, which the Company believes can best be accomplished by providing customers with superior service

and value. Accordingly, the Company is focusing on enhancing its image through the remodeling of existing restaurants, increasing training at the restaurant level and improving menus. The Company now principally employs in-store, point of purchase materials such as banners, posters and buttons, as marketing tools. The Company also is using radio advertising that is image- and product-oriented.

Restaurant managers are encouraged to create and implement marketing strategies on a local level to build sales and generate guest traffic and to become involved in community programs in order to strengthen a restaurant's ties to its community. These community programs include activities with area schools and youth organizations and participation in local events.

FRANCHISING

As of October 2, 1994, the Company had 41 franchised restaurants, the majority of which were located in the same geographic regions as, or in close proximity to, Company-operated restaurants. During fiscal 1994, the average annual comparable sales by the Company's franchised restaurants were $1.8 million. The Company's franchise program enables the Company to enhance its brand-name recognition and derive additional revenue without substantial investment.

In fiscal 1994, two new franchised restaurants were opened, and five restaurants were closed. Four of the five franchised restaurants were terminated for cause. Four of the five franchised restaurants that ceased operating during fiscal 1994 were in the bottom 30% in annualized sales among all franchised restaurants. The Company expects four additional franchise restaurants to open in fiscal 1995.

Franchisees undergo a selection process supervised by the Director of Development and requiring final approval by senior management. The Company seeks franchisees with significant experience in the restaurant business who have demonstrated financial and management capabilities to develop and operate a franchised restaurant.

The Company assists franchisees with both the development and ongoing operation of their restaurants. The Company provides assistance with site selection, approves all franchise sites and provides franchisees with prototype plans and specifications for construction of their restaurants. The Company's training and new restaurant opening teams provide on-site instruction to franchised restaurant employees. The Company's support continues with periodic training programs, the provision of manuals and updates

-6-

<PAGE>   9
relating to product specifications and quality control procedures, advertising and marketing materials and assistance with particular advertising and marketing needs.

Supervision of franchisees is the primary responsibility of the Director of Franchise Operations and the respective Regional Directors. The Company provides the franchisees with ongoing support and assistance  in the operations of their restaurants and makes periodic visits to consult with franchisees and assure that franchisees are complying with the terms of the franchise agreement. In addition, from time to time, the Company performs audits to verify the proper calculation of royalty payments from franchisees.

All franchised restaurants are required, pursuant to their respective **franchise** agreements, to serve Ground Round menu items. In addition, all **franchisees are** required to purchase food, equipment and smallwares from suppliers **approved by** the Company. This enables the Company to assure that the items sold **in all** Ground Round restaurants meet the Company's standards and specifications **for** uniform quality. Although not required to do so, virtually all **franchisees'** purchase through the Company's purchasing department to capitalize **on the** strength of the Company's purchasing power.

The current Ground Round franchise agreement has an initial term of **20 years.** Among other obligations, the agreements require franchisees to pay **an initial** franchise fee of $40,000 for the first restaurant and $35,000 for **subsequent** restaurants and a continuing royalty of 3% of monthly gross sales. **The** current franchise agreement also requires franchisees to spend 2% **of monthly** gross sales on advertising, 1 1/2% of which must be spent locally **and 1/2% of** which is paid to the Company for creative and promotional development. **The** franchise agreements related to ten of the 41 franchised restaurants **will** expire in the next five years but give the franchisees the right to **renew their** agreements for a 20-year term, subject to certain conditions. There **currently** are no territorial exclusivity provisions that limit the Company's **ability to** expand in any market. The Company, however, currently is engaged **in** discussions with an existing franchisee regarding the granting of **exclusive** territorial development rights in a market in which there are no **Ground Round** restaurants.

EMPLOYEES

As of October 2, 1994, the Company had approximately 9,400 employees, approximately 5,600 of whom were part-time employees. Approximately 8,700 of these employees were employed in non-management restaurant positions, 600 were involved in restaurant management or training programs and 75 were corporate employees. The typical restaurant has approximately 60 employees. **Company** employees are not unionized, and the Company considers its employee **relations** to be good.

COMPETITION

The restaurant business generally, and the full-service, casual **dining segment** in particular, is highly competitive. While management believes that **Ground** Round's "no compromise" dining concept distinguishes its restaurants **from other** casual dining restaurants, there can be no assurance that other chains **will not** adopt a concept similar to that of Ground Round or that the concept **will not** lose its appeal. Competitors of Ground Round include restaurants **operated by** large national and regional chains having substantially greater financial **and** marketing resources and name recognition than Ground Round, as well as **numerous** local independent restaurants. The Company and its franchisees also **encounter** substantial competition in their efforts to obtain suitable locations for **new** restaurants.

-7-

<PAGE>   10
HEALTH CARE AND MINIMUM WAGE LAWS

The Clinton Administration and various members of Congress have proposed legislation to overhaul the nation's health care system. Because the outcome

of any health care reform legislation is uncertain, the Company is unable to determine the likely impact of health care reform initiatives on its operations.

A significant number of the Company's food service personnel are paid at rates based on applicable federal and state minimum wages. During the 1992 presidential election campaign, then-candidate Clinton pledged to seek an increase in the minimum wage, coupled with a proposal to index future increases. It is not possible at this time to predict the likelihood that an increase in the minimum wage will be enacted or, if enacted, its impact on the Company's profitability.

GOVERNMENTAL REGULATION

The Company is subject to various federal, state and local laws affecting its employees and guests, its owned and leased properties and the operations of its restaurants. The Company restaurants are subject to licensing and/or regulations by various fire, health, sanitation and safety agencies in the applicable state and/or municipality. In particular, the Company has adopted extensive procedures designed to meet the requirements of applicable food handling and sanitation laws and regulations. The Company has not experienced any material problems resulting from its sanitation and food handling procedures.

Ground Round restaurants are subject to state and local licensing and regulations with respect to the sale and service of alcoholic beverages. Typically, licenses must be renewed annually and may be revoked or suspended for cause. Alcoholic beverage control regulations relate to numerous aspects of the daily operations of the Company's restaurants, including minimum age of patrons and employees, hours of operation, advertising, wholesale purchasing, inventory control and the handling, storage and dispensing of alcoholic beverages. The Company has not encountered material problems relating to alcoholic beverage licenses to date, but the failure of a restaurant to obtain or retain a liquor license would adversely affect the restaurant's operations.

In certain states, the Company is subject to "dram shop" statutes, which generally give a person injured by an intoxicated person the right to recover damages from the establishment that wrongfully served alcoholic beverages to the intoxicated person. The Company carries liquor liability coverage as part of its existing comprehensive general liability insurance. The Company currently is a defendant in several "dram shop" suits. Management does not believe that an adverse result in any of these cases will have a materially adverse effect on the Company's financial condition or results of operations.

The Company is subject to federal and state fair labor standards, statutes and regulations that govern such matters as minimum wages, overtime, tip credits, child labor and other working conditions. A significant number of Ground Round food service personnel are paid at rates based on applicable federal and state minimum wages.

The Company's restaurants are subject to the provisions of the Americans with Disabilities Act ("ADA"), which requires that private entities operating places of public accommodation, including restaurants, take steps to ensure that disabled employees and customers are not denied access and are not segregated. Under ADA, however, the Company is not required to make any accommodation that would result in an "undue burden" on the Company.

Management is not aware of any federal or state environmental regulations that have had a material effect

-8-

<PAGE>   11
on the Company's operations to date.  However, more stringent requirements of
local governmental bodies with respect to waste disposal, zoning, construction
and land use may increase both the cost and the time required for construction
of new restaurants and the cost of operating restaurants.

The Company is subject to federal and state laws, rules and regulations
governing the offer and sale of franchises.  Most states have enacted laws that
require detailed disclosure in the offer and sale of franchises and/or the
registration of the franchisor with state administrative agencies.  The Company
also is subject to Federal Trade Commission regulations relating to disclosure
requirements in the sale of franchises.  Certain states have enacted, and
others may enact, legislation governing certain aspects of the franchise
relationship and limiting the ability of the franchisor to terminate or refuse
to renew a franchise.  The law applicable to franchise sales and relationships
is rapidly evolving, and the Company is unable to predict the effect on its
franchising program of additional requirements or restrictions that may be
enacted or promulgated or of court decisions that may be adverse to
franchisors.  Such decisions and regulations often have limited the ability of
franchisors to enforce certain provisions of franchise agreements and alter or
terminate franchise agreements.  The scope of the Company's business, and the
complexity of franchise regulation, may create regulatory compliance problems
from time to time.  The Company does not believe that such problems would be
material to the operation of its business.

TRADEMARKS

The Company has registered the name THE GROUND ROUND and its logo with the
United States Patent and Trademark Office.  In addition, the Company has other
registered trademarks, including WHERE KIDS CAN RELAX AND GROWN-UPS CAN HAVE
FUN;  THE GROUND ROUNDER; BINGO THE CLOWN; KIDS PAY WHAT THEY WEIGH; JUST A
PENNY A POUND; KIDS PAY BY DEGREE!; IT'S A GREAT DEAL OF FUN!; FAMILY COUNTS;
CINNAMON DIPPERS' and SLIDER sundae.  The Company believes that these
trademarks are valuable to the operation of its restaurants and marketing
strategy.


ITEM 2.   PROPERTIES

As of October 2, 1994, the Company operated 164 of the 205 Ground Round
restaurants.  At 29 locations, both the real estate and structure are owned by
the Company in fee.  At 117 locations, both the real estate and structure are
leased.  At the remaining 18 locations, the land is leased and the structure is
owned.  Lease terms run from 10 to 30 years, with most of the leases providing
for an option to renew for at lease one additional term of five years.  Within
the next five years, 83 of the Company's leases will be up for renewal.  Under
most leases, rent is calculated as a percentage of gross revenues, subject to a
minimum annual rent.  Generally, the leases are net leases which require the
Company to pay the cost of insurance, taxes and maintenance on the leased
property.  The Company owned properties and certain leased properties are
subject to security interests.

The Company's headquarters are located in a modern office park in Braintree,
Massachusetts, where the Company leases approximately 22,000 square feet.  The

lease expires in 1996 and has a five-year renewal option.  The Company believes
this space is adequate for its present and projected needs for at least the
next five years.

-9-

<PAGE>  12
<TABLE>
COMPANY-OPERATED RESTAURANT LOCATIONS

The following table sets forth the 164 company-operated restaurants as of
October 2, 1994.  An * denotes a new restaurant added in 1994:

<S>                         <C>                        <C>
CONNECTICUT                   Stoughton                  Fairport
  Enfield                     W. Springfield             Fayetteville
  Groton                      Taunton                    Garden City
  Manchester                  Walpole                    Kenmore
  Plainville                  Worcester                  Kingston
  Rocky Hill                                             Latham
  Waterbury                                              Liverpool (2)
                            MICHIGAN                     Mamaroneck
                              Farmington Hills           Middletown
DELAWARE                      Grand Rapids               Nanuet
  Newark                      Jackson                    New Hartford
  Wilmington                  Kalamazoo                  Newburgh
                              Livonia                    Niagara Falls
                              Royal Oak                  Northport
ILLINOIS                                                 Port Jefferson
  Bloomington                                            Poughkeepsie
  Decatur                   MINNESOTA                    Rochester (4)
  Rockford                    Brooklyn Center            Roslyn
  Springfield                 Burnsville                 Scarsdale
                              Coon Rapids                Schenectady (2)
                              Crystal                    Utica
INDIANA                       Duluth                     Vestal
  Castleton                   Fridley                    Yonkers
  Greenwood                   Mankato*
  Indianapolis (2)            North St. Paul
                              Richfield                  OHIO
                              Roseville                    Akron (2)
IOWA                          St. Cloud                    Cincinnati (3)
  Davenport                   St. Paul                     Columbus (3)
  Des Moines                  West St. Paul                Elyria*
  Dubuque                                                  Kent
  Iowa City                                               Kettering
  Waterloo                  MISSOURI                       Lima
                              Bridgeton                    Madeira
                              St. Joseph                   Mentor
KENTUCKY                      St. Louis                    Miamisburg
  Florence                    St. Peters                   North Olmsted
                                                           Parma
MARYLAND                                                   Parma Heights
  Baltimore                 NEW HAMPSHIRE                   Solon*
  BelAir*                     Manchester                   Strongsville
  Frederick*                                               Toledo
  Hagerstown*                                              Willowick
                            NEW JERSEY
MASSACHUSETTS                 Cedar Knolls
  Allston                     Deptford
  Andover                     Ewing Township
  Boston*                     Gloucester

```
    Braintree              Greenbrook              PENNSYLVANIA
    Brighton               Hackensack                Camp Hill
    Cambridge              Hasbrouck Heights         Corapolis
    Danvers                Keyport                   Erie
    Framingham             Maple Shade               Greensburg
    Natick                 Sayreville                Johnstown
    North Dartmouth        Voorhees                  Monroeville
    Norwell                                          No. Wales
    Norwood              NEW YORK                    Philadelphia
    Salem                  Albany (2)                Pittsburgh (3)
    Saugus                 Amherst                   Reading
    Springfield*           Bayshore                  Scranton*
    Stoneham               Clay                      Springfield
```

</TABLE>

                                        -10-

<PAGE>   13
<TABLE>
FRANCHISED RESTAURANT LOCATIONS

The following table sets forth the 41 franchise restaurants as of October 2,
1994.  An * denotes a new restaurant added in 1994:

```
<S>                      <C>                     <C>
CONNECTICUT                NEW HAMPSHIRE           OHIO
  Branford                   Nashua                  Boardman
  Danbury
  Glastonbury              NEW JERSEY              PENNSYLVANIA
                             Bordentown             Langhorne
MAINE                        Egg Harbor             York *
  Auburn                     Flemington
  Augusta                    Lawrenceville        RHODE ISLAND
  Bangor                     Toms River             Pawtucket
  So. Portland
                           NEW YORK               SOUTH DAKOTA
MARYLAND                     Commack                Sioux Falls
  Annapolis                  Farmingdale
                             Hicksville           VERMONT
MASSACHUSETTS                Plattsburgh            So. Burlington
  Chelmsford                 Rensselaer
  Hadley                     Sayville             VIRGINIA
  Lanesboro                                         Danville
  Needham                  NORTH DAKOTA             Lynchburg
  Shrewsbury                 Bismarck               Roanoke
  Waltham                    Fargo
                             Grand Forks
MICHIGAN                     Minot *
  Dearborn Hts.
```
</TABLE>

ITEM 3.   LEGAL PROCEEDINGS

The Company is subject to various claims and legal actions that arise in the
ordinary course of business, including claims and actions brought pursuant to
"dram shop" statutes and under federal and state employment laws prohibiting
employment discrimination.

The Company has been named in a number of separate claims brought by former
employees alleging that the Company engaged in discriminatory practices based

on age, race, sex or disability. Plaintiffs maintaining claims of employment discrimination, such as those being brought against the Company, generally are entitled to have their claims tried by a jury and such claims may result in punitive damage awards. Most of the proceedings against the Company are still in the discovery phase. Management believes that the discrimination claims against the Company are without merit and the Company is actively defending the claims.

On August 24, 1994, a suit was filed in the Massachusetts Superior Court, Suffolk County in which the Company and each member of its Board of Directors were named as defendants. That suit is styled Perry v. O'Donnell, et al., Civil Action No. 94-4648 G. The suit, which has been brought by a purported,

-11-

<PAGE>   14
shareholder seeking to be certified as a representative of a class of shareholders, alleges in substance that the members of the Board of Directors acted in breach of their fiduciary duty to the Company's shareholders by (i) failing to take appropriate steps to maximize the value to be received by the Company shareholders upon the sale of the Company, (ii) authorizing the Company to enter into the Merger Agreement with an entity in which certain members of the Company's senior management, including Mr. O'Donnell, will have ownership interest and (iii) agreeing to recommend a transaction in which the Merger Consideration is unfair and grossly inadequate. The relief requested by the plaintiff includes that the proposed Merger be enjoined or, if completed, rescinded, or that damages be awarded. On September 13, 1994, a similar suit, Weinstein v. Ground Round Restaurants, Inc., Civil Action No. 94- 4714 G, was brought by another purported shareholder. That suit, also brought in the Massachusetts Superior Court, Suffolk County, made the same allegations and demanded the same relief as were made and demanded in Perry. The Company and its directors currently are preparing their responses to both complaints. The Company and the Board of Directors believe that such allegations completely are without merit, and they intend vigorously to defend against them.

ITEM 4.   SUBMISSION OF MATTERS TO A VOTE OF SECURITY HOLDERS

Not applicable

-12-

<PAGE>  15

PART II

<TABLE>
ITEM 5.   MARKET FOR THE REGISTRANT'S COMMON STOCK AND RELATED STOCKHOLDER MATTERS.

The Common Stock of the Company is listed on the NASDAQ National Market System under the symbol "GRXR." Prior to June 24, 1993, shares of the Company's common stock were traded on the American Stock Exchange. The following table sets forth for the fiscal quarters indicated, the reported high and low closing sales prices of the Company's Common Stock during the fiscal year ended October 2, 1994 and October 3, 1993, respectively.

```
<CAPTION>                        1994                1993
                                 ----                ----
                          HIGH      LOW       HIGH      LOW
                          -----     ---       ----      ---
          <S>             <C>       <C>       <C>       <C>
      1st Fiscal Quarter  $8.13    $ 6.50    $7.75     $4.75
      2nd Fiscal Quarter   8.00      5.50     9.63      7.50
      3rd Fiscal Quarter   7.13      5.50     8.50      6.13
      4th Fiscal Quarter   8.63      5.63     8.13      5.50
</TABLE>
```

The Company has not paid a cash dividend on the Common Stock since its public
offering in September 1991.  The Company intends to retain future earnings for
use in the operation and expansion of its restaurants and, accordingly, does
not intend to pay cash dividends in the foreseeable future.  In addition, the
terms of the Company's current credit agreement effectively prohibit the
Company from declaring or paying cash dividends while borrowings are
outstanding pursuant to this agreement.

As of November 30, 1994, the number of holders of record of shares of the
Company's Common Stock was 866.

                                  -13-

```
<PAGE>   16
```

```
<TABLE>
ITEM 6.   SELECTED FINANCIAL DATA
```

The following table contains certain selected consolidated financial data for
each of the past five fiscal years.  In 1991, the Company changed its fiscal
year-end to the Sunday closest to September 30.  The following selected
financial information should be read in conjunction with "Management's
Discussion and Analysis of Financial Condition and Results of Operations" and
the consolidated financial statements and the notes thereto included elsewhere
in this Report.

| <CAPTION> | 52 WEEKS ENDED OCTOBER 2, 1994 | 53 WEEKS ENDED OCTOBER 3, 1993 | 5 SEP |
|---|---|---|---|
| (IN THOUSANDS, EXCEPT FOR PER SHARE DATA) | ----- | ------ | |
| <S> | <C> | <C> | |
| STATEMENT OF OPERATIONS DATA: | | | |
| Revenue . . . . . . . . . . . . . . | $243,971 | $232,556 | |
| Operating income from continuing operations . . . . . . . . . | 13,277 | 11,866 | |
| Interest expense from continuing operations, net . . . . . . . . | 4,091 | 4,031 | |
| Income from continuing operations before income taxes . . . . . . | 9,186 | 7,835 | |

| | | |
|---|---|---|
| Income taxes . . . . . . . . . . . . | 2,940 | 2,507 |
| | ------ | ------ |
| Income from continuing operations: | | |
|     Total . . . . . . . . . . . . . | 6,246 | 5,328 |
|     Per share . . . . . . . . . . . | .56 | .48 |
| Weighted average common shares outstanding . | 11,109 | 11,086 |
| OPERATING DATA: | | |
| Systemwide sales: | | |
|     Company-operated . . . . . . . . . | $241,777 | $230,017 |
|     Franchised . . . . . . . . . . . | 72,726 | 71,876 |
| | ------ | -------- |
|     Total systemwide sales . . . . . | 314,503 | 301,893 |
| Average annual systemwide sales per | | |
| restaurant . . . . . . . . . . . | 1,534 | 1,438 |
| Number of restaurants (at period end): | | |
|     Company-operated . . . . . . . . . | 164 | 166 |
|     Franchised . . . . . . . . . . . | 41 | 44 |
| | -- | ---- |
|     Total restaurants . . . . . . . | 205 | 210 |
| BALANCE SHEET DATA: | | |
| Total assets . . . . . . . . . . . | $156,772 | $151,813 |
| Long-term debt, including current maturities | 58,770 | 60,305 |
| Stockholders' equity . . . . . . . . . | 65,036 | 58,637 |

<FN>

(a)  Annualized to a 52 week year

</TABLE>

-14-

<PAGE>   17
ITEM 7.   MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND
          RESULTS OF OPERATIONS

GENERAL

The following discussion and analysis examines the Company's operations which
comprise the Ground Round restaurant chain.  As of October 2, 1994, the Company
operated 164 and franchised 41 family-oriented, full service, casual dining
restaurants.

For purposes of this discussion and analysis, the 52 week year ended October 2,
1994, the 53 week year ended October 3, 1993 and the 52 week year ended
September 27, 1992, are referred to as 1994, 1993, and 1992, respectively.

<TABLE>
RESULTS OF OPERATIONS

The following table sets forth the percentages which the items in the Company's
consolidated Statements of Operations bear to total revenue or Company-operated
restaurant revenue, as indicated:

```
<CAPTION>
```

|  | 52 WEEKS ENDED OCTOBER 2, 1994 | 53 WEEKS ENDED OCTOBER 3, 1993 |
| --- | --- | --- |
|  | ----- | ---- |
| `<S>` | `<C>` | `<C>` |
| Revenue: |  |  |
|     Restaurant revenue | 99.1% | 98.9% |
|     Franchise revenue | .9 | 1.1 |
|  | ----- | ------ |
|     Total Revenue | 100.0 | 100.0 |
|  |  |  |
| Costs and Expenses: |  |  |
|     Cost of products sold (1) | 83.9 | 84.2 |
|     Selling, general and administrative | 6.3 | 6.8 |
|     Depreciation and amortization | 5.5 | 4.8 |
|     Interest expense | 1.7 | 1.7 |
|     Other (income) expense | (.4) | (.1) |
|  |  |  |
| Net income before income taxes | 3.8 | 3.4 |
| Income taxes | 1.2 | 1.1 |
|  | --- | ---- |
| Net income | 2.6% | 2.3% |

```
<FN>
```

(1) As a percentage of Company-operated restaurant revenue.

```
</TABLE>
```

-15-

```
<PAGE>   18
```

RESTAURANT REVENUE.  Restaurant revenue totalled $242.0, $230.0 and $224.0 million for 1994, 1993 and 1992, respectively.  Restaurant revenue is comprised of comparable restaurant revenue (revenue from restaurants open during all of both fiscal years) and non-comparable restaurant revenue.

Comparable restaurant revenue, comprised of revenue from restaurants open during all of 1994 and 1993, increased in 1994 by .7% to $213.6 million for the comparable 52 week period.  Management believes the increase is principally attributable to improvement in operations, the continued impact of the Company's renovation program and image- and product-based advertising. Comparable restaurant revenue in 1993 decreased 2.1% for the comparable 52-week period.  In 1993, management de-emphasized advertised discounting, which contributed to lower guest count levels and lower revenue but resulted in significant savings in discounting and advertising.

The average guest check was approximately $8.29, $7.95 and $7.35 in 1994, 1993 and 1992, respectively.  These increases primarily reflected an evolving menu mix with higher priced menu items, as well as the de-emphasized discounting in 1994 and 1993.  For example, 1992 included 66 additional days of JUST A PENNY A POUND(R) and KIDS PAY BY DEGREE!(R) promotions which were not duplicated in 1993 or 1994.  An insignificant portion of the increase in the average guest check is attributed to price increases on existing menu items.  Sales of alcoholic beverages (excluding soda) were approximately 22% of revenue in each of these three years.

Non-comparable restaurant revenue, consisting of those restaurants not in operation during all of both comparable years, increased to $28.2 million in 1994 from $13.8 million in 1993 and $9.7 million in 1992. The increase in 1994 was attributable to the full year operation of nine new restaurants added in 1993, as well as nine new restaurants added in 1994. These increases were partially offset by the sale or closing of eleven locations in 1994. In 1993, the increase in non-comparable restaurant revenue was attributable to the full year operation of seven new restaurants added in 1992, as well as nine new restaurants added in 1993. These increases were partially offset by the closing of three locations in 1993.

FRANCHISE REVENUE. The Company's franchise base consisted of 41 franchised restaurants in 1994 and 44 franchised restaurants in 1993 and 1992. In 1994 two new franchised restaurants were added, while five franchised restaurants were closed. Five new franchised restaurants were added during 1993, four of which were opened by new franchisees, while one franchise agreement was not renewed, three franchised restaurants were closed and another was acquired by the Company. Revenue from franchised restaurants (consisting of royalties and franchise fees) were $2.2 million, $2.5 million and $2.4 million in 1994, 1993 and 1992, respectively. In 1993 and 1992, $.2 million and $.5 million, respectively, which had been reserved in prior periods, was received and recognized as royalty revenue.

COST OF PRODUCTS SOLD. Cost of products sold consists of both food and beverage costs and restaurant operating expenses. Food and beverage costs totalled 31.8%, 31.9% and 31.3% of Company-operated restaurant revenue in 1994, 1993 and 1992, respectively. Restaurant operating expenses were 52.1%, 52.3% and 52.5% of Company-operated restaurant revenue, respectively, in 1994, 1993 and 1992.

                                   -16-

<PAGE>   19
Food and beverage costs as a percentage of Company-operated restaurant revenue decreased .1% from 1993 to 1994 as compared to the increase of .6% from 1992 to 1993. The decrease in food and beverage costs in 1994 was attributable to lower product costs and management's increased efforts to control food costs and reduce waste. These activities resulted in a decrease of .5% of food costs, offset by an increase of 1.1% of beverage costs largely due to the increased cost of beer. Food and beverage costs in 1993 were adversely affected by higher produce costs due to winter flooding in Arizona, late planting in California and higher beef prices.

Restaurant operating expenses in 1994 decreased by .2% of Company-operated restaurant revenue from 1993, principally due to decreases in labor costs as a result of a change in the Company's policy on accrued vacation for hourly employees, partially offset by increases in bonuses earned by restaurant management based on increased profits. Other costs have remained at relatively constant levels as compared with the prior year. In 1993, restaurant operating expenses decreased by .2% of Company-operated restaurant revenue from 1992, principally due to decreases in labor costs and reductions in discounts, partially offset by increases in rental expense.

SELLING, GENERAL AND ADMINISTRATIVE EXPENSES. Selling, general and administrative expenses were 6.3%, 6.8% and 7.2% of total revenue in 1994, 1993 and 1992, respectively. Selling expenses, comprised of advertising and point

of purchase materials, development and production costs, were .5%, .7% and 1.5% of total revenue for 1994, 1993 and 1992, respectively.  Selling expenses decreased in 1994 by .2% of total revenue from 1993, primarily due to an additional credit of $.4 million from Coca-Cola(TM) based on product usage. Management's strategic decision to de-emphasize media advertising used in connection with discounting programs was primarily responsible for reducing selling costs by .8% of revenue in 1993.

General and administrative costs, comprised of restaurant manager training, regional overhead, and corporate administrative costs, were 5.8%, 6.1% and 5.7% of total revenue in 1994, 1993 and 1992, respectively.  General and administrative costs decreased in 1994 from 1993 largely due to the termination of the executive retirement plan which resulted in a credit of $.3 million. All other general and administrative costs in 1994 remained constant as a percentage of total revenue as compared to 1993.  In 1993, general and administrative cost increases reflect the impact of increased training and recruitment expenses associated primarily with the hiring of new restaurant and regional management personnel.

DEPRECIATION AND AMORTIZATION.  Depreciation and amortization expenses were 5.5%, 4.8% and 4.4% of total revenue in 1994, 1993 and 1992, respectively.  The increase in depreciation and amortization from 4.8% of total revenue in 1993 to 5.5% of total revenue in 1994 resulted from nine new restaurants added in 1994, nine new restaurants added in 1993 and the remodeling of seventy-eight restaurants since 1992.  In 1993, depreciation and amortization increased to 4.8% from 4.4% in 1992 due to new restaurant development and the remodeling of twenty-nine restaurants.

OTHER (INCOME) AND EXPENSE.  During 1994, the Company completed a sale of one location for approximately $2.0 million and realized a pretax gain of approximately $1.5 million.  This gain was partially offset by the write-off of $.6 million in expenses associated with a proposed public offering of convertible subordinated debentures which the Company withdrew due to market conditions.

In August 1994, the Company entered into the Merger Agreement pursuant to which it agreed to be acquired for cash.  Completion of the proposed acquisition is subject to, among other things, the approval

-17-

<PAGE>  20
of the holders of two-thirds of the Company's stock and the acquiror's receipt of financing.  In November 1994, the acquiror advised the Company that the acquiror did not believe the financing necessary to consummate the proposed acquisition will be available on the terms contemplated at the time the parties entered into the Merger Agreement.  Although the acquiror is obligated to use its best efforts to obtain financing on terms contemplated at the time of the Merger Agreement that would permit it to consummate the Merger for the Merger Consideration, there can be no assurance that the financing can be obtained on such terms and, therefore, that the acquisition can be completed.  To date, the Company has incurred $.4 million of expense in connection with the proposed acquisition.  If the transaction is not completed, those expenses will be recognized in fiscal 1995.

INTEREST EXPENSE.  Interest expenses were 1.7%, 1.7% and 2.0% of total revenue in 1994, 1993 and 1992, respectively.  Interest expense in 1994 remained

constant as a percentage of total revenue as compared to 1993. The decrease in interest expense from 1992 to 1993 was primarily a result of lower average interest rates, which more than offset interest expense incurred under interest rate swap agreements (see "Liquidity and Capital Resources" below) of approximately $.8 million and $.9 million in 1993 and 1992, respectively. At November 30, 1994, the average interest rate under the Company's credit facilities (described below) was 7.3% as compared to an average interest rate of 6.5% for 1994. The increase in the applicable interest rate reflects the rising interest rate environment in the United States during the second half of calendar 1994.

INCOME TAXES. The Company's effective income tax rates were 32%, 32% and 38% in 1994, 1993 and 1992, respectively. The reduction in the 1993 effective tax rate was primarily the result of lower state taxes and the generation of targeted jobs tax credits. The full utilization of a net operating loss carryforward also affected the 1992 income tax rate.

NET INCOME. As a result of the above, the Company reported income from continuing operations of $6.2 million in 1994, $5.3 million in 1993 and $4.6 million in 1992, representing 2.6%, 2.3% and 2.1% of total revenue, respectively. Net income from continuing operations was $.56, $.48 and $.42 per share for 1994, 1993 and 1992, respectively.

LIQUIDITY AND CAPITAL RESOURCES

A significant amount of the Company's restaurant sales are for cash, with the remainder made with credit cards that are generally realized in cash within a few days. Because the Company does not have significant accounts receivable or inventories and pays its expenses within normal terms, the Company operates with working capital deficits as is typical in the restaurant industry. The Company had working capital deficits of $15.3 million and $12.6 million as of October 2, 1994 and October 3, 1993, respectively.

Net cash provided by operating activities totalled $22.4 million in 1994, and $15.5 million in 1993. The company incurred capital expenditures totalling $24.1 million and $25.1 million in 1994 and 1993, respectively, primarily for restaurant capital maintenance, remodeling and new restaurant construction. Cash flow from operations plus proceeds from sales of locations funded 1994 capital expenditures and provided for the repayment of approximately $1.0 million in long-term borrowings. On October 2, 1994 and October 3, 1993, the Company's borrowings under its credit facilities were approximately $53.0 million and $53.0 million, respectively. On October 8, 1993 the credit facilities were amended to a $70 million commitment, with the aggregate balance of $53.7 million of the combined facility balances on that date converted to term debt. The balance of $16.3 million is a revolving facility to fund operations

-18-

<PAGE>   21
and new store development and converts to term debt on October 8, 1995. Principal payments under the credit facilities begin in October 1995 and are scheduled through July 2000.

The credit facility obligates the Company to hedge its interest rate risk on approximately 50% of its total term borrowings. In fiscal 1992 and 1993, the Company effected such a hedge by entering into interest rate swap agreements

under which it agreed to exchange LIBOR-based interest payments for **fixed-rate** payments (see "Results of Operations-Interest Expense" above). In **fiscal 1994**, the Company hedged its interest rate risk by entering interest cap **agreements** under which the maximum base interest rate of its LIBOR-based payments **would be** 7.0%. The interest rate cap agreements had no effect on the Company's **interest** expense in fiscal 1994.

The credit facilities contain certain restrictions on the conduct of **the** Company's business including a prohibition on the payment of dividends. In addition, the Company is required to comply with certain financial **covenants** relating to maintenance of net worth, interest coverage, fixed charges coverage, the ratio of funded debt to free operating cash flow and **capital** expenditures (other than the separate limitations for capital expenditures **for** new restaurants). The revolving line of credit requires the satisfaction **of** certain criteria prior to entering into a commitment to open a new **restaurant**. These criteria relate to projected capital investment and first year **sales**, margins and profits as well as to location. The credit facilities **also** currently restrict the Company from entering into commitments to open **more than** 18 new restaurants in any fiscal year, entering into a new commitment **if ten or** more restaurants for which commitments are outstanding remain unopened **or** entering into a new restaurant commitment if total new restaurant **commitments** exceed $15 million at any one time. In addition, new restaurants **must meet** certain operating tests.

The Company expects to incur approximately $25 million in capital **expenditures** during the 1995 fiscal year. Management believes that existing **cash, cash flow** from operations, and available borrowings under the credit facilities **will be** sufficient to meet operating needs, fund anticipated capital **expenditures and** service debt requirements during fiscal 1995.

ITEM 8.    FINANCIAL STATEMENTS AND SUPPLEMENTARY DATA

The information required under this item is set forth on pages F-1 **through F-18** of this report.

ITEM 9.    CHANGES IN AND DISAGREEMENTS WITH ACCOUNTANTS ON ACCOUNTING AND
           FINANCIAL DISCLOSURE

None.

-19-

<PAGE>   22                          PART III

ITEM 10.  DIRECTORS AND EXECUTIVE OFFICERS OF THE REGISTRANT

DIRECTORS OF REGISTRANT

The information called for by this Item with respect to directors will be contained in either (i) the Company's Proxy Statement, if the Company files the proxy statement within 120 days after the end of the Company's fiscal year ended October 2, 1994 or (ii) an amendment to this Annual Report filed on Form 10.

<TABLE>
EXECUTIVE OFFICERS OF THE REGISTRANT

Certain information is set forth below concerning the executive officers of the Company who have been elected to hold office for such terms as may be prescribed by the Board, and unless sooner removed under the Bylaws of the Company, or until their successors are duly elected and qualified.   There is no family relationship among any of the officers and directors of the Company. The executive officers of the Company are as follows:

```
<CAPTION>
NAME                                                     AGE
- - - ----                                               ---
<S>                                                      <C>
Michael P. O'Donnell                                     38

Peter J. Beaudrault                                      39

Michael R. Jorgensen                                     42

William C. Schoener                                      43

Warren C. Hutchins                                       50

Holly J. Young                                           41

Robin L. Moroz                                           38

Elizabeth Brennan Baker                                  40

</TABLE>
```

Michael P. O'Donnell has served as the Chairman of the Board, President and Chief Executive Officer of the Company since September 1991 and President and Chief Executive Officer of the Ground Round since January 1990.  He was Senior Vice President (Southern Division) of TGI Friday's Inc., a restaurant chain, from December 1986 through December 1989.

Peter J. Beaudrault has served as Executive Vice President of the Company since June 1994 and was Senior Vice President of Division Operations of the Company from September 1993 to May 1994.  He

-20-

<PAGE>   23
was Divisional Vice President of the Company and Ground Round since September 1992.  He was Regional Manager of TGI Friday's Inc.  from July 1989 through September 1992.  He was Director of Operations for Hard Rock Cafes, Inc. from November 1987 through July 1989.

Michael R. Jorgensen has served as Vice President, Chief Financial Officer and Treasurer of the Company since June 1993 and was appointed Senior Vice President in September 1993.  He was Vice President, Finance - Middle East of Alghanim Industries, the largest consumer products distributor in Kuwait, from March 1992 to April 1993.  Prior to that, Mr. Jorgensen was Vice President and Chief Financial Officer of the Company (then known as International Proteins) from May 1988 to September 1991.

William C. Schoener has served as Senior Vice President of Division Operations since September 1993. He was Divisional Vice President of the Company since September 1991 and January 1989, respectively. He was a Director of Operations of Ground Round from June 1986 through December 1988.

Warren C. Hutchins has served as Vice President, Purchasing and Distribution of the Company since September 1991 and August 1986, respectively. He was Secretary of Ground Round from March 1990 through February 1991.

Holly J. Young has served as Vice President of Marketing since May of 1994, and served as Director of Marketing when she joined the Company in March of 1994 to April 1994. She was Senior Vice President of Marketing of Chi-Chi's Restaurants, Inc. from January 1993 through January 1994, and Vice President of Marketing for Grisanti's Inc. from April 1992 to December 1992. From June 1989 to March 1991, she was Senior Vice President of Marketing for Metromedia Steakhouses, Inc. She was Vice President of Marketing for TGI Friday's Inc. from 1987 to 1989.

Robin L. Moroz was appointed General Counsel and Secretary in December 1994. She was hired by the Company in August 1989 and since October 1991 has served as Assistant General Counsel.

Elizabeth Brennan Baker has served as Vice President of Organizational Development since July of 1994. She was Vice-President of Human Resources from January 1993 through June of 1994. She was Vice President - Personnel and Training of the Company since September 1991 and March 1990, respectively. She was Vice President - Training and Development of Ground Round from November 1988 through February 1990, Director of Training and Development of Ground Round from August 1985 through October 1988.

ITEM 11.  EXECUTIVE COMPENSATION

The information called for by this Item with respect to directors will be contained in either (i) the Company's Proxy Statement, if the Company files the proxy statement within 120 days after the end of the Company's fiscal year ended October 2, 1994 or (ii) an amendment to this Annual Report filed on Form 10.

                                    -21-

<PAGE>   24

ITEM 12.  SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT

The information called for by this Item with respect to directors will be contained in either (i) the Company's Proxy Statement, if the Company files the proxy statement within 120 days after the end of the Company's fiscal year ended October 2, 1994 or (ii) an amendment to this Annual Report filed on Form 10.

ITEM 13.  CERTAIN RELATIONSHIPS AND RELATED TRANSACTIONS

The information called for by this Item with respect to directors will be contained in either (i) the Company's Proxy Statement, if the Company files the proxy statement within 120 days after the end of the Company's fiscal year

ended October 2, 1994 or (ii) an amendment to this Annual Report filed on Form 10.

-22-

<PAGE>   25

PART IV

ITEM 14.  EXHIBITS, FINANCIAL STATEMENT SCHEDULES, AND REPORTS ON FORM 8-K.

(A)      FINANCIAL STATEMENTS

Report of Ernst & Young LLP, Independent Auditors.

Consolidated Balance Sheets - October 2, 1994 and October 3, 1993.

Consolidated Statements of Income - Years Ended October 2, 1994 and October 3, 1993 and  September 27, 1992.

Consolidated Statements of Stockholders' Equity - Years Ended October 2, 1994 and October 3, 1993, and September 27, 1992.

Consolidated Statements of Cash Flows -Years Ended October 2, 1994 and October 3, 1993, and September 27, 1992.

Notes to Consolidated Financial Statements - Years Ended October 2, 1994 and October 3, 1993, and September 27, 1992.

FINANCIAL STATEMENT SCHEDULES

Schedule II - Amounts Receivable from Related Parties and Underwriters, Promoters, and Employees other than Related Parties

Schedule V - Property and Equipment

Schedule VI - Accumulated Depreciation, Depletion and Amortization of Property and Equipment

Schedule VIII - Valuation and Qualifying Accounts

Schedule X - Supplementary Income Statement Information

All other schedules for which provision is made in the applicable accounting regulations of the Securities and Exchange Commission are not required under the related instructions or are inapplicable and, therefore, have been omitted.

(B)      EXHIBITS

Exhibits filed as part of this Report are listed in the EXHIBIT INDEX appearing on Pages 26 and 27 of this Report.

```
                              -23-
<PAGE>    26
<TABLE>
(C)        REPORTS ON FORM 8-K

           The only reports on form 8-K filed by the Company during the fiscal
           quarter ended October 2, 1994 are the following are the following:

<CAPTION>
          Date of Report                      Items Reported
          --------------                      --------------
          <S>                                 <C>
          August 23, 1994                     Pursuant to Item 1 of form 8-K, the C
                                              to be aquired pursuant to the terms o
                                              dated August 23, 1994 (the "Merger Ag
                                              Inc. and GRR Aquisition Corporation.


          November 16, 1994                   Pursuant to Item 1 of Form 8-K, the C
                                              into the First Amendment to the Merge

</TABLE>
```

```
                              -24-
<PAGE>    27
```

SIGNATURES

Pursuant to the requirement of Section 13 or 15(d) of the Securities Exchange
Act of 1934, as amended, the Registrant has duly caused this Report to be
signed on its behalf by the undersigned, thereunto duly authorized, on the 14th
day of December, 1994.

                    GROUND ROUND RESTAURANTS, INC.
                    (Registrant)

                    By: /s/ Michael R. Jorgensen
                        ------------------------
                        Michael R. Jorgensen
                        Senior Vice President, Chief Financial
                        Officer and Treasurer
                        (Principal Financial and Accounting
                         Officer)

```
<TABLE>
```
Pursuant to the requirement of the Securities Exchange Act of 1934, as amended,
this report has been signed below by the following persons on behalf of the
Registrant in the capacities and on the dates indicated.

```
<CAPTION>
```

```
SIGNATURE                        TITLE
- - ---------                    -----
<S>                              <C>
/s/ Michael P. O'Donnell         Chairman of the Board, President,
- - -----------------------          and Chief Executive Officer
Michael P. O'Donnell


/s/ Michael R. Jorgensen         Senior Vice President, Chief Financial
- - -----------------------          Officer and Treasurer
Michael R. Jorgensen             (Principal Financial and
                                  Accounting Officer)


/s/ J. Eric Hanson               Director
- - -----------------
J. Eric Hanson

/s/ Robert E. Lee                Director
- - -----------------
Robert E. Lee

/s/ David J. P. Meachin          Director
- - -----------------------
David J. P. Meachin

/s/ Stanley J. Moss              Director
- - -------------------
Stanley J. Moss

/s/ Thomas J. Russo              Director
- - -------------------
Thomas J. Russo

/s/ Daniel R. Scoggin            Director
- - ----------------------
Daniel R. Scoggin
</TABLE>
```

-25-

```
<PAGE>   28
<TABLE>
                         EXHIBIT INDEX


<CAPTION>
Exhibit No.      Description
- - -----------      -----------
<S>              <C>
   2.1           Agreement and Plan of Merger dated August 23, 1994
                 (the "Merger Agreement") among the Company, GRR, Inc.
                 and GRR Acquisition Corporation.

   2.2           First Amendment dated November 16, 1994 to Merger
                 Agreement.

   3.1           Restated Certificate of Incorporation of the Company filed
                 pursuant to Rule 102(c) of Regulation S-T, which integrates
                 the Company's 1991 Restated Certificate of Incorporation
```

and the 1994 amendment thereto.

3.2        Amended and Restated By-laws of the Company
           (incorporated by reference to the Company's
           Quarterly Report on Form 10-Q for the quarter ended
           March 29, 1992).

*10.31     Agreement between Michael P. O'Donnell and the
           Company dated April 21, 1992 (incorporated by
           reference to the Company's Annual Report on
           Form 10-K for the year ended September 27, 1992).

10.32      Amended and Restated Credit Agreement, dated
           as of October 8, 1993, among The Ground Round,
           Inc. and GR of Minn., Inc., as Borrowers, and
           The Bank of New York, as agent, and the banks
           parties thereto (including certain exhibits)
           (incorporated by reference to the Company's
           Annual Report on Form 10-K for the year ended
           October 3, 1993).

*10.33     1992 Equity Incentive Plan (incorporated by reference
           to the Company's definitive Proxy Statement for its
           Annual Meeting of Shareholders held on March 10, 1992).

*10.34     1994 Corporate Office Incentive Plan (incorporated by
           reference to the Company's Annual Report on Form
           10-K for the year ended October 3, 1993).

*10.35     Agreement between Michael P. O'Donnell and the
           Company dated July 26, 1994.

*10.36     Agreement between Peter J. Beaudrault and the
           Company dated July 26, 1994.
</TABLE>

                              -26-

<PAGE>   29
<TABLE>
<CAPTION>
Exhibit No.        Description
- - ----------       -----------
<S>                <C>
*10.37     Agreement between Michael R. Jorgensen and
           the Company dated July 26, 1994.

*10.38     Agreement between William C. Schoener and
           the Company dated July 26, 1994.

21         List of Subsidiaries.

23         Consent of Ernst & Young.

24         Power of Attorney.
<FN>

Asterisk (*) denotes management contract or compensatory plan or arrangement.

</TABLE>

-27-

<PAGE>    30

REPORT OF INDEPENDENT AUDITORS

To the Shareholders and Board of Directors
Ground Round Restaurants, Inc.

We have audited the accompanying consolidated balance sheets of Ground Round
Restaurants, Inc. as of October 2, 1994 and October 3, 1993, and the related
consolidated statements of income, stockholders' equity, and cash flows for
each of the three years in the period ended October 2, 1994. Our audits also
included the financial statement schedules listed in the Index at Item 14(a).
These financial statements and schedules are the responsibility of the
Company's management. Our responsibility is to express an opinion on these
financial statements and schedules based on our audits.

We conducted our audits in accordance with generally accepted auditing
standards. Those standards require that we plan and perform the audit to
obtain reasonable assurance about whether the financial statements are free of
material misstatement. An audit includes examining, on a test basis, evidence
supporting the amounts and disclosures in the financial statements. An audit
also includes assessing the accounting principles used and significant
estimates made by management, as well as evaluating the overall financial
statement presentation. We believe that our audits provide a reasonable basis
for our opinion.

In our opinion, the consolidated financial statements referred to above present
fairly, in all material respects, the consolidated financial position of Ground
Round Restaurants, Inc. at October 2, 1994 and October 3, 1993, and the
consolidated results of its operations and its cash flows for each of the three
years in the period ended October 2, 1994, in conformity with generally
accepted accounting principles. Also, in our opinion, the related financial
statement schedules, when considered in relation to the basic financial
statements taken as a whole, present fairly in all material respects the
information set forth therein.

                                              ERNST & YOUNG LLP


Boston, Massachusetts
November 1, 1994
except for Note L, as to which
the date is November 16, 1994


-28-

<PAGE>    31