<TABLE>

GROUND ROUND RESTAURANTS, INC.
CONSOLIDATED BALANCE SHEETS
AS OF OCTOBER 2, 1994 AND OCTOBER 3, 1993
(Dollars in thousands, except per share amounts)

<CAPTION>

|  | 1994 |
|---|---|
| <S> | <C> |
| ASSETS: | |
| Current assets: | |
| Cash and cash equivalents | $ 1,457 |
| Receivables, net of allowances for doubtful accounts of $276 in 1994 and $95 in 1993 | 1,511 |
| Inventories | 2,577 |
| Prepaid expenses and other current assets | 2,249 |
| | -------- |
| Total current assets | 7,794 |
| | |
| Property and equipment: | |
| Land | 11,203 |
| Buildings and leasehold improvements | 120,034 |
| Machinery and equipment | 39,867 |
| | --------- |
| | 171,104 |
| Accumulated depreciation and amortization | 43,531 |
| | --------- |
| Property and equipment, net | 127,573 |
| Other assets | 21,405 |
| | --------- |
| | $156,772 |
| | ========= |
| | |
| LIABILITIES AND STOCKHOLDERS' EQUITY: | |
| Current liabilities: | |
| Accounts payable | $ 7,107 |
| Accrued expenses | 14,900 |
| Income taxes | 201 |
| Current portion of long-term debt and capital lease obligations | 902 |
| | -------- |
| Total current liabilities | 23,110 |
| | |
| Long-term debt and capital lease obligations | 57,868 |
| Deferred income taxes | 3,080 |
| Other long-term liabilities | 7,678 |
| | |
| STOCKHOLDERS' EQUITY: | |
| Preferred Stock, undesignated, par value $100 per share; authorized 30,000 shares; none issued | |
| Common Stock, par value $.16 2/3 per share: authorized 35,000,000 shares in 1994 and 15,000,000 shares in 1993; issued 11,114,000 in 1994 and 11,099,000 shares in 1993 | 1,852 |
| Additional paid-in capital | 57,631 |
| Accumulated earnings (deficit) | 5,649 |
| | -------- |
| | 65,132 |
| Deferred Officer Compensation | (96) |
| | -------- |
| Total stockholders' equity | 65,036 |
| | -------- |

                                                              $156,772
                                                              ========

</TABLE>

See notes to consolidated financial statements.

                                    F-1

<PAGE>    32
<TABLE>
                        GROUND ROUND RESTAURANTS, INC.
                       CONSOLIDATED STATEMENTS OF INCOME
                   (Dollars in thousands, except per share amounts)

<CAPTION>

| | 52 WEEKS ENDED OCTOBER 2, 1994 | 53 WEEKS ENDED OCTOBER 3, 1993 |
|---|---|---|
| | ---- | ---- |
| <S> | <C> | <C> |
| REVENUE | $243,971 | $232,556 |
| | -------- | -------- |
| | | |
| COSTS AND EXPENSES: | | |
| Cost of products sold | 202,819 | 193,707 |
| Selling, general and administrative | 15,370 | 15,923 |
| Depreciation and amortization | 13,507 | 11,205 |
| Interest expense | 4,091 | 4,031 |
| Other (income) expense | (1,002) | (145) |
| | -------- | -------- |
| | 234,785 | 224,721 |
| | -------- | -------- |
| | | |
| Net income before income taxes | 9,186 | 7,835 |
| | | |
| Income taxes | 2,940 | 2,507 |
| | -------- | -------- |
| | | |
| NET INCOME | $  6,246 | $  5,328 |
| | ======== | ======== |
| | | |
| Weighted average common shares outstanding | 11,109 | 11,086 |
| | ======== | ======== |
| | | |
| PER SHARE DATA: | | |
| | | |
| Net income per common share | $    .56 | $    .48 |
| | ======== | ======== |

</TABLE>

See notes to consolidated financial statements.

                                    F-2

<PAGE>    33
<TABLE>
                        GROUND ROUND RESTAURANTS, INC.

CONSOLIDATED STATEMENTS OF STOCKHOLDERS' EQUITY
(Dollars and shares in thousands)

<CAPTION>

| | SHARES | | | ADDITIONAL | ACCUMULATED | |
| | COMMON STOCK | TREASURY STOCK | COMMON STOCK | PAID-IN CAPITAL | EARNINGS (DEFICIT) | TREAS STOC |
| --- | --- | --- | --- | --- | --- | --- |
| <S> | <C> | <C> | <C> | <C> | <C> | <C> |
| BALANCE AT SEPTEMBER 29, 1991 | 11,082 | (18) | $1,847 | $57,427 | $(10,571) | $(13 |
| Net income | | | | | 4,646 | |
| BALANCE AT SEPTEMBER 27, 1992 | 11,082 | (18) | 1,847 | 57,427 | (5,925) | (13 |
| Issuance of restricted shares from treasury stock | | 18 | | | | 13 |
| Issuance of restricted shares | 12 | | 2 | 142 | | |
| Amortization of deferred officer compensation | | | | | | |
| Converted stock options | 5 | | 1 | 3 | | |
| Net income | | | | | 5,328 | |
| BALANCE AT OCTOBER 3, 1993 | 11,099 | 0 | 1,850 | 57,572 | (597) | |
| Amortization of deferred officer compensation | | | | | | |
| Converted stock options | 15 | | 2 | 59 | | |
| Net income | | | | | 6,246 | |
| BALANCE AT OCTOBER 2, 1994 | 11,114 | 0 | $1,852 | $57,631 | $ 5,649 | $ |

</TABLE>

See notes to consolidated financial statements

F-3

<PAGE>   34
<TABLE>

GROUND ROUND RESTAURANTS, INC.
CONSOLIDATED STATEMENTS OF CASH FLOWS
(Dollars in thousands)

<CAPTION>

| | 52 WEEKS ENDED OCTOBER 2, 1994 |
| --- | --- |
| <S> | <C> |
| CASH FLOWS FROM OPERATING ACTIVITIES: | |
| Net income | $  6,246 |
| Adjustments to reconcile net income to net cash provided by operating activities: | |
| Depreciation and amortization | 13,851 |
| Deferred income taxes | 336 |
| Write-off of deferred debt costs | 572 |
| Loss (gain) on disposition of assets | (1,574) |
| Other, net | 92 |
| Return of insurance deposits | 4,690 |

```
Change in operating assets and liabilities:
  Accounts receivable                                        (152)
  Inventories and prepaid expenses                         (1,468)
  Accounts payable and accrued expenses                      (218)
                                                          -------
      Net cash provided by operating activities           22,375
                                                          -------


CASH FLOWS FROM INVESTING ACTIVITIES:
Purchase of property and equipment                        (22,437)
Proceeds from sale of property and equipment                4,378
Purchase of liquor licenses                                  (681)
Proceeds from sale of liquor license
Deposits received (paid)                                     (217)
Notes receivable and working capital loan collections         130
Pre-opening costs and related items                          (988)
                                                          -------
      Net cash used in investing activities               (19,815)
                                                          -------


CASH FLOWS FROM FINANCING ACTIVITIES:
Proceeds from long-term borrowings                         28,800
Payments of long-term borrowings                          (29,813)
Payments of deferred debt costs                            (1,413)
Proceeds from issuance of common stock                         61
                                                          -------
      Net cash provided by (used in) financing activities  (2,365)
                                                          -------


NET INCREASE (DECREASE) IN CASH                               195

Cash at beginning of period                                 1,262
                                                          -------
Cash at end of period                                 $     1,457
                                                          =======


SUPPLEMENTAL CASH FLOW INFORMATION:
Interest paid                                         $     3,458
Taxes paid                                                  2,339
</TABLE>
```

See notes to consolidated financial statements.

F-4

<PAGE>    35

GROUND ROUND RESTAURANTS, INC.
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
For the years ended October 2, 1994 and October 3, 1993 and September 27, 1992

A.    SIGNIFICANT ACCOUNTING POLICIES

BASIS OF PRESENTATION:  The consolidated financial statements include the
accounts of Ground Round Restaurants, Inc. (the Company), and its wholly-owned
subsidiaries.  All significant intercompany accounts and transactions have been
eliminated in consolidation.  The Company operates and franchises
family-oriented, full-service restaurants primarily in the Northeast,

Mid-Atlantic and Midwest United States.

The fiscal year of the Company is the 52 or 53 week period ending on the Sunday closest to September 30th. For purposes of these notes to the consolidated financial statements, the 52 week fiscal year ended October 2, 1994, the 53 week fiscal year ended October 3, 1993, and the 52 week fiscal year ended September 27, 1992, are referred to as 1994, 1993, and 1992, respectively.

Certain items in prior years in specific captions of the accompanying consolidated financial statements and notes to the consolidated financial statements have been reclassified for comparative purposes.

CASH EQUIVALENTS: Cash equivalents consist of highly liquid investments with maturities of three months or less when purchased, and are carried at cost which approximates fair value.

INVENTORIES: Inventories are stated at the lower of cost or market, as determined by the first-in, first-out (FIFO) cost method.

PROPERTY AND EQUIPMENT: Property and equipment are recorded at cost. Depreciation and amortization, including amortization of assets recorded under capital leases, are computed principally by the straight-line method, based on estimated useful lives. Useful lives range from 33 years for buildings, 10 years for machinery and equipment and the shorter of the lease term or estimated useful life for leasehold improvements.

DEFERRED DEBT COSTS: Deferred debt costs, included in other assets, are costs associated with the issuance of long-term debt and are amortized over the terms of the related instruments.

DEFERRED PRE-OPENING COSTS: Pre-opening costs consist of incremental amounts directly associated with opening a new restaurant. These costs, which principally include initial purchases of expendables and expenses of the restaurant staff, hired to operate the restaurant upon opening, for the training period before the restaurant opens, are capitalized and amortized over the twelve month period following the restaurant opening. Prior to 1994, the Company amortized the costs over the 24 month period following the restaurant opening. The change did not have a material effect on the Company's results of operations.

INTANGIBLE ASSETS: Intangible assets included in other assets consist of the excess of the cost of acquired companies over the values assigned to net tangible assets and primarily represent fair values assigned to trade names, goodwill, liquor licenses and franchises. These intangibles are being amortized by the straight-line method over lives ranging between 15 and 40 years.

ACCRUED INSURANCE CLAIMS: The Company maintains insurance coverage for workers' compensation risks under contractual arrangements which retroactively adjust premiums for claims paid subject to specified limitations. In addition, the Company is self insured up to certain limits for risks associated with the health care plan provided for its employees. Expenses associated with such risks are accrued based upon the estimated amounts required to cover incurred incidents. The Company does not provide health or other benefits to retirees.

F-5

<PAGE>   36
INCOME TAXES: On September 28, 1992 the Company adopted Statement of Financial Accounting Standards (SFAS) No. 109, Accounting for Income Taxes. In fiscal

1992, the Company provided for income taxes following the provisions of SFAS No. 96. The cumulative effect of this accounting change on the provision for income taxes in 1993 was not significant.

OTHER LONG-TERM LIABILITIES: Other long-term liabilities comprise various reserves including reserves for casualty insurance coverage and restaurant closings.

FRANCHISE REVENUE: Initial franchise fees of $40,000 new franchises are recognized as revenue when substantially all commitments and obligations have been fulfilled, which is generally when the restaurant opens. The terms of franchise agreements are generally twenty years and provide for a continuing franchise royalty fees equal to 3% of monthly gross sales. The franchise agreements also provide that franchisees are required to pay up to 2% of monthly gross sales for advertising. Franchise and royalty fees included in revenues aggregated $2,192,000, $2,539,000 and $2,418,000 for 1994, 1993 and 1992, respectively.

<TABLE>
B.    OTHER ASSETS

Other assets consist of the following:
<CAPTION>

|  | 1994 | 1993 |
|---|---|---|
|  | (In thousands) | |
| <S> | <C> | <C> |
| Deferred debt acquisition costs | $ 3,172 | $ 2,331 |
| Deferred pre-opening costs | 2,735 | 1,747 |
| Franchises | 4,696 | 4,796 |
| Goodwill | 4,166 | 4,166 |
| Liquor licenses | 4,662 | 3,981 |
| Tradename | 3,073 | 3,073 |
| Prepaid insurance | 3,871 | 2,999 |
| Other | 409 | 318 |
|  | 26,784 | 23,411 |
| Less accumulated amortization | 5,379 | 3,674 |
|  | $21,405 | $19,737 |

</TABLE>

Other assets were net of allowances for doubtful accounts of $307,000 and $352,000 at October 2, 1994 and October 3, 1993, respectively.

<TABLE>
C.    PREPAID AND ACCRUED EXPENSES

Accrued expenses consist of the following:
<CAPTION>

|  | 1994 | 1993 |
|---|---|---|
|  | (In thousands) | |
| <S> | <C> | <C> |
| Casualty insurance | $ 2,336 | $ 2,620 |
| Occupancy costs | 2,747 | 3,292 |
| Payroll and payroll related expenses | 5,273 | 6,025 |
| Sales taxes | 1,319 | 1,303 |
| Other | 3,225 | 1,865 |

```
                                                 -------              -------
                                                 $14,900              $15,105
                                                 =======              =======
```

</TABLE>

Prepaid expenses and other current assets of $2,249,000 at October 2, 1994 and
$6,413,000 at October 3, 1993 included prepaid casualty insurance costs of
$1,510,000 and $5,656,000, respectively.

<PAGE>    37

<TABLE>
D.        LONG-TERM DEBT AND LEASE OBLIGATIONS

Long-term debt and capitalized lease obligations consist of the following:

<CAPTION>

|  |  | 1994 | |
|---|---|---|---|
|  |  | ---- | |
|  |  |  | (In thousands) |
| <S> |  | <C> | <C |
| Amended Credit Agreement dated |  |  | $ |
| October 8, 1993: |  |  |  |
| Tranche A Term |  | $36,641 |  |
| Tranche A Revolving |  | 2,100 |  |
| Tranche B Term |  | 14,220 |  |
| Other |  |  |  |
| Capitalized lease obligations @ 5% to 15% |  | 5,809 |  |
|  |  | ------- | --- |
|  |  | 58,770 |  |
| Less current portion |  | 902 |  |
|  |  | ------- | --- |
|  |  | $57,868 | $ |
|  |  | ======= | === |

</TABLE>

The Company had an amended credit agreement dated April 26, 1992 with a
syndicate of banks consisting of (a) a term facility in the original amount of
$44,000,000 expiring on October 15, 1997, (b) a growth facility in an amount up
to $25,000,000 and (c) a working capital facility in an amount of up to
$10,000,000.  Interest on each of these facilities was, at the option of the
Company, payable at a spread over the prime rate or Eurodollar rate.  The
spread, in each case, was subject to adjustment based on the Company's ratio of
free operating cash flow to debt.

On October 8, 1993 the Company and a majority of its lenders along with certain
new banks, amended the agreement dated April 26, 1992.  The Amended and
Restated Credit Agreement ("Amended Agreement") provides the Company with
$70,000,000 that is comprised of the following:  Tranche A Term borrowings of
$37,953,000, at prime plus .5% to .875% or LIBOR plus 1.125% to 1.625%,
depending on the funded debt to free operating cash flow ratio, with payments
commencing on October 8, 1995 (the "Conversion Date") and payable through
January 1999;  Tranche A Revolving facility of up to $16,348,000 ($2,100,000
outstanding at October 2, 1994, none outstanding at October 3, 1993), at prime
plus .5% to .875% or LIBOR plus 1.125% to 1.625%, depending on the funded debt
to free operating cash flow ratio, which converts to term on the Conversion
Date and is then payable through January 1999;  and Tranche B Term borrowings
of $15,000,000 at prime plus .875% or LIBOR plus 2.25% with payments commencing
in April 1999 and a final maturity of July 2000.  The interest rates under the

Amended Agreement at October 2, 1994 on Tranche A Term, Tranche A Revolving, and Tranche B Term were 6.06%, 7.75% and 6.94%, respectively.

The Amended Agreement also contains certain financial covenants, including maintenance of minimum interest and fixed charge coverage ratios, cash flow ratios, minimum levels of net worth and maximum leverage ratios. Provisions of the Amended Agreement restricting the payment of dividends would prevent the Company from paying dividends during the term of the Amended Agreement.

<TABLE>
Maturities of long-term debt for the years succeeding October 2, 1994 are as follows:

<CAPTION>

|  | (In thousands) |
| --- | --- |
| <S> | <C> |
| 1995 | $ 0 |
| 1996 | 7,361 |
| 1997 | 9,879 |
| 1998 | 13,443 |
| 1999 | 13,746 |
| Thereafter | 8,532 |

</TABLE>

F-7

Interest expense for 1994, 1993 and 1992 as presented has been reduced by interest income of $171,000, $248,000 and $379,000, respectively.
<PAGE>   38
Principal payments may be accelerated due to additional payments based upon excess cash flow from operations, the sale of certain assets and the offering proceeds from the sale of stock of the Company. Pursuant to the Amended Agreement, certain commitment and facility fees are payable based upon the borrowing levels.

During 1994, the Company entered into two interest rate cap agreements in the aggregate of $15,000,000 expiring during fiscal 1995. The fixed interest rates on these contracts at October 2, 1994 ranged from 5.5% to 7%. During 1993, the Company had outstanding a $10,000,000 interest rate swap agreement which expired in fiscal 1994, and a $15,000,000 interest cap agreement expiring in fiscal year 1995 to exchange LIBOR based interest payments for fixed rate payments. The fixed rate interest rates on these contracts at October 3, 1993 were 8.725% and 7% on the swap and cap agreements, respectively. The interest rate differential is recognized over the lives of the agreements as an adjustment to interest expense. The amount included in the financial statements for outstanding debt and the related swap agreements approximates fair value.

The Company occupies certain of its real estate under long-term leases, substantially all of which contain renewal options. Most of these leases provide for a percentage rental based on sales and, in most cases, require a minimum annual rental.

<TABLE>
A summary of property leased under capital leases is as follows:
<CAPTION>

|  | 1994 | | 1993 |
| --- | --- | --- | --- |
|  | ---- | | ---- |
|  |  | (In thousands) | |
| <S> | <C> | | <C> |

| | | |
|---|---|---|
| Real Estate | $9,353 | $10,204 |
| Equipment | 456 | 456 |
| | ------ | ------- |
| | 9,809 | 10,660 |
| Less accumulated amortization | 5,107 | 4,446 |
| | ------ | ------- |
| | $4,702 | $ 6,214 |
| | ====== | ======= |

</TABLE>

The above amounts represent the present value of future minimum lease payments at the inception of the leases, excluding that portion of the lease payments representing estimated insurance and tax cost.  Leases capitalized also exclude that portion of the minimum lease payments attributable to land.  Lease amortization is included in depreciation expense.

<TABLE>
Future minimum lease payments under noncancelable leases as of October 2, 1994 for each of the following years are as follows:

<CAPTION>

| | CAPITAL LEASES | OPERATING LEASES |
|---|---|---|
| | ------ | ------ |
| | (In thousands) | |
| <S> | <C> | <C> |
| 1995 | $1,462 | $ 5,825 |
| 1996 | 1,420 | 5,283 |
| 1997 | 1,248 | 4,729 |
| 1998 | 1,104 | 5,106 |
| 1999 | 981 | 3,417 |
| Thereafter | 1,640 | 24,241 |
| | ------ | ------- |
| Total minimum payments | 7,855 | $48,601 |
| Amount representing interest | 2,046 | ======= |
| | ------ | |
| Present value of net minimum payments | 5,809 | |
| Current portion of capital lease obligations | 902 | |
| | ------ | |
| Long-term capital lease obligations | $4,907 | |
| | ====== | |

</TABLE>

Minimum obligations for noncancelable operating leases have been reduced by minimum noncancellable operating sublease rentals of $397,000.

F-8

<PAGE>  39
Rent expense under operating leases for continuing operations was $8,280,000, $7,623,000 and $7,087,000 for 1994, 1993 and 1992, respectively.  Rent expense includes contingent rental expense for capital and operating leases of $2,373,000, $2,424,000 and $2,532,000 for 1994, 1993 and 1992, respectively.

E.    STOCKHOLDERS' EQUITY

The 1992 Equity Incentive Plan, approved by the shareholders of the Company, authorizes the granting of various options and rights to purchase 350,000 shares of common stock of the Company.  Incentive stock options cannot be issued at less than fair market value whereas the exercise price of nonqualified stock options is specified by the Compensation Committee.

Furthermore, the number of shares available for grant is reduced by shares that are issued or are issuable under the 1987 and 1982 stock option plans.

<TABLE>
The following is a summary of stock option transactions during 1994, 1993 and 1992:

<CAPTION>

|  | SHARES |  |
|---|---|---|
| <S> | <C> | <C> |
| Options outstanding September 29, 1991 | 146,000 | $3. |
| Granted | 391,000 | $4. |
| Cancelled | (60,000) | $3. |
|  | -------- |  |
| Options outstanding at September 27, 1992 | 477,000 | $3. |
| Granted | 304,000 | $7. |
| Cancelled | (77,000) | $3. |
|  | -------- |  |
| Options outstanding at October 3, 1993 | 704,000 | $3. |
| Granted | 19,000 | $6. |
| Cancelled | (95,000) | $4. |
|  | -------- |  |
| Options outstanding at October 2, 1994 | 628,000 | $3. |
|  | ======= | === |

</TABLE>

As of October 2, 1994, options to purchase 628,000 shares of Common Stock were exercisable, options to purchase 195,000 shares of Common Stock were available for future grants and 823,000 shares of Common Stock were reserved for issuance. In December of 1991 the exercise price of previously issued options to purchase 113,000 shares of Common Stock were adjusted downward to reflect the distribution of the Company's non-restaurant operations in September 1991.

On February 2, 1993 the Compensation Committee of the Board of Directors authorized 30,000 shares of restricted stock to be offered to Michael P. O'Donnell, Chairman of the Board, President, and Chief Executive Officer. These shares, valued at $274,000 at issuance, are subject to forfeiture and transfer restrictions over the three years following issuance. At the completion of each year of service subsequent to the issuance date, forfeiture restrictions are released on 10,000 shares. An aggregate amount of $178,000 has been recorded as compensation expense through fiscal 1994.

F-9

<PAGE>   40
<TABLE>
F.   INCOME TAXES

The provision for income taxes for continuing operations computed under SFAS No. 96 in 1992 and SFAS No. 109 in 1993 and 1994, consists of the following:
<CAPTION>

|  | 1994 | 1993 | 1992 |
|---|---|---|---|
|  | ---- | ---- | ---- |
|  |  | (In thousands) |  |

| <S> | <C> | <C> | <C> |
|---|---|---|---|
| Current: | | | |
| Federal | $2,344 | $1,574 | $1,457 |
| State | 260 | 226 | 305 |
| | ------ | ------ | ------ |
| | 2,604 | 1,800 | 1,762 |
| Deferred: | | | |
| Federal | 298 | 654 | 932 |
| State | 38 | 53 | 152 |
| | ------ | ------ | ------ |
| | $2,940 | $2,507 | $2,846 |
| | ====== | ====== | ====== |

</TABLE>

<TABLE>
The reasons for the difference between total tax expense and the amount computed by applying the statutory federal income tax rate to income from continuing operations are as follows:

<CAPTION>

| | 1994 | 1993 | 199 |
|---|---|---|---|
| | ---- | ---- | --- |
| | | (In thousands) | |
| <S> | <C> | <C> | <C> |
| Taxes at statutory rate applied to pretax income from continuing operations | $3,123 | $2,664 | $2,54 |
| Increases (reductions) in tax resulting from: | | | |
| State income taxes | 197 | 184 | 30 |
| Targeted jobs tax credits | (499) | (232) | (15 |
| FICA tax credits | (422) | | |
| Other | 541 | (109) | 15 |
| | ------ | ------ | ----- |
| | $2,940 | $2,507 | $2,84 |
| | ====== | ====== | ===== |

</TABLE>

<TABLE>
Deferred income taxes reflect the net tax effects of temporary differences between the carrying amounts of assets and liabilities for financial reporting purposes and the amounts used for income tax purposes. Significant components of the Company's deferred tax liabilities and assets at October 2, 1994 and October 3, 1993 are as follows:

<CAPTION>

| | October 2, 1994 | | |
|---|---|---|---|
| | (In thousands) | | |
| | ASSETS | LIABILITIES | TOTAL |
| | ------ | ----------- | ----- |
| <S> | <C> | <C> | <C> |
| Current: | | | |
| Vacation pay | $ 200 | | $ 200 |
| Accounts receivable | 151 | | 151 |
| Other deductible (income) amounts | 42 | $(72) | (30) |
| Less valuation allowance | (321) | | (321) |
| | ------ | ----- | ----- |
| | $ 72 | $(72) | $ 0 |
| | ------ | ----- | ----- |

</TABLE>

```
                                        F-10
<PAGE>    41
<TABLE>
<CAPTION>
                                                                          O

                                                                   ASSETS
                                                                   ------
                       <S>                                         <C>
                       Noncurrent:
                          Credits                                  $ 2,285
                          Depreciation                               1,101
                          Lease obligations                          2,358
                          Accrued insurance                          2,640
                          Closed location reserve                      704
                          Amortization
                          Land
                          Other deductible (income amounts)
                          Less valuation allowances                 (4,718)
                                                                   -------
                                                                   $ 4,370
                                                                   -------
                                                                   $ 4,442
                                                                   =======

</TABLE>


<TABLE>
<CAPTION>
                                                                          O

                                                                   ASSETS
                                                                   ------
                       <S>                                         <C>
                       Current:
                          Credits                                  $300
                          Vacation pay                              224
                          Accounts receivable                       65
                          Other deductible (income) amounts         25
                          Less valuation allowance                 (410)
                                                                   ----
                          Total current                            $204
                                                                   ----

</TABLE>


<TABLE>
<CAPTION>
                                                                   ASSETS
                                                                   ------
                       <S>                                         <C>
                       Noncurrent:
                          Credits                                  $ 1,376
                          Depreciation                                535
                          Lease obligations                          1,431
                          Accrued insurance                          1,561
                          Closed location reserve                      493
                          Other deductible (income amounts)            614
```

```
                  Less valuation allowances                          (4,629)
                                                                    --------
            Total noncurrent                                        $ 1,381
                                                                    --------
            Total current and noncurrent                           $ 1,585
                                                                   ===========
```

</TABLE>

<TABLE>
Deferred income tax provision (benefit) from continuing operations under SFAS
No. 96 consisted of the following:

<CAPTION>


                      <S>
                      Accrued insurance
                      Lease obligations
                      Depreciation
                      Notes and accounts receivable
                      Closed location reserve
                      Other


</TABLE>                            F-11

<PAGE>   42
A valuation allowance has been provided for those deferred tax assets for which
management believes it is more likely than not that the tax benefit will not be
realized.   As of October 2, 1994 the Company had approximately $1,231,000 of
alternative minimum tax credit carryforwards for federal tax purposes,
approximately $298,000 of targeted jobs tax credits, approximately $640,000 of
FICA tax credits, and $17,000 of foreign tax credits which expire on various
dates through 2009.   The Company also had a 1991 net operating loss
carryforward of $1,710,000 at the end of 1991 that was utilized in 1992.

G.   RETIREMENT BENEFITS

The Company sponsors a qualified defined contribution pension plan which covers
substantially all full-time eligible employees.  Employees may contribute up to
10% of earnings on an after tax basis which are matched by the Company based
upon years of participation in the plan up to a maximum of 3%.   Defined
contribution expense for the Company was $221,000, $240,000 and $260,000 for
1994, 1993 and 1992, respectively.

The Company also sponsors a non-qualified deferred compensation plan for key
management employees.  An employee can defer up to 10% of eligible compensation
which will be matched by the Company up to 3%.   The Company may also make
discretionary matching contributions between 25% and 100% of each employee's
deferred compensation between 3% and 10%.   In addition, a rate of return,
determined in advance by the Company, will be credited each year to the
employee's account.   The funds are invested at the discretion of the company.
Deferred compensation expense for the Company was $112,000, $97,000 and $95,000
for 1994, 1993 and 1992, respectively.   Except as set forth above, the Company
has no liability for health or other benefits to retirees.

H.   COST OF PRODUCTS SOLD
<TABLE>

Cost of products sold comprises the following:

| <CAPTION> | 1994 |
|---|---|
| <S> | <C> |
| Food and beverage costs | $ 76,949 |
| Labor costs | 76,845 |
| Other costs | 49,025 |
| | -------- |
| | $202,819 |
| | ======== |

</TABLE>

I.  OTHER INCOME

During 1994, the Company completed a sale of one location for approximately
$2.0 million and realized a pretax gain of approximately $1.5 million.  This
gain was partially offset by the write-off of $.6 million in expenses
associated with a proposed public offering of convertible subordinated
debentures which the Company withdrew due to market conditions.

<TABLE>
J.  QUARTERLY FINANCIAL DATA (UNAUDITED)

The following is a summary of unaudited quarterly consolidated results of
operations for 1994, 1993 and 1992:

| <CAPTION> | JANUARY 2 | APRIL 3 |
|---|---|---|
| 1994: | --------- | ------- |
| | | (In thousands |
| <S> | <C> | <C> |
| Revenue | $62,199 | $59,885 |
| Gross Profit | 10,731 | 9,400 |
| Net Income | 1,534 | 1,554 |
| Per share data: | | |
| Net income | .14 | .14 |

</TABLE>

F-12

<PAGE>   43
<TABLE>

| <CAPTION> | JANUARY 3 | APRIL 4 |
|---|---|---|
| 1993: | --------- | ------- |
| | | (In thousand |
| <S> | <C> | <C> |
| Revenue | $62,231 | $56,389 |
| Gross Profit | 10,729 | 9,423 |
| Net Income | 1,427 | 1,227 |
| Per share data: | | |
| Net Income | .13 | .11 |

</TABLE>
<TABLE>

| <CAPTION> | DECEMBER 29 | MARCH 2 |
|---|---|---|
| 1992: | ----------- | ------- |
| | | (In thousands |

```
<S>                                          <C>         <C>
Revenue                                   $54,395     $57,237
Gross Profit                                9,688       9,776
Net Income                                  1,128       1,156
Per share data:
     Net Income                               .10         .10
</TABLE>
```

K.    LITIGATION

The Company has been named in a number of separate claims brought by former employees alleging that the Company engaged in discriminatory practices based on age, race, sex or disability.  Plaintiffs maintaining claims of employment discrimination, such as those being brought against the Company, generally are entitled to have their claims tried by a jury and such claims may result in punitive damage awards.  Most of the proceedings against the Company are still in the discovery phase.  Management believes that the discrimination claims against the Company are without merit and the Company is actively defending the claims.

L.    SUBSEQUENT EVENT

On August 23, 1994 the Company announced that it had entered into a definitive merger agreement with a private investor group to include 399 Ventures, Inc., certain key members of management and various financial institutions.  The merger agreement is subject to receipt of financing and shareholder approval, and provides that the Company's shareholders will receive $9 in cash for each share of common stock.  In connection with the merger, the Company plans to repay all amounts outstanding under its Amended Agreement as described in Note D.  On November 16, 1994, the Company announced that it had agreed to extend until January 31, 1995 the termination date of the Merger Agreement in order to allow the acquiror more time to arrange financing for the transaction.  The Company anticipates holding a special meeting of shareholders to consider and act on a proposal to approve and adopt the merger in the second quarter of fiscal 1995.  Management does not expect that the resolution of these matters will have a material adverse effect on the consolidated financial position of the Company.

                                    F-13

```
<PAGE>    44
<TABLE>                                                    SCHEDULE II
```

                   GROUND ROUND RESTAURANTS, INC.
          AMOUNTS RECEIVABLE FROM RELATED PARTIES, UNDERWRITERS,
             PROMOTERS AND EMPLOYEES OTHER THAN RELATED PARTIES
                          (Dollars in thousands)

```
<CAPTION>                                   BALANCE
                                                         -----
                                          BEGINNING       AMOUN
```

| NAME OF DEBTOR | OF PERIOD | ADDITIONS | COLLE |
|---|---|---|---|
| - - -------------- | --------- | --------- | - |
| <S> | <C> | <C> | <C> |
| YEAR ENDED OCTOBER 2, 1994 | | | |
| Rodrigues-Perrett Corporation, 10% interest bearing note | $ 135 | $ --- | $ - |
| YEAR ENDED OCTOBER 3, 1993: | | | |
| Rodrigues-Perrett Corporation, 10% interest bearing note | $ --- | $ 135 | $ - |
| YEAR ENDED SEPTEMBER 27, 1992: | | | |
| HSA Properties, Inc., non-interest bearing accounts receivable | $ 141 | $ --- | $ 141 |

</TABLE>


F-14

<PAGE>   45

<TABLE>                                                    SCHEDULE V


GROUND ROUND RESTAURANTS, INC.
PROPERTY AND EQUIPMENT
(Dollars in thousands)


<CAPTION>

| CLASSIFICATION | BALANCE BEGINNING OF PERIOD | ADDITIONS AT COST | RETIREME |
|---|---|---|---|
| - - -------------- | --------- | ------- | ---- |
| <S> | <C> | <C> | <C> |
| YEAR ENDED OCTOBER 2, 1994: | | | |
| Land | $ 11,434 | $ --- | $ |
| Buildings | 106,869 | 15,920 | 2, |
| Machinery & equipment | 35,439 | 6,185 | 1, |
| | -------- | -------- | ---- |
| | $153,742 | $22,105 | $4, |
| | ======== | ======== | ==== |
| YEAR ENDED OCTOBER 3, 1993: | | | |
| Land | $ 11,434 | $ --- | $ |
| Buildings | 92,406 | 14,727 | |
| Machinery & equipment | 27,434 | 9,128 | 1, |
| | -------- | -------- | ------ |
| | $131,274 | $23,855 | $1, |
| | ======== | ======== | ==== |

```
YEAR ENDED SEPTEMBER 27, 1992:
            Land                        $ 11,281        $   153        $
            Buildings                     85,582          7,143
            Machinery & equipment         23,768          5,458            1,
                                        --------        --------       -----
                                        $120,631        $12,754         $2,
                                        ========        ========       ====
```

<FN>



(a)  Reclassification of assets.
(b)  Sale of assets.

</TABLE>


                                    F-15

<PAGE>   46

<TABLE>                                                SCHEDULE VI

                        GROUND ROUND RESTAURANTS, INC.
            ACCUMULATED DEPRECIATION, DEPLETION AND AMORTIZATION OF
                            PROPERTY AND EQUIPMENT
                            (Dollars in thousands)


<CAPTION>

| CLASSIFICATION | BALANCE BEGINNING OF PERIOD | ADDITIONS AT COST | RETIREMENTS |
|---|---|---|---|
| <S> | <C> | <C> | <C> |
| YEAR ENDED OCTOBER 2, 1994: | | | |
|    Buildings | $20,823 | $ 7,189 | $   910 |
|    Machinery & equipment | 12,388 | 4,935 | 894 |
| | $33,211 | $12,124 | $1,804 |
| YEAR ENDED OCTOBER 3, 1993: | | | |
|    Buildings | $15,125 | $ 6,116 | $   419 |
|    Machinery & equipment | 8,636 | 4,150 | 398 |
| | $23,761 | $10,266 | $   817 |
| YEAR ENDED SEPTEMBER 27, 1992: | | | |
|    Buildings | $ 9,677 | $ 5,645 | $   206 |
|    Machinery & equipment | 6,593 | 3,663 | 1,625 |
| | $16,270 | $ 9,308 | $1,831 |

```
                                    ========    ========    ======
<FN>



(a)  Reclassification of assets.
(b)  Sale of assets.


</TABLE>



                              F-16

<PAGE>   47

<TABLE>                                          SCHEDULE VIII
                      GROUND ROUND RESTAURANTS, INC.
                      VALUATION AND QUALIFYING ACCOUNTS
                          (Dollars in thousands)


<CAPTION>
                                         BALANCE
                                         BEGINNING            ADDITIONS CHARGED T
                                         OF PERIOD   COST        OTHE
DESCRIPTION                              ---------   ----
- - -----------
<S>                                      <C>         <C>         <C>
YEAR ENDED OCTOBER 2, 1994:
        Allowances deducted from assets
        to which they apply:
            For doubtful accounts        $   447     $140        $---


YEAR ENDED OCTOBER 3, 1993:
        Allowances deducted from assets
        to which they apply:
            For doubtful accounts        $1,270      $ 51        $---


YEAR ENDED SEPTEMBER 27, 1992:
        Allowances deducted from assets
        to which they apply:
            For doubtful accounts        $2,006      $276        $100
<FN>



(a)  Reclassification of reserve.
(b)  Write-off in connection with uncollectible account.
(c)  Recoveries.


</TABLE>
```

F-17

`<PAGE>   48`

`<TABLE>`                                                           SCHEDULE X

GROUND ROUND RESTAURANTS, INC.
SUPPLEMENTARY INCOME STATEMENT INFORMATION
(Dollars in thousands)

`<CAPTION>`
ITEM                                        CHARGED TO COSTS AND EXPENSES
- - ----                                    ------------------------------

| | 1994 | 1993 | 1992 |
|---|---|---|---|
| | ---- | ---- | ---- |
| `<S>` | `<C>` | `<C>` | `<C>` |
| Maintenance and repairs | $ 7,566 | $7,416 | $7,342 |
| Advertising | 1,013 | 204 | 2,025 |
| Taxes other than payroll and income taxes | 2,699 | 2,860 | 2,740 |

`</TABLE>`

Depreciation and amortization of intangible assets, restaurant development
costs and similar deferrals and royalties are not scheduled above since each of
these items does not exceed one percent of total revenues.

F-18

`</TEXT>`
`</DOCUMENT>`
`<DOCUMENT>`
`<TYPE>EX-2.1`
`<SEQUENCE>2`
`<DESCRIPTION>AGREEMENT & PLAN OF MERGER`
`<TEXT>`

`<PAGE>   1`

EXHIBIT 2.1

APPENDIX A
----------

Agreement and Plan of Merger

by and among

Ground Round Restaurants, Inc.,

GRR, Inc.

and

GRR Acquisition Corp.

dated as of

August 23, 1994

<PAGE>    2

AGREEMENT AND PLAN OF MERGER

AGREEMENT AND PLAN OF MERGER, dated as of August 23, 1994 ("Agreement" or "Merger Agreement"), by and among GRR, Inc., a Delaware corporation ("Parent"), GRR Acquisition Corp., a New York corporation and a wholly owned subsidiary of Parent ("Purchaser"), and Ground Round Restaurants, Inc., a New York corporation (the "Company").

ARTICLE I
THE MERGER

1.1    Merger.
       ------

1.1.1    MERGER.  Subject to the terms and conditions hereof and in accordance with the applicable provisions of the New York Business Corporation Law (the "NYBCL"), (a) Purchaser will be merged with and into the Company at the Effective Time (as defined in Section 1.1.2) and the separate corporate existence of Purchaser will thereupon cease (the "Merger") and (b) each of the Company and Parent will use its best efforts to cause the Merger to be consummated as soon as practicable after satisfaction, or waiver if permitted, of the conditions hereof.

1.1.2    EFFECTIVE TIME.  As soon as practicable following fulfillment or waiver of the conditions specified in Article V, and provided that this Agreement has not been terminated pursuant to Section 6.1, the Company and Purchaser (the "Constituent Corporations") will cause a Certificate of Merger (the "Certificate of Merger") to be filed with the Secretary of State of the State of New York as provided in Section 904 of the NYBCL.  The Merger will become effective at the time that the Certificate of Merger has been filed with the Secretary of State of the State of New York in accordance with Section 104 of the NYBCL (the "Effective Time").

1.1.3    EFFECT OF MERGER.  The Company will be the surviving corporation in the Merger (sometimes hereinafter referred to as the "Surviving Corporation"), and the separate corporate existence of Purchaser will cease. The Certificate of Incorporation (the "Certificate") and the By-laws (the "By-laws") of the Company in effect at the Effective Time will be amended at the Effective Time by incorporating the language from Purchaser's certificate of incorporation and by-laws, which by-laws shall contain the provisions required by Section 4.6.1.  The directors of Purchaser immediately prior to the Effective Time will be the directors of the Surviving Corporation, and unless the Company and Parent otherwise agree, the officers of Purchaser immediately

prior to the Effective Time will be the officers of the Surviving Corporation, from and after the Effective Time, to serve in accordance with the NYBCL and the terms of the Surviving Corporation's certificate of incorporation and by-laws.  The consummation of the Merger will have the effects provided in the NYBCL with respect to mergers of two domestic corporations.

1.1.4  CONVERSION OF SHARES.  At the Effective Time, (a) each then-outstanding share of Company common stock, par value $.16-2/3 per share (a "Share"), not owned by
<PAGE>    3
Parent, Purchaser or any other direct or indirect subsidiary of Parent and other than any Shares held in the treasury of the Company and Dissenting Shares, as defined in Section 1.6, will be cancelled and retired and will be converted into a right only to receive in cash an amount per Share in U.S. dollars equal to nine dollars ($9.00) (the "Merger Price"), (b) each then-outstanding Share owned by Parent, Purchaser or any other direct or indirect subsidiary of Parent will be cancelled and retired, and no payment will be made with respect thereto, (c) each Share issued and held in the Company's treasury will be cancelled and retired, and no payment will be made with respect thereto, and (d) each then-outstanding share of common stock of Purchaser will be converted into and become a share of common stock of the Surviving Corporation, which thereafter will constitute all of the issued and outstanding shares of capital stock of the Surviving Corporation.

1.2     CONSUMMATION OF THE MERGER.  The closing of the Merger (the "Closing") will take place (a) at the Boston offices of Nutter, McClennen & Fish as promptly as practicable after the later of (i) the day of (and immediately following) adoption and approval of this Agreement by the Company's shareholders and (ii) the day on which the last of the conditions set forth in Article V hereof is satisfied or, if permitted, duly waived, or (b) at such other time and place and on such other date as Purchaser and the Company may agree.

1.3     PAYMENT FOR SHARES.  Purchaser will authorize the depositary for the Offer (or one or more commercial banks organized under the laws of the United States or any state thereof with capital, surplus and undivided profits of at least $100,000,000) to act as Paying Agent hereunder with respect to the Merger (the "Paying Agent").  Each holder (other than Parent, Purchaser or any other direct or indirect subsidiary of Parent) of a certificate or certificates which prior to the Effective Time represented outstanding Shares will be entitled to receive, upon surrender to the Paying Agent of such certificate or certificates for cancellation and subject to any required withholding of taxes, the aggregate amount of cash into which the Shares previously represented by such certificate or certificates will have been converted in the Merger.  Immediately prior to the Closing, Parent and Purchaser will make available to the Paying Agent sufficient funds to make all payments pursuant to the immediately preceding sentence, and the Paying Agent shall certify to the Company receipt of such funds.  Pending payment of such funds to the holders of Shares, such funds shall be held and invested by the Paying Agent as Parent directs.  Any net profit resulting from, or interest or income produced by, such investments will be payable to the Surviving Corporation or Parent, as Parent directs.  Parent will promptly replace any monies lost through any investment made pursuant to this Section 1.4.  Following the Effective Time, each certificate which immediately prior to the Effective Time represented outstanding Shares (other than Dissenting Shares and Shares owned by Parent, Purchaser or any other direct or indirect subsidiary of Parent) will be deemed for all corporate purposes to evidence only the right to receive upon such surrender the aggregate amount of cash into which the Shares represented thereby will have been converted in the Merger as set forth in Section 1.1.4, subject to any required withholding of taxes.  No interest will be paid on the

cash payable upon the surrender of the certificates.  Any cash delivered or
made available to the Paying Agent pursuant to this Section 1.4 and not
exchanged for certificates representing Shares

-2-

<PAGE>   4
within one hundred eighty (180) days after the Effective Time will be returned
by the Paying Agent to the Surviving Corporation which thereafter will act as
Paying Agent, subject to the rights of holders of unsurrendered certificates
representing Shares under this Article I, and any former shareholders of the
Company who have not theretofore complied with the instructions for exchanging
their certificates representing Shares will thereafter look only to the
Surviving Corporation for payment of their claim for the consideration set
forth in Section 1.1, without any interest thereon, but will have no greater
rights against the Surviving Corporation (or either Constituent Corporation)
than may be accorded to general creditors thereof under applicable law.
Notwithstanding the foregoing, neither the Paying Agent nor any party hereto
will be liable to a holder of Shares for any cash or interest thereon delivered
to a public official pursuant to applicable abandoned property laws.  Promptly
after the Effective Time (but in any event no later than the next business day
after the Effective Time), the Paying Agent will mail to each record holder of
certificates which immediately prior to the Effective Time represented Shares
(the "Certificates") a form of letter of transmittal (the "Transmittal Letter")
and instructions for use thereof in surrendering such Certificates which will
specify that delivery will be effected, and risk of loss and title to the
Certificates will pass, only upon proper delivery of the Certificates to the
Paying Agent in accordance with the terms of delivery specified in the
Transmittal Letter and instructions for use thereof in surrendering such
Certificates and receiving the Merger Price for each Share previously
represented thereby.

          1.4     CLOSING OF THE COMPANY'S TRANSFER BOOKS.  At the Effective
Time, the stock transfer books of the Company will be closed and no transfer of
Shares will thereafter be made.  If, after the Effective Time, Certificates are
presented to the Surviving Corporation, they will be cancelled, retired and
exchanged for cash as provided in Section 1.3, subject to applicable law in the
case of Dissenting Shares.

          1.5     STOCK OPTIONS AND RELATED MATTERS.  Immediately prior to the
Effective Time, each outstanding stock option (a "Company Option") granted
under the Company's 1989 Stock Option Plan or 1992 Equity Incentive Plan
(collectively referred to as the "Option Plans"), whether or not then
exercisable, shall be cancelled by the Company and each holder of a cancelled
Company Option shall be entitled to receive from the Company, in cancellation
and settlement of the Company Option, an amount equal to the product of (i) the
number of Shares previously subject to the Company Option and (ii) the excess,
if any, of the Merger Price over the exercise price per Share previously
subject to the Company Option (the "Option Consideration").  Unless on at least
five (5) business days' advance notice Purchaser requests and the holder of a
Company Option agrees for no consideration to either amend or terminate such
Company Option effective as of the Effective Time, as of the Effective Time,
each holder of a Company Option will be entitled to receive only an amount
equal to the applicable Option Consideration.

          1.6     DISSENTERS' RIGHTS.  Notwithstanding anything in this
Agreement seemingly to the contrary, any Shares which are issued and

outstanding immediately prior to the Effective Time and which are held by
shareholders of the Company who have not voted such Shares in

-3-

<PAGE>    5

favor of the adoption of this Agreement and who have delivered a written demand
for the payment of the fair cash value of such Shares in the manner provided in
Section 623 of the NYBCL ("Dissenting Shares") will not be converted as
described in Section 1.1.4 but will thereafter constitute only the right to
receive payment of the fair cash value of such Shares in accordance with the
provisions of Section 623 of the NYBCL; PROVIDED, HOWEVER, that (i) if any
holder of Dissenting Shares subsequently withdraws such holder's demand for
payment of the fair cash value of such Shares, (ii) if any holder fails to
comply with such Section 623, or (iii) if the Surviving Corporation and any
holder of Dissenting Shares have not come to an agreement as to the fair cash
value of such holder's Dissenting Shares, and neither such holder of Dissenting
Shares nor the Surviving Corporation has filed or joined in a petition
demanding a determination of the value of all Dissenting Shares within the
period provided in Section 623 of the NYBCL, the right of each such holder to
receive such fair cash value will terminate, and upon the expiration of the
rights of such holder pursuant to Section 623 of the NYBCL, such Shares will
thereupon be deemed to have been extinguished and to have been converted, as of
the Effective Time, into the right to receive the Merger Price, without
interest. Persons who have perfected statutory rights with respect to
Dissenting Shares as aforesaid will not be paid by the Surviving Corporation as
provided in this Agreement and will have only such rights as are provided by
Section 623 of the NYBCL with respect to such Shares. Notwithstanding anything
in this Agreement to the contrary, if Parent or Purchaser abandons or is
finally enjoined or prevented from carrying out this Agreement, the right of
each holder of Dissenting Shares to receive the fair cash value of such
Dissenting Shares in accordance with Section 623 of the NYBCL will terminate,
effective as of the time of such abandonment, injunction, prevention or
rescission.

ARTICLE II
REPRESENTATIONS AND WARRANTIES OF PARENT AND PURCHASER

Parent and Purchaser hereby jointly and severally represent and
warrant to the Company that:

2.1    ORGANIZATION. Parent is a corporation duly organized, validly
existing and in good standing under the laws of its jurisdiction of
organization and has all requisite power and authority to own, lease and
operate its properties and assets and to carry on its business as it is now
being conducted. Purchaser is a corporation duly organized, validly existing
and in good standing under the laws of its jurisdiction of incorporation and
has all requisite corporate power and authority to own, lease and operate its
properties and assets and to carry on its business as it is now being
conducted. Parent is the sole legal and beneficial owner of all of the
outstanding capital stock of Purchaser.

2.2    AUTHORITY. Each of Parent and Purchaser has the requisite
power and authority to execute and deliver this Agreement and to consummate the
transactions contemplated hereby. The execution and delivery of this Agreement
and the consummation of the transactions contemplated hereby have been duly
approved by each of the Boards of Directors of Parent and Purchaser and by
Parent as the sole shareholder of Purchaser and no

-4-

&lt;PAGE&gt;   6

other proceedings on the part of Parent or Purchaser are necessary to
consummate the transactions so contemplated.  This Agreement has been duly
executed and delivered by each of Parent and Purchaser and constitutes a valid
and binding obligation of each of Parent and Purchaser, enforceable against
Parent and Purchaser in accordance with its terms.

　　　　2.3     MERGER PROXY STATEMENT.  None of the information supplied in
writing by Parent, Purchaser or any other affiliate of Purchaser expressly for
inclusion in any proxy or information statement of the Company required to be
mailed to the Company's shareholders in connection with the Merger (the "Merger
Proxy Statement"), or in any amendments or supplements thereto, will, at the
time of (a) the first mailing thereof and (b) the meeting of shareholders to be
held in connection with the Merger, contain any untrue statement of a material
fact or omit to state any material fact required to be stated therein or
necessary in order to make the statements therein, in light of the
circumstances under which they were made, not misleading.

　　　　2.4     FEES.  Neither Parent nor Purchaser nor any other direct or
indirect subsidiary of Parent has paid or become obligated to pay any fee or
commission to any broker or finder in connection with the transactions
contemplated hereby.

　　　　2.5     CONSENTS AND APPROVALS; NO VIOLATION.  Neither the execution
and delivery of this Agreement by Parent and Purchaser nor the consummation by
Parent and Purchaser of the transactions contemplated hereby will (a) conflict
with, or result in any breach or violation of, any provision of their
respective certificates of incorporation or by-laws (or comparable governing
instruments), or (b) violate, conflict with, breach, constitute a default (or
an event which, with notice or lapse of time or both, would constitute a
default) under, or result in the termination of, or accelerate the performance
required by, or result in the creation of any lien or other encumbrance upon
any of the properties or assets of Parent or any of its subsidiaries under, any
of the terms, conditions or provisions of any note, bond, mortgage, indenture,
deed of trust, license, lease, agreement or other instrument or obligation to
which Parent or any such subsidiary is a party or to which they or any of their
respective properties or assets are subject, except for such violations,
conflicts, breaches, defaults, terminations, accelerations or creations of
liens or other encumbrances, that, individually or in the aggregate, will not
have a material adverse effect on the business or financial condition of Parent
and its subsidiaries, taken as a whole, or (c) require any consent, approval,
authorization or permit of or from, or filing with or notification to, any
court, governmental authority or other regulatory or administrative agency or
commission, domestic or foreign ("Governmental Entity"), except (i) pursuant to
the Securities Exchange Act of 1934, as amended, and the rules and regulations
thereunder (the "Exchange Act"), (ii) filing the Certificate of Merger, (iii)
filings under the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as
amended (the "HSR Act"), or (iv) consents, approvals, authorizations, permits,
filings or notifications which, if not obtained or made, will not have a
material adverse effect, individually or in the aggregate, on the business or
financial condition of Parent and its subsidiaries, taken as a whole.

-5-

&lt;PAGE&gt;   7

　　　　2.6     FINANCING.  The letter from Bear Stearns & Co. Inc. ("Bear
Stearns") dated August 22, 1994 and set forth as SCHEDULE 2.6(A) (the "Bear
Stearns Letter") regarding (i) up to one hundred million dollars ($100,000,000)
of senior unsecured notes (the "Senior Note Financing") and (ii) up to forty
million dollars ($40,000,000) of subordinated discount notes (the "Discount

Note Letter" and "Discount Note Financing") has not been withdrawn, amended, modified or qualified as of the date hereof.  The letter from 399 Ventures, Inc. dated August 22, 1994 and set forth as SCHEDULE 2.6(B) (the "399 Ventures Letter") regarding certain equity and subordinated debt financing (the "Parent Financing") has not been withdrawn, amended, modified or qualified as of the date hereof.

ARTICLE III
REPRESENTATIONS AND WARRANTIES OF THE COMPANY

The Company hereby represents and warrants to each of Parent and Purchaser that, except as otherwise disclosed to Parent and Purchaser prior to the execution hereof:

3.1    CORPORATE ORGANIZATION.  The Company and each of its subsidiaries is a corporation duly organized, validly existing and in good standing under the laws of its state of incorporation and is in good standing as a foreign corporation in each jurisdiction where failure to so qualify or be in good standing is reasonably likely to have a material adverse effect on the business or financial condition of the Company and its subsidiaries, taken as a whole.  The Company and each of its subsidiaries has the requisite corporate power to own, lease and operate their respective properties and assets and to carry on their respective businesses as they are now being conducted.  The subsidiaries listed on SCHEDULE 3.1 are all of the subsidiaries of the Company, and each subsidiary listed on SCHEDULE 3.1 is a direct or indirect wholly owned subsidiary of the Company.  The Company has filed with the Securities and Exchange Commission (the "Commission") pursuant to the Exchange Act true and correct copies of its Certificate and By-laws, as amended to the date hereof. The Company's Certificate and By-laws as so filed are in full force and effect.

3.2    CAPITALIZATION.  As of the date hereof, the authorized capital stock of the Company consists of (i) 35,000,000 Shares and (ii) 30,000 shares of Cumulative Preferred Stock, par value $100 per share ("Preferred Shares"). As of the close of business on the date hereof, (a) 11,113,269 Shares were issued and outstanding, (b) no Preferred Shares were issued and outstanding and (c) Company Options to purchase an aggregate of 628,461 Shares were outstanding pursuant to the Option Plans.  All issued and outstanding Shares are validly issued, fully paid and nonassessable and are not subject to preemptive rights. Since the close of business on the date hereof, the Company has not issued any additional Shares or any Preferred Shares other than pursuant to the exercise of Company Options, has not granted any additional Company Options, and has not modified outstanding Company Options, except as expressly contemplated in this Agreement.  As of the date hereof, except for Shares and Preferred Shares, there are no shares of capital stock of the Company authorized, issued or outstanding, and except for the Company Options, there are no outstanding subscriptions, options, warrants, puts, calls, rights, convertible securities,

-6-

<PAGE>   8
exchangeable securities or any other agreements or commitments of any character relating to the issued or unissued capital stock or other securities of the Company obligating the Company to issue, deliver or sell, or cause to be issued, delivered or sold, additional shares of capital stock of the Company or obligating the Company to grant, extend or enter into any subscription, option, warrant, right, convertible security or other similar agreement or commitment, except as disclosed on SCHEDULE 3.2.  There are no voting trusts or other

agreements or understandings to which the Company or, to best of the Company's knowledge, any other person is a party with respect to the voting of the capital stock of the Company, except as disclosed on SCHEDULE 3.2. There are no stock appreciation rights, phantom stock or other similar arrangements or understandings to which the Company is a party.

3.3    AUTHORITY. The Company has the requisite corporate power and authority to execute and deliver this Agreement and, except for any required vote of the Company's shareholders, to consummate the transactions contemplated hereby. The execution, delivery and performance of this Agreement and the consummation of the transactions contemplated hereby have been duly approved by the Board of Directors of the Company and no other corporate proceedings on the part of the Company are necessary to authorize the execution and delivery of this Agreement or to consummate the transactions so contemplated, subject to the extent required with respect to the consummation of the Merger, to the adoption and approval of this Agreement by the shareholders of the Company. This Agreement has been duly executed and delivered by, and constitutes a legal, valid and binding obligation of, the Company, enforceable against the Company in accordance with its terms.

3.4    CONSENTS AND APPROVALS; NO VIOLATION. Neither the execution, delivery nor performance of this Agreement by the Company nor the consummation by the Company of the transactions contemplated hereby will (a) conflict with, violate, result in any breach, termination, acceleration or violation of any obligation under, or constitute a default under, any provision of the Certificate or By-laws, or (b) violate, conflict with, breach, constitute a default (or an event which, with notice or lapse of time or both, would constitute a default) under, or result in the termination of, or accelerate the performance required by, or result in the creation of any lien or other encumbrance upon any of the properties or assets of the Company under, any of the terms, conditions or provisions of any note, bond, mortgage, indenture, deed of trust, license, lease, agreement or other instrument or obligation to which the Company or any of its subsidiaries is a party or to which they or any of their respective properties or assets are subject, except for such violations, conflicts, breaches, defaults, terminations, accelerations or creations of liens or other encumbrances that, individually or in the aggregate, will not have a material adverse effect on the business or financial condition of the Company and its subsidiaries, taken as a whole, or that are described on SCHEDULE 3.4, or (c) require any consent, waiver, approval, authorization or permit of or from, or filing with or notification to, any Governmental Entity, except (i) pursuant to the Exchange Act, (ii) filing the Certificate of Merger, (iii) filings under the HSR Act, (iv) consents, approvals, waivers, authorizations, permits, filings or notifications which, if not obtained or made will not have a material adverse effect, individually or in the aggregate, on the business or

-7-

<PAGE>  9
financial condition of the Company and its subsidiaries, taken as a whole, or (v) as disclosed on SCHEDULE 3.4 hereto.

3.5    COMMISSION FILINGS AND FINANCIAL STATEMENTS. The Company has heretofore filed all reports, registration statements and other documents including, without limitation, any financial statements and schedules included therein, with the Commission required to be filed with the Commission under the rules and regulations of the Commission since September 29, 1991 (the "SEC Documents"). The SEC Documents (a) did not (as of their respective filing dates) contain any untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary in order to make the statements made therein, in light of the circumstances under which they were

made, not misleading and (b) complied as to form in all material respects with the requirements of the Securities Act of 1933, as amended (the "Securities Act"), and the Exchange Act, as applicable. The audited and unaudited consolidated financial statements, together with the notes thereto, of the Company included (or incorporated by reference) in the SEC Documents complied in all material respects with Commission requirements as of the respective dates thereof and fairly presented the financial position of the Company and its consolidated subsidiaries, in each case as of the dates thereof, and the results of their operations and changes in financial position for the periods then ended in accordance with, and have been prepared in accordance with, generally accepted accounting principles applied on a consistent basis (except as stated in such financial statements), subject, in the case of the unaudited financial statements, to year-end adjustments and to the disclaimers contained in footnote 1 to the financial statements contained in the Company's Quarterly Reports on Form 10-Q previously filed with the Commission.

3.6    GOVERNMENTAL AUTHORIZATIONS. The Company and each of its subsidiaries has all licenses, permits, approvals, and other authorizations (collectively, "Governmental Authorizations") from all Governmental Entities as are necessary for the conduct of its business and operations, except for Governmental Authorizations where the failure to obtain such would not have a material adverse effect, either individually or in the aggregate, on the Company's consolidated financial condition or business, and all Governmental Authorizations which the Company or any of its subsidiaries has are in full force and effect and are not subject to any material condition, qualification or limitation. Neither the Company nor any of its subsidiaries has received any notification from any agency, department or instrumentality (or the staff thereof) of any Governmental Entity asserting noncompliance in any material respect with any of the laws, rules, regulations or orders that such governmental authority enforces or threatening to revoke any Governmental Authorization.

3.7    OWNED REAL ESTATE. Except as disclosed in the SEC Documents filed prior to the date of this Agreement, the Company or one of its subsidiaries has good, clear and marketable title to all the properties and assets either reflected in the latest audited balance sheet included in such SEC Documents as being owned by the Company or one of its subsidiaries or acquired after the date thereof, which are material to the Company's business on a consolidated basis (except properties sold or otherwise disposed of since the date thereof

-8-

<PAGE>   10
in the ordinary course of business), free and clear of all claims, liens, charges, security interests or encumbrances of any nature whatsoever, except (i) as set forth on SCHEDULE 3.7, (ii) statutory liens securing payments not yet due and (iii) such imperfections or irregularities in title or such claims, liens, charges, security interests or encumbrances as do not materially affect the use of the properties or assets subject thereto or affected thereby or otherwise materially affect the Company's business operations at such properties.

3.8    REAL ESTATE LEASES. SCHEDULE 3.8 hereof sets forth a list of (a) all leases and subleases under which the Company or its subsidiaries is lessor or lessee of any real property together with all amendments, supplements, nondisturbance agreements and other agreements that are in effect as of the date of this Agreement; (b) all material options held by the Company or its subsidiaries or contractual obligations on the part of the Company or its subsidiaries to purchase or acquire any interest in real property; and (c) all options granted by the Company or its subsidiaries or contractual

obligations on the part of the Company or its subsidiaries to sell or dispose of any material interest in real property.  There exists no default or event of default, violation, occurrence, condition or act on the part of the Company or any subsidiary, or, to the best knowledge of the Company, on the part of any other party thereto, which, with or without the giving of notice or lapse of time or both, would have a material adverse effect upon the condition (financial or otherwise), properties, assets, business, results of operations or prospects of the Company and its subsidiaries, taken as a whole.  The Company has not granted any liens on any of the leasehold interests set forth on SCHEDULE 3.8 except for (i) liens reflected in the balance sheet included in the July 3, 1994 Form 10-Q, (ii) liens consisting of zoning or planning restrictions, easements, permits and other restrictions or limitations on the use of real property which do not materially detract from the value of, or materially impair the use of, such property by the Company or its subsidiaries in the operation of their respective businesses, (iii) liens for current taxes, assessments or governmental charges or levies on property not yet delinquent, (iv) statutory liens securing payments not yet due and (v) liens which do not materially affect the operation of the business of the Company and any subsidiaries, taken as a whole, or as may be set forth on SCHEDULE 3.8.

      3.9    COMPLIANCE WITH LAWS.  The Company and its subsidiaries have complied with and are not in violation of applicable federal, state or local statutes, laws and regulations, including, without limitation, any applicable building, zoning, health, sanitation, safety, labor relations or other law, ordinance or regulation, other than violations, if any, which would not have a material adverse effect on the condition (financial or otherwise), properties, assets, business, results of operations or prospects of the Company and its subsidiaries, taken as a whole.  Neither the Company nor any subsidiary has failed to obtain any license, permit, franchise or other governmental authorization which is applicable to its respective operations, except for licenses, permits, franchises or other governmental authorizations the failure of which to obtain would not have a material adverse effect on the condition (financial or otherwise), properties, assets, business, results of operation or prospects of the Company and its subsidiaries, taken as a whole.

                                     -9-
<PAGE>   11
      3.10   ENVIRONMENTAL PROTECTION.  There are no pending or, to the best knowledge of the Company, threatened, actions or claims against the Company or any of its current or, to the best knowledge of the Company, former subsidiaries arising out of the presence or release into the environment of any chemicals, pollutants or contaminants related to the operations of the Company or its current or former subsidiaries or arising in connection with any of the properties owned by them or as to which the Company or any subsidiary or former subsidiary of the Company is or could be a potentially responsible party under applicable law, except for such matters which would not have a material adverse effect on the condition (financial or otherwise), properties, assets, business, results of operation or prospects of the Company and its subsidiaries, taken as a whole.

      3.11   NO UNDISCLOSED LIABILITIES.  There is no liability or obligation of the Company or any subsidiary of any nature, whether absolute, accrued, contingent or otherwise, which, individually or in the aggregate, is material to the Company and its subsidiaries, taken as a whole, other than (i) the liabilities and obligations reflected on the balance sheet contained in the July 3, 1994 Form 10-Q and (ii) all liabilities and obligations of the Company incurred since July 3, 1994 in the ordinary course of business.  There is no prepayment premium with respect to any of the Company's outstanding indebtedness for borrowed money.

3.12    FEES.  Except as described on SCHEDULE 3.12 hereto, neither the Company nor any of its subsidiaries has paid or become obligated to pay any fee or commission to any broker or finder in connection with the transactions contemplated hereby.

3.13    ABSENCE OF MATERIAL ADVERSE CHANGES.  Since July 3, 1994, neither the Company nor any of its subsidiaries has undergone or suffered any changes in its condition (financial or otherwise), properties, assets, business, results of operations or prospects which have been, or may reasonably be anticipated to be, individually or in the aggregate, adverse to the Company, except for such changes which, individually or in the aggregate, would not have a material adverse effect on the condition (financial or otherwise), properties, assets, business or results of operation of the Company and its subsidiaries, taken as a whole.

3.14    FAIRNESS OPINION.  The Board of Directors of the Company has received an opinion from Smith Barney Inc. ("Smith Barney") to the effect that, as of the date hereof, the Merger Price is fair, from a financial point of view, to the holders of the Shares (the "Fairness Opinion").

3.15    SHAREHOLDER AGREEMENT.  A majority of the members of the Company's Board of Directors that have not been designated by HM Holdings, Inc. ("HMH") have taken all action necessary to approve, including in accordance with Section 3.2(b) of that certain Stockholder Agreement between HMH and the Company dated as of August 1, 1991, (i) HMH's grant of an option and irrevocable proxy to Parent and Purchaser pursuant to that Shareholder Agreement by and among Parent, Purchaser and HMH dated as of the date hereof and as set forth as SCHEDULE 3.15 (the "Shareholder Agreement") and (ii) the

-10-

<PAGE>    12
performance by HMH of its obligations under the terms and conditions of the Shareholder Agreement in effect as of the date hereof.

ARTICLE IV
COVENANTS

4.1    CONDUCT OF THE BUSINESS OF THE COMPANY PRIOR TO THE EFFECTIVE TIME.  The Company agrees that, prior to the Effective Time and except as described on SCHEDULE 4.1, otherwise consented to or approved in writing by Purchaser or expressly permitted by this Agreement:

(a)  the businesses of the Company and its subsidiaries shall be conducted in all material respects only in, the Company and its subsidiaries shall not take any action except in, and the Company and its subsidiaries shall maintain their facilities in, the ordinary course of business and consistent with immediate past practice;

(b)  the Company shall not (i) amend its Certificate or By-Laws, (ii) issue or sell any securities (including any options, warrants, convertible or exchangeable securities, stock appreciation rights, phantom stock or similar rights) or otherwise change the number of authorized, issued or outstanding shares of its capital stock other than the issuance of Shares upon exercise of any Company Options, (iii) declare, set aside or pay any dividend or other distribution or payment (whether in cash, stock or property) with respect to, or make any direct or indirect redemption, retirement, purchase or other acquisition of any shares of capital stock or

options issued by, the Company (except as contemplated by Section 1.5); or (iv) enter into any arrangement or contract with respect to the purchase or voting of shares of its capital stock, or adjust, split, combine or reclassify any of its capital stock or other securities;

(c)   the Company shall, and shall cause each of its subsidiaries to, (i) use its best efforts to preserve intact its business organization and operations, keep available the services of its operating personnel, and preserve the goodwill of those having business relationships with each of them, (ii) make whatever repairs and maintenance that may be necessary to maintain their properties in substantially their present condition and (iii) conduct relations with its employees, including, without limitation, termination and hiring practices, only in the ordinary course of business and consistent in all material respects with immediate past practice; PROVIDED, however, that any inability of the Company or any of its subsidiaries to keep available the services of such operating personnel or to maintain any such business relationship despite its aforesaid best efforts to do so shall not constitute a breach of this Section 4.1(c);

-11-

<PAGE>   13

(d)   the Company or any of its subsidiaries will not, directly or indirectly, (i) increase the compensation payable or to become payable by it to any of its officers, directors or employees (except increases for non-officer employees in the ordinary course of business consistent in all material respects with immediate past practice or as required by collective bargaining agreements), (ii) make any payment or provision (except as required by existing plans or agreements, disclosed on SCHEDULE 4.1(d) or contemplated by Section 1.5) with respect to, or adopt or amend, any bonus, profit sharing, pension, retirement, severance (including "golden parachutes"), deferred compensation, employment or other payment plan, agreement or arrangement for the benefit of employees of the Company or any of its subsidiaries, (iii) grant any stock options or stock appreciation rights, (iv) enter into or amend any employment or consulting agreement, except that nothing contained in this clause (iv) shall prohibit the Company from terminating a consulting agreement with any person who is not a senior management employee of the Company, (v) make any loan or advance to, or enter into any written contract, lease or commitment with, any officer or director of the Company or its subsidiaries, other than routine advances to employees in the ordinary course of business and consistent in all material respects with immediate past practice, (vi) encumber or pledge any of the respective assets of the Company or any of the subsidiaries, or make any acquisition of assets or securities, except in the ordinary course of business and consistent in all material respects with immediate past practice, (vii) incur any long-term or short-term debt for borrowed money from any bank or lending institution, except pursuant to existing credit agreements in the ordinary course of business and consistent in all material respects with immediate past practice, (viii) assume, guarantee, endorse or otherwise become responsible for the obligations of any other individual, firm or corporation or make any loans or advances to any individual, firm or corporation, except in the ordinary course of business and consistent in all material respects with immediate past practice, (ix) enter into any contract or agreement or effect any transaction or commitment relating to the assets or business (including the acquisition or disposition of any