substantial assets) of the Company or relinquish any contract or other right which, in each case, is material to the Company, other than the transactions, commitments and relinquishments disclosed on SCHEDULE 4.1 or contemplated by this Agreement, (x) enter into any material new leases for real property or terminate any of the lease agreements identified on SCHEDULE 3.8 except in the ordinary course of business and consistent in all material respects with immediate past practice or (xi) make any loan, or make any distribution or other transfer of assets to or from the Company or any of its subsidiaries from or to any shareholder or Affiliate (which term for purposes of this Agreement shall have the meaning set forth in Rule 405 of the Commission promulgated under the Securities Act) of the Company or of any subsidiary, except for any distribution or transfer to or from the Company or any of its wholly owned subsidiaries from or to any wholly owned subsidiary;

        (e)  the Company shall use its best efforts to cause its current insurance (or reinsurance) policies not to be cancelled or terminated or any of the coverage

<div align="center">-12-</div>

&lt;PAGE&gt; 14

thereunder to lapse, unless simultaneously with such termination, cancellation or lapse replacement policies providing coverage substantially similar to the coverage under the cancelled, terminated or lapsed policies for substantially similar premiums are in full force and effect; or

        (f)  authorize or enter into an agreement to do any of the things not permitted under this Section 4.1.

Notwithstanding the foregoing, the Company may incur costs, expenses, obligations or liabilities in connection with any Qualifying Acquisition Proposal (as defined in Section 4.9) including, without limitation, costs, expenses, obligations or liabilities incurred in the prosecution of, or defense against, any cause of action related thereto or any costs, expenses, obligations or liabilities incurred from activities permitted by Section 4.9.

    4.2  ACCESS AND INFORMATION.  The Company will afford to Parent and its agents, accountants, representatives and representatives of its potential financing sources such access during normal business hours throughout the period prior to the Effective Time to the Company's properties, contracts, commitments, books, records, personnel and to such other information concerning its business as Parent reasonably requests.  Parent shall, and shall cause each of its agents, accountants and representatives of its potential financing sources to,  hold in confidence all such non-public information in accordance with the provisions of the Letter Agreement between Smith Barney Inc., as agent for the Company, and Parent, dated June 21, 1994 (the "Letter Agreement"), and if this Agreement is terminated, Parent and its agents, accountants and representatives of its potential financing sources shall redeliver or otherwise provide for all such information and other materials as required pursuant to the Letter Agreement.

    4.3  CERTAIN FILINGS, CONSENTS AND ARRANGEMENTS.  Parent, Purchaser and the Company will (a) promptly, but in any event within fifteen (15) days, make their respective filings, and will thereafter use their best efforts promptly to make any required submissions, under the HSR Act with respect to the Merger and the other transactions contemplated by this Agreement and (b)

cooperate with one another (i) in promptly determining whether any filings are required to be made or consents, approvals, permits or authorizations are required to be obtained under any other federal, state or foreign law or regulation and (ii) in promptly making any such filings, furnishing information required in connection therewith and seeking timely to obtain any such consents, approvals, permits or authorizations.

4.4     ACTIONS OF DIRECTORS AND SHAREHOLDERS.  The Company shall take all action necessary in accordance with the NYBCL and its Certificate and By-Laws to convene promptly a special meeting of its shareholders (the "Special Meeting") to consider and vote upon this Agreement and the Merger, subject to the exercise by the Board of Directors of the Company of its fiduciary duties consistent with the provisions of Section 4.9.  The Merger Proxy Statement shall contain the recommendation of the Board of Directors of the Company

-13-

<PAGE>  15
in favor of the Merger and the adoption and approval of this Agreement, subject to the Board of Directors' exercise of its fiduciary duties consistent with the provisions of Section 4.9.  The Company shall, if and to the extent requested by Purchaser, use all reasonable efforts to solicit from shareholders of the Company proxies in favor of such adoption and approval and shall take any other reasonable action.  The Company shall use its best efforts to take all action necessary for the Merger not to be subject to any state anti-takeover statute. At the Special Meeting, all of the Shares then owned by Parent, Purchaser or any other direct or indirect subsidiary of Parent, if any, will be voted in favor of adoption of this Agreement.

4.5     MERGER PROXY STATEMENT.  The Company shall use all reasonable efforts to prepare and file with the Commission as promptly as practicable, and in any event within fifteen (15) business days after the date of this Agreement, and have cleared by the Commission and promptly thereafter mail to its shareholders the Merger Proxy Statement, which shall include, subject to the exercise by the Board of Directors of the Company of its fiduciary duties consistent with the provisions of Section 4.9, a recommendation by the Board of Directors that the Company's shareholders adopt and approve this Agreement and which shall include all information required under applicable laws to be furnished to the stockholders of the Company in connection with the transactions contemplated hereby, shall comply as to form in all material respects with all applicable requirements of federal securities laws and shall be in form reasonably satisfactory to Purchaser and its counsel.  The Company shall request Smith Barney to prepare and, subject to Smith Barney's consent, shall include in the Merger Proxy Statement a letter from Smith Barney, dated the date of the Merger Proxy Statement, confirming its Fairness Opinion.  The Merger Proxy Statement shall include all information and statements which the Company or the Purchaser reasonably believes to be necessary for inclusion therein but shall not, in the reasonable opinion of the Company or the Purchaser, include any untrue statement of material fact or omit to state a material fact required to be stated therein or necessary in order to make the statements made therein, in light of the circumstances under which they were made, not misleading.  The Company shall notify Purchaser promptly of the receipt by it of any comments of the Commission and of any requests for supplements to the Merger Proxy Statement and will supply Purchaser with copies of all correspondence between it and its representatives, on the one hand, and the Commission or the members of its staff, on the other hand, with respect to the Merger Proxy Statement.  The Company shall use its best efforts to obtain and furnish the information required to be included in the Merger Proxy Statement, and the Company, after consultation with Purchaser, shall use its best efforts to respond promptly to any comments made by the Commission with respect to the Merger Proxy Statement and any preliminary version thereof.

Parent, Purchaser and the Company will cooperate with each other in the preparation of the Merger Proxy Statement; without limiting the generality of the foregoing, Parent and Purchaser will furnish to the Company in writing the information relating to Parent and Purchaser required by the Exchange Act to be set forth in the Merger Proxy Statement.

-14-

<PAGE> 16
    4.6      Indemnification and Insurance.
             -----------------------------

    4.6.1 BY-LAWS.  The by-laws of the Surviving Corporation will contain the provisions with respect to indemnification set forth in Article Ninth of the Certificate and Article XI of the By-laws, as in effect on the date hereof, which provisions will not be amended for a period of six years from the Effective Time in any manner that would adversely affect the rights thereunder of any person who, immediately prior to the Effective Time, is a current or former director, officer, employee or agent of the Company, except if such amendment is required by law.

    4.6.2 PARENT INDEMNITY.  From and after the Effective Time, Parent shall indemnify, defend and hold harmless each person who, immediately prior to the Effective Time, is a current or former officer or director of the Company or any of its subsidiaries or who prior to the Effective Time acted as a fiduciary under any employee benefit plan (each an "Indemnified Party") against all losses, claims, damages or liabilities arising out of acts or omissions occurring at or prior to the Effective Time to the fullest extent permitted under the NYBCL and the Certificate or By-laws (to the extent consistent with applicable law), including, without limitation, provisions relating to advances of expenses incurred in the defense of any action or suit; PROVIDED, HOWEVER, that such Indemnified Parties as a group may retain only one law firm to represent them in any jurisdiction with respect to each such matter unless there is, under applicable standards of professional conduct, a conflict on any significant issues between the positions of any two or more Indemnified Parties.  Without limiting the foregoing, Parent shall periodically advance expenses as incurred with respect to the foregoing to the fullest extent permitted under applicable law provided that the Indemnified Party to whom the expenses are advanced provides an undertaking to repay such advance if it is ultimately determined that such person is not entitled to indemnification.

    4.6.3 INSURANCE.  Prior to the Effective Time, Parent or Purchaser shall have purchased a noncancellable run-off policy for officers' and directors' liability insurance (the "D&O Policy") providing such coverage for persons who, immediately prior to the Effective Time, were current or former directors or officers of the Company, which insurance shall commence as of, and continue for a period of six years after, the Effective Time and shall be no less favorable in scope and amount of coverage than the Company's existing officers' and directors' liability insurance and provided by an insurer of no lesser financial standing than the Company's existing insurer; PROVIDED, HOWEVER, that Parent and Purchaser shall have no obligation under this Section to pay more than two hundred twenty-five thousand dollars ($225,000) (the "D&O Limit"), and PROVIDED FURTHER that if the cost of the D&O Policy exceeds the D&O Limit, the Company will be entitled to modify, in its sole discretion, the terms and conditions of the D&O Policy such that the cost of the D&O Policy does not exceed the D&O Limit.

    4.6.4 DETERMINATION.  Any determination which is required to be made with respect to whether an Indemnified Party's conduct complies with the standards set forth under New York law, the Certificate or the By-laws and any decision which is made as to

-15-

<PAGE>    17

the necessity for such determination shall be made by independent counsel
approved by the Indemnified Party; PROVIDED, HOWEVER, that the Indemnified
Parties as a group shall designate one independent counsel with respect to each
such matter.  The fees and expenses of such counsel will be paid by Parent or
the Surviving Corporation promptly after the submission of invoices by such
counsel in accordance with its standard practices.

     4.7     EMPLOYEE BENEFIT MATTERS.  (a)  Parent will provide, or cause
the Surviving Corporation to provide, employees of the Company with pension,
health, medical, disability, life insurance, severance and other similar
employee benefits under employee benefit plans (as such term is defined under
Section 3(3) of the Employee Retirement Income Security Act of 1974, as
amended), immediately following the Effective Time, which are competitive with
industry practice.  Notwithstanding the foregoing, except as otherwise
expressly contemplated by this Agreement, nothing herein shall require the
Surviving Corporation to maintain any particular plan or arrangement following
the Effective Time or shall be construed to obligate Parent or the Surviving
Corporation to issue to employees of the Company, or adopt any plans or
arrangements to provide for the issuance of, any shares of its capital stock or
any options, warrants, stock appreciation rights or other rights in respect of
any shares of its capital stock or any securities convertible into or
exchangeable for such shares.

          (b)  From and after the Effective Time, Parent agrees
to cause the Surviving Corporation to honor in accordance with the terms
thereof the employment, severance, consulting, retirement and deferred
compensation agreements or arrangements existing on the date hereof to which
the Company or any subsidiary is a party, including, without limitation, the
Company's non-qualified deferred compensation plan and its non-qualified
retirement plan.  Prior to the Effective Time, Parent agrees not to take or to
permit Purchaser or any other affiliate of Parent to take any action
inconsistent with the immediately preceding sentence.

          (c)  The Company will terminate or amend, in a manner
satisfactory to Parent and certain holders of Company Option, the Company
Options held by such persons; PROVIDED, HOWEVER, that such termination or
amendment will take effect immediately prior to Effective Time.  The Company
agrees to take all action necessary to fully vest the restricted stock held by
the Company's Chief Executive Officer and all Company Options issued and
outstanding as of the date hereof, in each case effective no later than
immediately prior to the Effective Time.

     4.8     ADDITIONAL AGREEMENTS.  Upon the terms and subject to the
conditions herein provided, each of the parties hereto agrees to use its best
efforts to take or cause to be taken all action, to do or cause to be done, and
to assist and cooperate with the other party hereto in doing, all things
necessary, proper or advisable under applicable laws and regulations, to
consummate and make effective, in the most expeditious manner practicable, the
transactions contemplated hereby, including, but not limited to, (i) the
obtaining of all necessary actions or inactions, waivers, consents and
approvals from the applicable Governmental Entities and the making of all
necessary registrations and filings, (ii) the obtaining of all necessary

-16-

<PAGE>    18

consents, approvals or waivers from third parties, (iii) the defending of any

lawsuits or other legal proceedings, whether judicial or administrative, challenging this Agreement or the consummation of the transactions contemplated hereby and (iv) the execution and delivery of such instruments, and the taking of such other actions as the other party hereto may reasonably require in order to carry out the intent of this Agreement and any agreements entered into between the parties pursuant to this Agreement. If, at any time after the Effective Time, the Surviving Corporation considers or is advised that any deeds, bills of sale, assignments, assurances or any other actions or things are necessary or desirable to vest, perfect or confirm of record or otherwise in the Surviving Corporation its right, title or interest in, to or under any of the rights, properties or assets of either of the Constituent Corporations acquired or to be acquired by the Surviving Corporation as a result of, or in connection with, the Merger or otherwise to carry out the purposes of this Agreement, the officers and directors of the Surviving Corporation will be authorized to execute and deliver, in the name and on behalf of each of the Constituent Corporations or otherwise, all such deeds, bills of sale, assignments and assurances and to take and do, in the name and on behalf of each of the Constituent Corporations or otherwise, all such other actions and things as may be necessary or desirable to vest, perfect or confirm any and all right, title and interest in, to and under such rights, properties or assets in the Surviving Corporation or otherwise to carry out the purposes of this Agreement.

4.9    NO SOLICITATION. The Company shall immediately cease, and cause each of its, and its subsidiaries', representatives, agents and advisors to terminate, any existing activities, discussions or negotiations previously conducted with any parties other than Parent and Purchaser with respect to any Alternative Transaction (as defined in Section 6.10); and the Company shall not, and shall cause each of its, and its subsidiaries', officers, directors, representatives, agents and advisors not to, solicit or encourage inquiries or proposals with respect to, or furnish any non-public information relating to or participate in any negotiations or discussions concerning, any proposal regarding an acquisition or purchase of all or a substantial portion of the assets of, or a substantial equity interest in, the Company or any of its subsidiaries or any merger or other business combination with the Company or any of its subsidiaries or any recapitalization involving the Company or any of its subsidiaries resulting in an extraordinary dividend or distribution to the Company's shareholders or a self-tender for or the redemption of some or all of the Shares (hereinafter collectively referred to as an "Acquisition Proposal") other than as contemplated by this Section 4.9. Notwithstanding the immediately preceding sentence, neither the Company nor its Board of Directors shall be prohibited from (i) engaging in discussions or negotiations with a third party which has made in writing a bona fide Acquisition Proposal which satisfies the conditions set forth in the proviso of this sentence (a "Qualifying Acquisition Proposal") and thereafter providing to such third party information previously provided or made available to Parent, provided the third party shall have entered into a confidentiality agreement substantially similar to the Letter Agreement, (ii) following receipt of a Qualifying Acquisition Proposal, taking and disclosing to its shareholders a position contemplated by Rule 14e-2(a) under the Exchange Act or otherwise making disclosure of the Qualifying Acquisition Proposal to its shareholders or (iii) following receipt of a Qualifying Acquisition Proposal, withdrawing its

-17-

<PAGE>    19
recommendation referred to in Section 4.4 or adjourning or otherwise postponing the Special Meeting; PROVIDED, HOWEVER, that the Company shall engage, and shall permit its, and its subsidiaries', officers, directors, representatives, agents and advisors to engage, in any of the activities referred to in clauses

(i) through (iii) of this sentence only to the extent that the Board of Directors of the Company (or an authorized committee thereof) shall have determined in good faith that such action is required under the fiduciary duties owed by the Board of Directors of the Company to the shareholders of the Company on the basis of a written opinion from the Company's counsel and a written analysis of the Acquisition Proposal by its financial advisor Smith Barney which analysis shall include a comparison of the financial terms of such Acquisition Proposal and the transactions contemplated in this Agreement.  The Company shall notify Parent promptly if any Acquisition Proposal is received by, or any such negotiations or discussions are sought to be initiated with, the Company or any of its subsidiaries regarding an Acquisition Proposal and shall disclose to Parent the identity of the third party making such Acquisition Proposal and the terms and conditions thereof.

        4.10    FINANCING.  Parent and Purchaser shall each use its best efforts to obtain within ten (10) business days after the date of this Agreement a commitment letter from Chemical Bank, N.A. or other lender reasonably satisfactory to Parent (the "Revolving Credit Facility Letter") regarding between twenty million dollars ($20,000,000) to twenty-five million dollars ($25,000,000) under a revolving credit facility (the "Revolving Credit Facility" and together with the Senior Note Financing, the Discount Note Financing and the Parent Financing, the "Financing").  Parent and Purchaser shall each use its best efforts to complete the negotiation of definitive agreements (collectively, the "Definitive Financing Agreements") relating to the Financing and containing customary terms and conditions; and Parent or Purchaser shall deliver to the Company copies of such agreements promptly after they have been executed.  In the event that Parent or Purchaser learns that any portion of the financing to be made available by any party which has committed to provide financing to Parent or Purchaser becomes unavailable or is likely to become unavailable, regardless of the reason therefor, Parent and Purchaser will each as promptly as practicable so notify the Company in writing and will use its best efforts to obtain alternative financing from other sources.  Each of Parent and Purchaser shall use its best efforts to satisfy, as promptly as practicable, all requirements of its agreements relating to the Financing that are conditions to consummating the Financing and to drawing down the cash proceeds thereunder.  The Company covenants and agrees to cooperate with Parent and Purchaser in negotiating (to the extent requested by Parent and Purchaser) the Definitive Financing Agreements and in furnishing all information reasonably required in connection with the negotiation and implementation thereof.

        4.11    NOTICE OF ADVERSE CHANGES.  The Company will promptly advise Parent and Purchaser in writing, and keep Parent and Purchaser fully informed, of (i) any inability or perceived inability by the Company to perform or comply with the terms or conditions of this Agreement or (ii) any event which may reasonably be expected to result in any of its representations and warranties set forth in this Agreement being or becoming untrue, or in

                                -18-

<PAGE>   20

any of the conditions to the Merger set forth in Article V not being satisfied, or in a violation of any provision of this Agreement.

        4.12    PUBLICITY.  The initial press release announcing this Agreement will be a joint press release substantially in the form set forth on SCHEDULE 4.12, and thereafter the Company and Parent will consult with each other prior to issuing any press releases or otherwise making public statements with respect to the transactions contemplated hereby and in making any filings with any Governmental Entity or with any national securities exchange with respect thereto.

ARTICLE V
CONDITIONS

5.1    CONDITIONS TO EACH PARTY'S OBLIGATIONS.  The obligations of Parent, Purchaser and the Company to consummate the Merger are subject to the satisfaction of the following conditions, none of which may be waived:

5.1.1  SHAREHOLDER APPROVAL.  Holders of at least two-thirds of the Shares shall have voted in favor of the adoption of this Agreement in accordance with the applicable provisions of the NYBCL.

5.1.2  INJUNCTIONS; ILLEGALITY.  The consummation of the Merger shall not be prohibited by any order, injunction, decree or ruling of a court of competent jurisdiction or any domestic Governmental Entity (each party agreeing to use its respective best efforts to obtain the stay or removal of any of the foregoing), and there shall not have been any statute, rule or regulation enacted, promulgated or deemed applicable to the Merger by any Governmental Entity which would prevent the consummation of the Merger.

5.1.3  GOVERNMENTAL APPROVALS AND CONSENTS.  All approvals of or filings with any Governmental Entity required to permit the consummation of the Merger shall have been obtained.

5.1.4  NOTICE FROM PAYING AGENT.  Notice shall have been received by the Company from the Paying Agent stating that the necessary funds for payment of Shares shall have been made available to the Paying Agent, as required by Section 1.4.

5.2    CONDITIONS TO THE OBLIGATIONS OF PARENT AND PURCHASER.  The obligations of Parent and Purchaser to consummate the Merger are further subject to the satisfaction, at or prior to the Closing, of the following conditions, any one or more of which may be waived by Parent and Purchaser:

5.2.1  FINANCING.  Parent and Purchaser shall have obtained the proceeds of the financing necessary to consummate the transactions contemplated by this Agreement on terms and conditions reasonably satisfactory to Parent.  With respect to the Senior Note Financing,

-19-

<PAGE>   21
the Discount Note Financing, the Revolving Credit Facility and the Parent Financing, the condition set forth in this Section 5.2.1 shall be satisfied if Parent and Purchaser shall be able to obtain such financing on terms and conditions substantially similar to those set forth in the Bear Stearns Letter, the Revolving Credit Facility Letter and the 399 Ventures Letter, respectively.

5.2.2  ACCURACY OF THE COMPANY'S REPRESENTATIONS.  The representations and warranties of the Company contained herein shall be true and correct in all material respects as of the date hereof and as of the Closing with the same effect as though all such representations and warranties had been made as of the Closing, except (x) for any such representations and warranties made as of a specified date, which shall be true and correct as of such date, or (y) as expressly contemplated by this Agreement.

5.2.3  ABSENCE OF CERTAIN CHANGES.  Since July 3, 1994, there shall not have been any material adverse change in the business, assets, financial condition or results of operations of the Company and its subsidiaries, considered as a whole.

5.2.4  SATISFACTION OF THE COMPANY'S COVENANTS.  Each and all of the agreements and covenants of the Company to be performed and complied with pursuant to this Agreement prior to the Closing shall have been duly performed and complied with in all material respects.

5.2.5  CERTAIN THIRD PARTY AND GOVERNMENTAL APPROVALS AND CONSENTS.  All approvals or consents of, waivers by or filings with third parties, including without limitation Governmental Entities, required to permit the Company to operate its business in the ordinary course immediately after the Effective Time substantially as it shall have been operated prior to the Effective Time, shall have been obtained, except for those approvals or filings which, if not obtained or made prior to the Effective Time, would not have a material adverse effect on the Company and its subsidiaries, taken as a whole. For purposes of this provision, the inability to transfer or otherwise retain liquor licenses for restaurants which, during the fiscal year ending October 2, 1994, provided in the aggregate six percent (6%) or more of the consolidated revenue of the Company and its subsidiaries, taken as a whole, constitutes a material adverse effect.

5.2.6  DISSENTING SHARES.  There shall not be more than 587,000 Dissenting Shares as of the Closing.

5.2.7  CERTIFICATES.  The Company will furnish Parent and Purchaser with such certificates of its officers or others and such other documents to evidence fulfillment of the conditions set forth in this Section 5.2 as Parent and Purchaser may reasonably request.

5.3    CONDITIONS TO THE OBLIGATIONS OF THE COMPANY.  The obligations of the Company to consummate the Merger are further subject to the satisfaction, at or prior to the

-20-

<PAGE>  22
Closing, of the following conditions, any one or more of which may be waived by the Company:

5.3.1  FAIRNESS OPINION.  The Company shall have received written confirmation from Smith Barney, dated as of the date the Merger Proxy Statement, which satisfies the criteria set forth in Section 4.5, is first to be mailed to the Company's shareholders, that Smith Barney has not withdrawn or, in any material respect, amended or modified the Fairness Opinion; PROVIDED, HOWEVER, that the Company shall be deemed to waive the condition set forth in this Section by mailing the Merger Proxy Statement without such confirmation from Smith Barney.

5.3.2  ACCURACY OF PARENT AND PURCHASER'S REPRESENTATIONS. The representations and warranties of Parent and Purchaser contained herein shall be true and correct in all material respects as of the date hereof and as of the Closing with the same effect as though all such representations and warranties had been made as of the Closing, except (x) for any such representations and warranties made as of a specified date, which shall be true and correct as of such date, or (y) as expressly contemplated by this Agreement.

5.3.3  SATISFACTION OF PARENT AND PURCHASER'S COVENANTS.  Each and all of the agreements and covenants of Parent and Purchaser to be performed and complied with pursuant to this Agreement prior to the Closing shall have been duly performed and complied with in all material respects.

5.3.4  CERTIFICATES.  Parent and Purchaser will furnish the

Company with such certificates of its officers or others and such other documents to evidence fulfillment of the conditions set forth in this Section 5.3 as the Company may reasonably request.

<div align="center">

ARTICLE VI
MISCELLANEOUS

</div>

6.1     TERMINATION.  This Agreement may be terminated and the Merger contemplated hereby may be abandoned (a) by the mutual consent of the boards of directors of Parent, Purchaser and the Company; (b) by the Company, if Parent or Purchaser is in material breach of any of the representations and warranties, covenants or obligations contained in this Agreement or the Letter Agreement and, in the case of a material breach of any covenant or obligation, such breach has not been cured within ten (10) business days after the Company has notified Parent of such breach; (c) by the Parent or Purchaser, if the Company is in material breach of any representations and warranties, covenants or obligations contained in this Agreement and, in the case of a material breach of any covenant or obligation, such breach has not been cured within ten (10) business days after Parent has notified the Company of such breach; (d) by either Parent and Purchaser, on the one hand, or the Company, on the other hand, if the Merger is not consummated prior to December 31, 1994 (the "Expiration Date"); PROVIDED, HOWEVER, that the right to terminate this Agreement under this Section 6.1(d) shall not be available to any party whose failure to fulfill any

<div align="center">-21-</div>

&lt;PAGE&gt;   23

obligation under this Agreement has been the primary cause of, or primarily results in, the failure of the Merger to have been consummated within such period; (e) by either Parent and Purchaser, on the one hand, or the Company, on the other hand, if the holders of at least two-thirds of the Shares fail to adopt this Agreement at the Special Meeting as required by applicable law; (f) by either Parent and Purchaser, on the one hand, or the Company, on the other hand, if either one is prohibited by an order or injunction (other than an order or injunction issued on a temporary or preliminary basis) of a court of competent jurisdiction from consummating the Merger and all means of appeal and all appeals from such order or injunction have been finally exhausted; (g) by the Company, if the Company receives a Qualifying Acquisition Proposal prior to shareholder adoption of this Agreement; PROVIDED, HOWEVER, that a condition to the effectiveness of the termination of this Agreement and the abandonment of the Merger pursuant to clause (g) of this sentence is the payment of the Fee and Expenses (each as defined in Section 6.10); (h) by the Parent or Purchaser upon at least five (5) business days' notice, if within ten (10) business days after the Board of Directors of the Company (x) withdraws or modifies its recommendation referred to in Section 4.4 or (y) adjourns or otherwise postpones the Special Meeting, the Board of Directors of the Company has not renewed its recommendation in favor of the Merger and the adoption and approval of this Agreement; or (i) by the Company, if the condition set forth in Section 5.3.1 shall not have been satisfied.  In the event of any termination and abandonment pursuant to this Section 6.1, no party hereto (or any of its directors or officers) will have any liability or further obligation to any other party to this Agreement, except for obligations in this Section 6.1, 6.10 and under the last sentence of Section 4.2 and except that nothing herein will relieve any party from liability for any breach of this Agreement. Notwithstanding clause (d) of the second preceding sentence, if the conditions set forth in Sections 5.1.2, 5.2.2, 5.2.3 and 5.2.4 have been satisfied, either the Company or Parent may extend the Expiration Date by up to thirty (30) days if the condition set forth in Section 5.2.5 has not been satisfied due to the inability to transfer or otherwise retain liquor licenses.

6.2    NON-SURVIVAL OF REPRESENTATIONS, WARRANTIES AND AGREEMENTS.
The representations and warranties or agreements in this Agreement will
terminate at the Effective Time or upon the earlier termination of this
Agreement pursuant to Section 6.1, as the case may be; PROVIDED, HOWEVER, that
if the Merger is consummated, Sections 1.5, 2.4, 4.6, 4.7 and 4.8 will survive
the Effective Time to the extent contemplated by such Sections, and PROVIDED
FURTHER that Section 6.10, the Letter Agreement, the first sentence of Section
6.9 and the last sentences of Sections 4.2 and 6.12 will in all events survive
any termination of this Agreement.

6.3    WAIVER AND AMENDMENT.  Subject to the applicable provisions of
the NYBCL, any provision of this Agreement may be waived at any time by the
party which is, or whose shareholders are, entitled to the benefits thereof,
and this Agreement may be amended or supplemented at any time, provided that no
amendment will be made after any shareholder adoption of this Agreement which
(i) alters or changes the Merger Price, (ii) alters or changes any term of the
certificate of the Surviving Corporation, or (iii) alters or changes any of the
terms or conditions of this Agreement, if such alteration or change would

-22-

<PAGE>   24
adversely affect the holders of any class or series of securities of either
Constituent Corporation, without further shareholder adoption.  No such waiver,
amendment or supplement will be effective unless in a writing which makes
express reference to this Section 6.3 and is signed by the party or parties
sought to be bound thereby.

6.4    ENTIRE AGREEMENT.  This Agreement contains the entire
agreement by and among Parent, Purchaser and the Company with respect to the
Merger and the other transactions contemplated hereby, and supersedes any prior
agreements among the parties with respect to such matters, other than the
Letter Agreement which remains in full force and effect.

6.5    APPLICABLE LAW.  This Agreement will be governed by and
construed in accordance with the laws of the State of New York, without giving
effect to the principles of conflict of laws thereof.

6.6    INTERPRETATION.  For purposes of this Agreement, (a) a
"subsidiary" of a corporation means any corporation more than 50% of the
outstanding voting securities of which are directly or indirectly owned by such
other corporation, (b) the descriptive headings contained herein are for
convenience and reference only and will not affect in any way the meaning or
interpretation of this Agreement, (c) words in the singular include the plural
and vice versa, (d) masculine pronouns include feminine and neuter versions
thereof, and (e) references to Sections (other than Sections of the Exchange
Act and the NYBCL) and Schedules are references to Sections in and Schedules to
this Agreement.

6.7    NOTICES.  All notices and other communications hereunder shall
be in writing and shall be deemed given if delivered personally or sent by
overnight courier (providing proof of delivery) or by facsimile (with a copy
provided by overnight courier) to the parties as follows (or to such other
addresses and facsimile numbers as shall be specified by the parties by like
notice):

        If to the Company to:

                Ground Round Restaurants, Inc.
                35 Braintree Office Hill Park

```
                    Braintree, MA  02184-9078
                    Fax:  (617) 380-3207
                    Attention:  Chairman, President and Chief Executive Officer


                                   -23-

<PAGE>    25
          With copies to:

                    Ground Round Restaurants, Inc.
                    35 Braintree Office Hill Park
                    Braintree, MA  02184-9078
                    Fax:  (617) 380-3207
                    Attention: Frank M. Puthoff, Senior Vice President,
                               General Counsel and Secretary


          and

                    Nutter, McClennen & Fish
                    One International Place
                    Boston, Massachusetts 02110-2699
                    Fax:  (617) 973-9748
                    Attention: Constantine Alexander, Esq.


          If to Parent or Purchaser to:

                    NEWCO
                    c/o 399 Ventures, Inc.
                    399 Park Avenue
                    New York, New York  10022
                    Fax:  (212) 888-2940
                    Attention:  Harold Rosser


          With a copy to:

                    Kirkland & Ellis
                    Citicorp Center
                    153 East 53rd Street
                    New York, New York  10022
                    Fax:  (212) 446-4900
                    Attention:  Kirk A. Radke, Esq.
```

6.8    COUNTERPARTS.  This Agreement may be executed in any number of counterparts, each of which will be deemed to be an original but all of which together will constitute but one agreement, and shall become effective when one or more counterparts have been signed by each party and delivered to the other parties, it being understood that all parties need not sign the same counterpart.

6.9    PARTIES IN INTEREST; ASSIGNMENT.  Except for Sections 1.5, 4.1(d), 4.6 and 4.7 (which are intended to be for the benefit of the persons referred to therein and their beneficiaries, and may be enforced by such persons as intended third-party beneficiaries),

                                   -24-

<PAGE>    26
this Agreement is not intended to nor will it confer upon any other person (other than the parties hereto) any rights or remedies, and this Agreement is binding upon and is solely for the benefit of the parties hereto and their

respective successors, legal representatives and assigns.  Purchaser will have
the right (a) to assign to Parent or any direct or indirect wholly owned
subsidiary of Parent any and all rights and obligations of Purchaser under this
Agreement, including without limitation the right to substitute in its place
Parent or such a subsidiary as one of the Constituent Corporations in the
Merger (such subsidiary assuming all of the obligations of Purchaser in
connection with the Merger), provided that any such assignment will not relieve
Parent or Purchaser from any of its obligations hereunder, and (b) to transfer
to Parent or to any direct or indirect wholly owned subsidiary of Parent the
right to purchase Shares tendered pursuant to the Offer, provided that any such
transfer will not relieve Purchaser from any of its obligations hereunder.

     6.10    EXPENSES.  (a)  The Company shall pay Parent a fee of three
million dollars ($3,000,000) (the "Fee") (i) if the Merger does not occur and
the Company consummates an Alternative Transaction (as hereinafter defined)
pursuant to a definitive agreement entered into within one year from the date
of this Agreement or (ii) prior to the Company's termination of this Agreement
pursuant to Section 6.1(g) or the Parent's or Purchaser's termination of the
Agreement pursuant to Section 6.1(h).  As used herein, the term Alternative
Transaction means either (i) a transaction pursuant to which a person other
than Parent or its affiliates (a "Third Party") acquires more than 50% of the
Shares then outstanding, whether from the Company or pursuant to a tender offer
or exchange offer or otherwise, (ii) a merger or other business combination
involving the Company pursuant to which any Third Party acquires more than 50%
of the outstanding equity securities of the Company or the entity surviving
such merger or business combination, (iii) any other transaction pursuant to
which any Third Party acquires control of all or substantially all of the
Company's assets, (iv) a recapitalization of the Company resulting in
extraordinary dividends or distributions to the Company's shareholders or (v) a
self-tender for, or redemption of, in the aggregate during such one-year period
of more than ten percent of the Shares outstanding immediately prior to the
commencement of such initial tender or redemption; PROVIDED, HOWEVER, that the
term "Alternative Transaction" shall not include any acquisition of securities
by a broker-dealer in connection with a bona fide public offering of such
securities.  The Fee shall be paid (x) within five (5) business days after the
consummation of an Alternative Transaction which satisfies the criteria set
forth in clause (i) of the first sentence of this Section 6.10(a) or (y)
immediately prior to the termination of this Agreement pursuant to Section
6.1(g) or Section 6.1(h).  Notwithstanding any other provision of this Section
6.10(a), the Company shall have no obligation to pay Parent the Fee which would
otherwise be due pursuant to clause (i) of the first sentence of Section
6.10(a)(i) in the event that (x) this Agreement is terminated pursuant to
Section 6.1(a), (b) or (d) (but only if terminated by the Company under
circumstances in which (I) Parent's or Purchaser's failure to fulfill any
obligation under this Agreement, or the failure of the condition in Section
5.2.1 to be satisfied, has been the primary cause of, or primarily resulted in,
the failure of the Effective Time to occur on or before the date specified
therein, (II) as of the date of such termination, the conditions set forth in
Sections 5.2.2, 5.2.3 and 5.2.4 were

                              -25-

<PAGE>   27
satisfied, and (III) as of such date, Smith Barney has not withdrawn or, in any
material respect, amended or modified the Fairness Opinion) or (y) Parent and
Purchaser have elected not to consummate the Merger because of the failure of
the condition in Section 5.2.1 to be satisfied, PROVIDED that at such time
there was no reasonable basis to conclude that the other conditions set forth
in Sections 5.1 and 5.2 would not have been satisfied on or before the
Expiration Date.

(b)   In the event that this Agreement is terminated, the Company shall be responsible for its own expenses incurred in connection with the transactions contemplated hereby.  Except as otherwise provided in Section 6.10(c), the Company will reimburse Purchaser for its expenses incurred in connection with the transactions contemplated hereby ("Expenses") up to a maximum of one million five hundred thousand dollars ($1,500,000) unless this Agreement has been terminated under the circumstances delineated in the last sentence of Section 6.10(a).

(c)   Under the circumstances set forth in the next following sentence, the Company and Parent shall bear responsibility for Expenses as follows:  (i) Parent shall be responsible for the first five hundred thousand dollars ($500,000) of Expenses, (ii) the Company shall be responsible to reimburse Parent for the next five hundred thousand dollars ($500,000) of Expenses, and (iii) the Company shall be responsible to reimburse Parent for fifty percent (50%) of the next two million dollars ($2,000,000) of Expenses; PROVIDED, HOWEVER, that under no circumstances shall the Company be responsible to reimburse Parent for more than one million five hundred thousand dollars ($1,500,000) of Expenses.  The allocation of responsibility for Expenses set forth in the immediately preceding sentence shall be applicable if this Agreement is terminated pursuant to (x) Section 6.1(f) or (y) Section 6.1(d), PROVIDED, with respect to this clause (y), that the failure of the Merger to be consummated prior to the Expiration Date has primarily resulted from (I) the failure of the conditions set forth in either Section 5.1.1 or Section 5.2.6 to be satisfied or waived, and in each case Smith Barney has not withdrawn or, in any material respect, amended or modified the Fairness Opinion, or (II) the failure of the condition set forth in Section 5.2.5 to be satisfied is due to the inability to transfer or otherwise retain liquor licenses as contemplated by Section 5.2.5 unless waived.

6.11    OBLIGATION OF PARENT.  Whenever this Agreement requires Purchaser to take any action, such requirement will be deemed to include an undertaking on the part of Parent to cause Purchaser to take such action.

6.12    ENFORCEMENT OF THE AGREEMENT.  The parties hereto agree that irreparable damage would occur in the event that any of the provisions of this Agreement were not performed in accordance with their specific terms or were otherwise breached.  It is accordingly agreed that the parties hereto (and intended third-party beneficiaries as provided for herein) will be entitled to an injunction or injunctions to prevent breaches of this Agreement and to enforce specifically the terms and provisions hereof in any court of the

-26-

<PAGE>   28
United States or any state having jurisdiction, this being in addition to any other remedy to which they are entitled at law or in equity.

6.13    SEVERABILITY. If any term or other provision of this Agreement is invalid, illegal or incapable of being enforced by any rule of law or public policy, all other terms and provisions of this Agreement will nevertheless remain in full force and effect.  Any term or provision of this Agreement which is invalid or unenforceable in any jurisdiction shall, as to that jurisdiction, be ineffective to the extent of such invalidity or unenforceability without rendering invalid or unenforceable the remaining terms and provisions of this Agreement or affecting the validity or enforceability of any of the terms or provisions of this Agreement in any other jurisdiction.  If any provision of this Agreement is so broad as to be unenforceable, the provision shall be interpreted to be only so broad as is enforceable.

6.14    TAXES. If the Merger is consummated, any liability for any tax imposed by any domestic or foreign taxing authority with respect to the property of the Company due with respect to or as a result of the Merger shall be borne by Parent and expressly shall not be a liability of the shareholders of the Company.

-27-

<PAGE>   29
IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed in counterparts by their duly authorized officers all as of the day and year first written above.

<TABLE>
<CAPTION>
                         ATTEST:                                    GRR, INC.
                         <S>                                        <C>
                         By /s/ Kirk A. Radke                       By /s/ Jose
                         --------------------------------           ---------
                             Kirk A. Radke                             Joseph
                             Assistant Secretary                       Vice Pr


                                                                    GRR ACQUISI


                         By /s/ Kirk A. Radke                       By /s/ Jose
                         --------------------------------           ---------
                             Kirk A. Radke                             Joseph
                             Assistant Secretary                       Vice Pr


                                                                    GROUND ROUN


                         By /s/ Frank M. Puthoff                    By /s/ Mich
                         --------------------------------           ---------
                             Frank M. Puthoff                          Michael
                             Secretary                                 Chairma
                                                                       Chief E

</TABLE>

                                        -28-

<PAGE>   30
<TABLE>
                                        TABLE OF CONTENTS


<S>                      <C>
ARTICLE I                        THE MERGER . . . . . . . . . . . . . . . . . . .
          1.1            Merger . . . . . . . . . . . . . . . . . . . . . . . . .
                         1.1.1  Merger . . . . . . . . . . . . . . . . . . . . .
                         1.1.2  Effective Time . . . . . . . . . . . . . . . . .
                         1.1.3  Effect of Merger . . . . . . . . . . . . . . . .
                         1.1.4  Conversion of Shares . . . . . . . . . . . . . .
          1.2            Consummation of the Merger . . . . . . . . . . . . . . .
          1.3            Payment for Shares . . . . . . . . . . . . . . . . . . .
          1.4            Closing of the Company's Transfer Books . . . . . . . .
          1.5            Stock Options and Related Matters . . . . . . . . . . .
          1.6            Dissenters' Rights . . . . . . . . . . . . . . . . . . .

ARTICLE II            REPRESENTATIONS AND WARRANTIES OF PARENT AND PURCHASER . . .
        2.1     Organization . . . . . . . . . . . . . . . . . . . . . .
        2.2     Authority . . . . . . . . . . . . . . . . . . . . . . .
        2.3     Merger Proxy Statement . . . . . . . . . . . . . . . . .
        2.4     Fees . . . . . . . . . . . . . . . . . . . . . . . . . .
        2.5     Consents and Approvals; No Violation . . . . . . . . . .
        2.6     Financing . . . . . . . . . . . . . . . . . . . . . . .

ARTICLE III           REPRESENTATIONS AND WARRANTIES OF  THE
                      COMPANY . . . . . . . . . . . . . . . . . . . . . . .
        3.1     Corporate Organization . . . . . . . . . . . . . . . . .
        3.2     Capitalization . . . . . . . . . . . . . . . . . . . . .
        3.3     Authority . . . . . . . . . . . . . . . . . . . . . . .
        3.4     Consents and Approvals; No Violation . . . . . . . . . .
        3.5     Commission Filings and Financial Statements . . . . . .
        3.6     Governmental Authorizations . . . . . . . . . . . . . .
        3.7     Owned Real Estate . . . . . . . . . . . . . . . . . . .
        3.8     Real Estate Leases . . . . . . . . . . . . . . . . . . .
        3.9     Compliance with Laws . . . . . . . . . . . . . . . . . .
        3.10    Environmental Protection . . . . . . . . . . . . . . . .
        3.11    No Undisclosed Liabilities . . . . . . . . . . . . . . .
        3.12    Fees . . . . . . . . . . . . . . . . . . . . . . . . . .
        3.13    Absence of Material Adverse Changes . . . . . . . . . .
        3.14    Fairness Opinion . . . . . . . . . . . . . . . . . . . .
        3.15    Shareholder Agreement . . . . . . . . . . . . . . . . .
</TABLE>
                                                    (i)

<PAGE>  31
<TABLE>
<S>                   <C>
ARTICLE IV            COVENANTS . . . . . . . . . . . . . . . . . . . . . . .
        4.1     Conduct of the Business of the Company Prior to the Effective Time
        4.2     Access and Information . . . . . . . . . . . . . . . . .
        4.3     Certain Filings, Consents and Arrangements . . . . . . .
        4.4     Actions of Directors and Shareholders . . . . . . . . .
        4.5     Merger Proxy Statement . . . . . . . . . . . . . . . . .
        4.6     Indemnification and Insurance . . . . . . . . . . . . .
                4.6.1   By-laws . . . . . . . . . . . . . . . . . . . .
                4.6.2   Parent Indemnity . . . . . . . . . . . . . . . .
                4.6.3   Insurance . . . . . . . . . . . . . . . . . . .
                4.6.4   Determination . . . . . . . . . . . . . . . . .
        4.7     Employee Benefit Matters . . . . . . . . . . . . . . . .
        4.8     Additional Agreements . . . . . . . . . . . . . . . . .
        4.9     No Solicitation . . . . . . . . . . . . . . . . . . . .
        4.10    Financing. . . . . . . . . . . . . . . . . . . . . . . .
        4.11    Notice of Adverse Changes . . . . . . . . . . . . . . .
        4.12    Publicity . . . . . . . . . . . . . . . . . . . . . . .

ARTICLE V             CONDITIONS . . . . . . . . . . . . . . . . . . . . . .
        5.1     Conditions to Each Party's Obligations . . . . . . . . .
                5.1.1   Shareholder Approval . . . . . . . . . . . . . .
                5.1.2   Injunctions; Illegality . . . . . . . . . . . .
                5.1.3   Governmental Approvals and Consents . . . . . .
                5.1.4   Notice from Paying Agent . . . . . . . . . . . .
        5.2     Conditions to the Obligations of Parent and Purchaser . . . . .
                5.2.1   Financing . . . . . . . . . . . . . . . . . . .
                5.2.2   Accuracy of the Company's Representations . . . . . . . . .
                5.2.3   Absence of Certain Changes . . . . . . . . . . .
                5.2.4   Satisfaction of the Company's Covenants . . . . . . . . . .

|        |        |                                                               |
|--------|--------|---------------------------------------------------------------|
|        | 5.2.5  | Certain Third Party and Governmental Approvals and Consents   |
|        | 5.2.6  | Dissenting Shares . . . . . . . . . . . . . . . . . .          |
|        | 5.2.7  | Certificates . . . . . . . . . . . . . . . . . . . .          |
| 5.3    |        | Conditions to the Obligations of the Company . . . . . . . . . . |
|        | 5.3.1  | Fairness Opinion . . . . . . . . . . . . . . . . . .          |
|        | 5.3.2  | Accuracy of Parent and Purchaser's Representations . . . .    |
|        | 5.3.3  | Satisfaction of Parent and Purchaser's Covenants . . . . .    |
|        | 5.3.4  | Certificates . . . . . . . . . . . . . . . . . . . .          |

| ARTICLE VI |        | MISCELLANEOUS . . . . . . . . . . . . . . . . . . .          |
|------------|--------|---------------------------------------------------------------|
|            | 6.1    | Termination . . . . . . . . . . . . . . . . . . . . .         |
|            | 6.2    | Non-Survival of Representations, Warranties and Agreements . . . . |
|            | 6.3    | Waiver and Amendment . . . . . . . . . . . . . . . . .        |
|            | 6.4    | Entire Agreement . . . . . . . . . . . . . . . . . . .        |
|            | 6.5    | Applicable Law . . . . . . . . . . . . . . . . . . . .        |

</TABLE>

(ii)

<PAGE>  32
<TABLE>

|        | <S>    | <C>                                                           |
|--------|--------|---------------------------------------------------------------|
|        | 6.6    | Interpretation . . . . . . . . . . . . . . . . . . .          |
|        | 6.7    | Notices . . . . . . . . . . . . . . . . . . . . . . .         |
|        | 6.8    | Counterparts . . . . . . . . . . . . . . . . . . . .          |
|        | 6.9    | Parties in Interest; Assignment. . . . . . . . . . . . .      |
|        | 6.10   | Expenses . . . . . . . . . . . . . . . . . . . . . .          |
|        | 6.11   | Obligation of Parent . . . . . . . . . . . . . . . . .        |
|        | 6.12   | Enforcement of the Agreement . . . . . . . . . . . . .        |
|        | 6.13   | Severability . . . . . . . . . . . . . . . . . . . .          |
|        | 6.14   | Taxes . . . . . . . . . . . . . . . . . . . . . . . .         |

</TABLE>

(iii)

</TEXT>
</DOCUMENT>
<DOCUMENT>
<TYPE>EX-2.2
<SEQUENCE>3
<DESCRIPTION>1ST AMENDMENT TO AGREEMENT & PLAN OF MERGER
<TEXT>

<PAGE>   1

EXECUTION VERSION
-----------------

EXHIBIT 2.2

FIRST AMENDMENT
TO
AGREEMENT AND PLAN OF MERGER

        FIRST AMENDMENT made as of November 16, 1994 to Agreement and Plan of
Merger dated as of August 23, 1994 (the "Agreement"), by and among GRR, Inc., a
Delaware corporation ("Parent"), GRR Acquisition Corp., a New York corporation
and a wholly-owned subsidiary of Parent ("Purchaser"), and Ground Round
Restaurants, Inc., a New York corporation (the "Company").  Any capitalized
term used in this First Amendment and not defined herein will have the meaning
given to it in the Agreement.

1.      Section 4.9 of the Agreement is hereby deleted in its entirety and the following is substituted in its place:

        4.9 NO SOLICITATION. (a)  The Company shall immediately cease, and cause each of its, and its subsidiaries', representatives, agents and advisors to terminate, any existing activities, discussions or negotiations previously conducted with any parties other than Parent and Purchaser with respect to any Alternative Transaction (as defined in this Section 4.9); and after such date, the Company shall not, and shall cause each of its, and its subsidiaries', officers, directors, representatives, agents and advisors not to, solicit or encourage inquiries or proposals with respect to, or furnish any non-public information relating to or participate in any negotiations or discussions concerning, any proposal regarding an acquisition or purchase of all or a substantial portion of the assets of, or a substantial equity interest in, the Company or any of its subsidiaries or any merger or other business combination with the Company or any of its subsidiaries or any recapitalization involving the Company or any of its subsidiaries resulting in an extraordinary dividend or distribution to the Company's shareholders or a self-tender for or the redemption of some or all of the Shares (hereinafter collectively referred to as an "Acquisition Proposal") other than as contemplated by this Section 4.9.  Notwithstanding the immediately preceding sentence, neither the Company nor its Board of Directors shall be prohibited from (i) engaging in discussions or negotiations with a third party which orally or in writing has made, or expressed an interest in making, an inquiry with regard to a possible Acquisition Proposal and thereafter providing to such third party information previously provided or made available to Parent, provided the third party shall have entered into a confidentiality agreement substantially similar to the Letter Agreement, (ii) following receipt of an Acquisition Proposal which satisfies the conditions set forth in the proviso of this sentence (a "Qualifying Acquisition Proposal"), taking and disclosing to its shareholders a position contemplated by Rule 14e-2(a) under the Exchange Act or otherwise making disclosure of the Qualifying Acquisition Proposal to its shareholders or (iii) following receipt of a Qualifying Acquisition Proposal, withdrawing its recommendation referred to in Section 4.4 or adjourning or otherwise postponing the Special Meeting; PROVIDED, HOWEVER, that the Company shall engage, and

<PAGE>   2

                                        EXECUTION VERSION
                                        -----------------
        shall permit its, and its subsidiaries', officers, directors, representatives, agents and advisors to engage, in any of the activities referred to in clauses (ii) and (iii) of this sentence only to the extent that the Board of Directors of the Company (or an authorized committee thereof) shall have determined in good faith that such action is required under the fiduciary duties owed by the Board of Directors of the Company to the shareholders of the Company on the basis of a written opinion from the Company's counsel and a written analysis of the Acquisition Proposal by its financial advisor Smith Barney which analysis shall include a comparison of the financial terms of such Acquisition Proposal and the transactions contemplated in this Agreement.  As used herein, the term Alternative Transaction means either (i) a transaction pursuant to which a person other than Parent or its affiliates (a "Third Party") acquires more than 50% of the Shares then outstanding, whether from the Company or pursuant to a tender offer or exchange offer or otherwise, (ii) a merger or other

business combination involving the Company pursuant to which any Third
Party acquires more than 50% of the outstanding equity securities of
the Company or the entity surviving such merger or business
combination, (iii) any other transaction pursuant to which any Third
Party acquires control of all or substantially all of the Company's
assets, (iv) a recapitalization of the Company resulting in
extraordinary dividends or distributions to the Company's shareholders
or (v) a self-tender for, or redemption of, in the aggregate during
such one-year period of more than ten percent of the Shares
outstanding immediately prior to the commencement of such initial
tender or redemption; provided, however, that the term "Alternative
Transaction" shall not include any acquisition of securities by a
broker-dealer in connection with a bona fide public offering of such
securities.

2.      Section 6.1 of the Agreement is hereby deleted in its entirety and the
following is substituted in its place:

        6.1 TERMINATION.  This Agreement may be terminated and the
Merger contemplated hereby may be abandoned (a) by the mutual consent
of the boards of directors of Parent, Purchaser and the Company; (b)
by the Company, if Parent or Purchaser is in material breach of any of
the representations and warranties, covenants or obligations contained
in this Agreement or the Letter Agreement and, in the case of a
material breach of any covenant or obligation, such breach has not
been cured within ten (10) business days after the Company has
notified Parent of such breach; (c) by the Parent or Purchaser, if the
Company is in material breach of any representations and warranties,
covenants or obligations contained in this Agreement and, in the case
of a material breach of any covenant or obligation, such breach has
not been cured within ten (10) business days after Parent has notified
the Company of such breach; (d) by either Parent and Purchaser, on the
one hand, or the Company, on the other hand, if the Merger is not
consummated on or before January 31, 1995 (the "Expiration Date");

                                -2-

<PAGE>   3
                                              EXECUTION VERSION
                                              -----------------

PROVIDED, HOWEVER, that the right to terminate this Agreement under
this Section 6.1(d) shall not be available to any party whose failure
to fulfill any obligation under this Agreement has been the primary
cause of, or primarily results in, the failure of the Merger to have
been consummated within such period; (e) by either Parent and
Purchaser, on the one hand, or the Company, on the other hand, if the
holders of at least two-thirds of the Shares fail to adopt this
Agreement at the Special Meeting as required by applicable law; (f) by
either Parent and Purchaser, on the one hand, or the Company, on the
other hand, if either one is prohibited by an order or injunction
(other than an order or injunction issued on a temporary or
preliminary basis) of a court of competent jurisdiction from
consummating the Merger and all means of appeal and all appeals from
such order or injunction have been finally exhausted; (g) by the
Company, if the Company receives a Qualifying Acquisition Proposal
prior to shareholder adoption of this Agreement; provided, however,
that a condition to the effectiveness of the termination of this
Agreement and the abandonment of the merger pursuant to clause (g) of
this sentence is the payment of the Expenses (as defined in Section

6.10); (h) by the Parent or Purchaser upon at least five (5) business days' notice, if within ten (10) business days after the Board of Directors of the Company (x) withdraws or modifies its recommendation referred to in Section 4.4 or (y) adjourns or otherwise postpones the Special Meeting, the Board of Directors of the Company has not renewed its recommendation in favor of the Merger and the adoption and approval of this Agreement; or (i) by the Company, if the condition set forth in Section 5.3.1 shall not have been satisfied.  In the event of any termination and abandonment pursuant to this Section 6.1, no party hereto (or any of its directors or officers) will have any liability or further obligation to any other party to this Agreement, except for obligations in this Section 6.1, 6.10 and under the last sentence of Section 4.2 and except that nothing herein will relieve any party from liability for any breach of this Agreement. Notwithstanding clause (d) of the second preceding sentence, if the conditions set forth in Sections 5.1.2, 5.2.2, 5.2.3 and 5.2.4 have been satisfied, either the Company or Parent may extend the Expiration Date by up to thirty (30) days if the condition set forth in Section 5.2.5 has not been satisfied due to the inability to transfer or otherwise retain liquor licenses.

3.          Section 6.10 of the Agreement is hereby deleted in its entirety and the following is substituted in its place:

          6.10    EXPENSES.  (a)  In the event that this Agreement is terminated, the Company shall be responsible for its own expenses incurred in connection with the transactions contemplated hereby. Except as otherwise provided in Section 6.10(b), the Company will reimburse Purchaser for its expenses incurred in connection with the transactions contemplated hereby ("Expenses") up to a maximum of one million five hundred thousand dollars ($1,500,000) unless this Agreement has been terminated under

-3-

<PAGE>    4

                                        EXECUTION VERSION
                                        -----------------

the circumstances delineated in the next following sentence. Notwithstanding any other provision of this Section 6.10(a), the Company shall  have no obligation to reimburse Parent for any Expenses in the event that (x) this Agreement is terminated pursuant to Section 6.1(a), (b) or (d) (but only if terminated by the Company under circumstances in which (I) Parent's or Purchaser's failure to fulfill any obligation under this Agreement, or the failure of the condition in Section 5.2.1 to be satisfied, has been the primary cause of, or primarily resulted in, the failure of the Effective Time to occur on or before the date specified therein, (II) as of the date of such termination, the conditions set forth in Sections 5.2.2, 5.2.3 and 5.2.4 were satisfied, and (III) as of such date, Smith Barney has not withdrawn or, in any material respect, amended or modified the Fairness Opinion) or (y) Parent and Purchaser have elected not to consummate the Merger because of the failure of the condition in Section 5.2.1 to be satisfied, PROVIDED that at such time there was no reasonable basis to conclude that the other conditions set forth in Sections 5.1 and 5.2 would not have been satisfied on or before the Expiration Date.

(b)  Under the circumstances set forth in the next following sentence, the Company and Parent shall bear responsibility for Expenses as follows:  (i) Parent shall be responsible for the first five hundred thousand dollars ($500,000) of Expenses, (ii) the Company shall be responsible to reimburse Parent for the next five hundred thousand dollars ($500,000) of Expenses, and (iii) the Company shall be responsible to reimburse Parent for fifty percent (50%) of the next two million dollars ($2,000,000) of Expenses; PROVIDED, HOWEVER that under no circumstances shall the Company be responsible to reimburse Parent for more than one million five hundred thousand dollars ($1,500,000) of Expenses.  The allocation of responsibility for Expenses as set forth in the immediately preceding sentence shall be applicable if this Agreement is terminated pursuant to (x) Section 6.1(f) or (y) Section 6.1(d), PROVIDED, with respect to this clause (y), that the failure of the Merger to be consummated prior to the Expiration Date has primarily resulted from (I) the failure of the conditions set forth in either Section 5.1.1 or Section 5.2.6 to be satisfied or waived, and in each case Smith Barney has not withdrawn or, in any material respect, amended or modified the Fairness Opinion, or (II) the failure of the condition set forth in Section 5.2.5 to be satisfied is due to the inability to transfer or otherwise retain liquor licenses as contemplated by Section 5.2.5 unless waived.

4.     The Agreement, as supplemented and modified by this First Amendment, and any other writing referred to in the Agreement or delivered pursuant thereto which forms a part thereof contain the entire agreement among the parties with respect to the subject matter thereof, and amend, restate and supersede all prior and contemporaneous arrangements or understandings with respect thereto.

-4-

<PAGE>    5

EXECUTION VERSION
-----------------

5.     Upon execution of this First Amendment, on and after the date hereof, each reference in the Agreement to "Agreement," "Merger Agreement," "hereof," "herein" or words of like import, and each reference in the other documents entered into in connection with the Agreement shall mean and be a reference to the Agreement, as amended hereby.  Except as specifically amended above, the Agreement will remain in full force and effect and is hereby ratified and confirmed as of the date of this Amendment.

6.     This First Amendment will be governed by and construed in accordance with the laws of the State of New York, without giving effect to the principles of conflict of laws thereof.

7.     This First Amendment may be executed in any number of counterparts, each of which will be deemed to be an original but all of which together will constitute but one agreement, and shall become effective when one or more counterparts have been signed by each party and delivered to the other parties, it being understood that all parties need not sign the same counterpart.

*  *  *  *  *

-5-

<PAGE>    6

EXECUTION VERSION
-----------------

IN WITNESS WHEREOF, the parties hereto have caused this First
Amendment to be executed in counterparts by their duly authorized officers all
as of the day and year first written above.

                                    GRR, INC.


                                    By /s/ Joseph Silvestri
                                       ---------------------
                                       Joseph Silvestri
                                       Vice President


                                    GRR ACQUISITION CORP.


                                    By /s/ Joseph Silvestri
                                       ---------------------
                                       Joseph Silvestri
                                       Vice President


                                    GROUND ROUND RESTAURANTS, INC.


                                    By /s/ Michael P. O'Donnell
                                       ------------------------
                                       Michael P. O'Donnell
                                       Chairman, President and
                                       Chief Executive Office




                            -6-



</TEXT>
</DOCUMENT>
<DOCUMENT>
<TYPE>EX-3.1
<SEQUENCE>4
<DESCRIPTION>CERTIFICATE OF INCORPORATION
<TEXT>

<PAGE>    1

                                    EXHIBIT 3.1


[The following instrument is a restatement of the Registrant's Certificate of
Incorporation as amended through December 20, 1994; the instrument has been
filed as a restatement in accordance with Rule 102(c) of Regulation S-T.]

CERTIFICATE OF INCORPORATION
OF
GROUND ROUND RESTAURANTS, INC.

Under Section 807 of the Business Corporation Law

FIRST:          The name of the corporation is Ground Round Restaurants, Inc.  The name under which the corporation was originally formed is Marine & Animal By-Products Corp.

SECOND:          The purpose of the corporation is to engage in any lawful act or activity for which the corporation may be organized under the Business Corporation Law of New York, provided that the corporation is not to engage in any act or activity requiring the consent or approval of any state official, department, board, agency, or other body without such consent or approval first being obtained.

THIRD:          The total number of shares of stock which the corporation shall have the authority to issue is 35,030,000 shares, consisting of 35,000,000 shares of the par value of $.16 2/3 per share, which shall be designated Common Stock, and 30,000 shares of the par value of $100.00 per share, which shall be designated Cumulative Preferred Shares.  The relative rights, preferences and limitations of the shares of each class are:

          The Preferred Shares may be issued in series, and each series shall be so designated as to distinguish the shares thereof from the shares of all other series.  All Preferred Shares shall be identical except as to the relative rights, preferences, and limitations below enumerated.

          Authority is hereby expressly granted to the Board of Directors to fix, subject to the provisions herein set forth, before the issuance of any shares of a particular series, the number of shares to be included in such series, the dividend rate per annum, the redemption price or prices, if any, and the terms and conditions of the redemption, any sinking fund provisions for the redemption or purchase of the shares of the series, the terms and conditions on which the shares are convertible, if they are convertible, and any other right, preferences and limitations pertaining to such series.

<PAGE>    2
FOURTH:          The Secretary of  State is designated as the agent of the corporation upon whom process against the corporation may be served.   The address to which the Secretary of State shall mail a copy of any process against the corporation which may be served upon him pursuant to law is:

          The Ground Round Restaurants, Inc.
          35 Braintree Office Hill Park
          Braintree, MA  02184-9078
          Attention:  General Counsel

FIFTH:          The office of the corporation is to be located in New York County of New York, State of New York.

SIXTH:          The duration of the corporation is to be perpetual.

SEVENTH:          The number of directors that shall constitute the entire Board of Directors shall be determined by the Board of Directors from time to

time, but in no event shall the number of directors that shall constitute the entire Board of Directors be less than three.

EIGHTH:                No person, by virtue of being a holder of this corporation's equity or voting shares, shall have any pre-emptive rights to have first offered to him, when the corporation proposes to issue, or to grant rights or options to purchase, equity or voting shares of securities convertible into or carrying rights or options to purchase equity or voting shares, any part of any such shares or other securities.

NINTH:                 To the fullest extent permitted by the New York Business Corporation Law as exists on the date hereof, or as it may hereafter be amended, no director of the corporation shall be liable to the corporation or its shareholders for damages for any breach of duty as a director.  Any repeal or modification of the foregoing sentence by the shareholders of the corporation shall not adversely affect any right or protection of a director of the corporation existing at the time of such repeal or modification.  This corporation shall indemnify each present and future director and officer of the corporation against any costs and expenses which may be imposed on, or reasonably incurred by him in connection with any claim, action, suit or proceeding hereafter made or instituted in which he may be involved by reason of his being or having been a director or officer of the corporation, or of any other corporation in which he served or serves as a director or officer at the request of the corporation, whether or not he continues to be a director or officer at the time of imposition of such costs, or incurring of such expenses; such costs and expenses to include the cost to such director or officer of reasonable court approved settlements, other than amounts paid to the corporation itself, or to such other corporation served at the request of the corporation.  The foregoing right of indemnification shall not be exclusive of other rights to which any director or officer may be entitled as a matter of law, and shall inure to the benefit of the heirs, executors and administrators of any such director or officer."

```
</TEXT>
</DOCUMENT>
<DOCUMENT>
<TYPE>EX-10.35
<SEQUENCE>5
<DESCRIPTION>AGREEMENT OF MICHAEL P. O'DONNELL & COMPANY
<TEXT>

<PAGE>    1
```

Exhibit 10.35

July 26, 1994

Mr. Michael P. O'Donnell
109 Nichols Road
Cohasset, MA  02025

Dear Mr. O'Donnell:

        The Board of Directors of Ground Round Restaurants, Inc. (the "Corporation") and the Compensation Committee (the "Committee") of the Board have determined that it is in the best interests of the Corporation and its shareholders for the Corporation to agree, as provided herein, to pay you compensation under the circumstances described below.

The Board and the Committee recognize that the continuing possibility
of a sale or change of control of the Corporation is unsettling to you and
other senior executives of the Corporation.  Therefore, these arrangements are
being made to help assure a continuing dedication by you to your duties to the
Corporation by diminishing the inevitable distraction to you from the personal
uncertainties and risks created by a pending sale or change of control of the
Corporation.  In particular, the Board and the Committee believe it important,
should the Corporation receive proposals from third parties with respect to its
future, to enable you, without being influenced by the uncertainties of your
own situation, to assess and advise the Board whether such proposals would be
in the best interests of the Corporation and its shareholders and to take such
other action regarding such proposals as the Board might determine to be
appropriate, including  being available to assist in any transition should
there be a sale or change of control of the Corporation.  The Board and the
Committee also wish to demonstrate to executives of the Corporation that the
Corporation is concerned with the welfare of its executives and intends to see
that loyal executives are treated fairly.

     1.  In view of the foregoing and in further consideration of your
continued employment with the Corporation, the Corporation will pay to you as a
bonus a lump sum amount, determined as provided below, in the event that (a)
you do not terminate your employment with the Corporation for a period of one
hundred twenty (120) days after a Change of Control of the Corporation has
occurred (your death or disability which prohibits you from performing your
duties to the Corporation for more than 60 consecutive days shall be deemed to
be a

<PAGE>   2

termination of your employment with the Corporation by you) or (b) within such
one hundred twenty (120) day period your employment with the Corporation is
terminated by the Corporation for any reason other than Cause.  The lump sum
compensation so payable (hereinafter referred to as the "Lump Sum Amount")
shall be an amount equal to the product of two (2) times the sum of (a) the
higher of (i) your current annual base salary and (ii), if your base salary is
hereafter increased, your highest annual base  salary from time to time
hereafter in effect plus (b) the higher of (i) your current targeted bonus
under the Corporation's incentive bonus plan and (ii), if your targeted bonus
is hereafter increased, your highest targeted bonus from time to time hereafter
in effect.  The Lump Sum Amount shall be paid to you within one hundred
twenty-five (125) days after the date a Change of Control of the Corporation
has occurred (hereinafter referred to as the "Payment Date").

     2.  In addition:

          (a) Any compensation and other amounts previously deferred by
you, together with accrued interest thereon, if any, to which you are
entitled, and any accrued vacation pay not yet paid by the Corporation,
shall be paid to you on the Payment Date.

          (b) All other amounts accrued or earned by you through the
Payment Date and amounts otherwise then owing under the Corporation's
plans and policies shall be paid to you on the Payment Date, other than
benefits due to you under any qualified plan(s) of the Corporation,
which benefits shall be paid in accordance with the terms of such
plan(s).

          (c) The Corporation shall pay all legal fees and expenses
incurred by you in seeking to obtain or enforce any right or benefit

provided by this Agreement, regardless of the outcome thereof.

(d) The Corporation shall maintain in full force and effect, for the continued benefit of you and/or your family for the period beginning on the date of the Change of Control and ending two years after the Payment Date, all employee welfare benefit plans and any other employee benefit programs or arrangements (including, without limitation, medical and dental insurance plans, disability and life insurance plans and car allowance programs) in which you were entitled to participate immediately prior to the Change of Control, provided that your continued participation is possible under the general terms and provisions of such plans and programs. In the event that your participation in any such plan or program is barred, the Corporation shall arrange to provide you with benefits substantially similar to those which you are entitled to receive under such plans and programs. At the

<PAGE>    3

end of the period of coverage, you shall have  the option to have assigned to you at no cost and with no apportionment of prepaid premiums, any assignable insurance policy owned by the Corporation and relating specifically to you.

(e) All outstanding stock options and all restricted stock which you hold shall vest immediately upon a Change of Control.

3. For purposes of this Agreement:

(a) "Exchange Act" means the Securities Exchange Act of 1934, as amended.

(b) A "Change of Control" shall be deemed to have taken place if (i) any "person" (as such term is used in Sections 13(d) and 14(d)(2) of the Exchange Act) other than HM Holdings, Inc. ("HMH") is or becomes the beneficial owner (within the meaning of Rule 13d-3 promulgated under the Exchange Act), directly or indirectly, of securities of the Corporation representing 25% or more of the combined voting power of the Corporation's then outstanding securities, (ii) HMH or any of its "affiliates" or "associates" (as such terms are used in Rule 12b-2 promulgated under the Exchange Act), either singly or collectively, is or becomes the beneficial owner, directly or indirectly, of securities of the Corporation representing 50% or more of the combined voting power of the Corporation's then outstanding securities, (iii) the stockholders of the Corporation shall have approved (A) a reorganization, merger or consolidation, in each case, with respect to which persons who were stockholders of the Corporation immediately prior to such reorganization, merger or consolidation do not, immediately thereafter, own more than 50% of the combined voting power entitled to vote generally in the election of directors of the reorganized, merged or consolidated company's then outstanding voting securities, (B) a liquidation or dissolution of the Corporation, or (C) a sale of all or substantially all of the assets of the Corporation, or (iv) as the result of a tender offer, exchange offer, merger, consolidation, sale of assets or contested election or any combination of the foregoing transactions (a "Transaction"), the persons who were directors of the Corporation immediately before the Transaction shall cease to constitute a majority of the Board of Directors of the Corporation or of any parent of or successor to the Corporation immediately after the Transaction occurs.

-3-

<PAGE>   4

    (c) "Cause" means (i) an act or acts of personal dishonesty on your part intended to result in substantial personal enrichment at the expense of the Corporation, or (ii) your conviction for a felony.

    4.(a) Anything in this Agreement to the contrary notwithstanding, in the event it shall be determined that any payment or distribution by the Corporation to you or for your benefit (whether paid or payable or distributed or distributable pursuant to the terms of this Agreement or otherwise) (a "Payment") would be nondeductible by the Corporation for Federal income tax purposes because of Section 280G of the Internal Revenue Code of 1986, as amended (the "Code"), then the aggregate present value of amounts payable or distributable to you or for your benefit pursuant to this Agreement (such payments or distributions pursuant to this Agreement are hereinafter referred to as "Agreement Payments") shall be reduced to the Reduced Amount. The "Reduced Amount" shall be an amount expressed in present value which maximizes the aggregate present value of Agreement Payments without causing any Payment to be nondeductible by the Corporation because of Section 280G of the Code. For purposes of this Section 4, present value shall be determined in accordance with Section 280G(d)(4) of the Code.

    (b) All determinations required to be made under this Section 4 shall be made by Ernst & Young (the "Accounting Firm") which shall provide detailed supporting calculations both to the Corporation and you within 15 business days of the date your employment with the Corporation terminates, or such earlier time as is requested by the Corporation, and an opinion to you that you have substantial authority not to report any Excise Tax on your federal income tax return with respect to the Agreement Payments. Any such determination by the Accounting Firm shall be binding upon the Corporation and you. You shall determine which and how much of the Agreement Payments shall be eliminated or reduced consistent with the requirements of this Section 4, provided that, if you do not make such determination within ten business days of the receipt of the calculations made by the Accounting Firm, the Corporation shall elect which and how much of the Agreement Payments shall be eliminated or reduced consistent with the requirements of this Section 4 and shall notify you promptly of such election. Within five business days thereafter, the Corporation shall pay to or distribute to you or for your benefit such amounts as are then due to you under this Agreement. For purposes of this Section 4, "Excise Tax" shall mean the excise tax imposed by Section 4999 of the Code or any interest or penalties with respect to such excise tax.

    (c) As a result of the uncertainty in the application of Section 280G of the Code at the time of the initial determination by the Accounting Firm hereunder,

-4-

<PAGE>   5

it is possible that Agreement Payments will have been made by the Corporation which should not have been made ("Overpayment") or that additional Agreement Payments which will not have been made by the Corporation could have been made ("Underpayment"), in each case, consistent with the calculations required to be made hereunder. In the event that the Accounting Firm, based upon the assertion of a deficiency by the Internal Revenue Service against you which the Accounting Firm believes has a high probability of success determines that an Overpayment has been made, any such Overpayment paid or distributed by the

Corporation to you or for your benefit shall be treated for all purposes as a loan ab initio to you which you shall repay to the Corporation together with interest at the applicable federal rate provided for in Section 7872(f)(2) of the Code; provided, however, that no such loan shall be deemed to have been made and no amount shall be payable by you to the Corporation if and to the extent such deemed loan and payment would not either reduce the amount on which you are subject to tax under Section 1 and Section 4999 of the Code or generate a refund of such taxes. In the event that the Accounting Firm, based upon controlling precedent or other substantial authority, determines that an Underpayment has occurred, any such Underpayment shall be promptly paid by the Corporation to you or for your benefit together with interest at the applicable federal rate provided for in Section 7872(f)(2) of the Code.

5. You shall not be required to mitigate the amount of any payment provided for in this Agreement by seeking other employment or otherwise, nor shall the amount of any payment provided for in this Agreement be reduced by any compensation earned by you as the result of employment by another employer after the Payment Date, or otherwise. The Corporation's obligation to make the payments provided for in this Agreement and otherwise to perform its obligations hereunder shall not be affected by any set-off, counterclaim, recoupment, defense or other claim, right or action which it may have against you or others.

6. Anything in this Agreement to the contrary notwithstanding, if your employment with the Corporation is terminated prior to the date on which a Change of Control occurs, and it is reasonably demonstrated by you that such termination (a) was at the request of a third party who has taken steps reasonably calculated to effect a Change of Control or (b) otherwise arose in connection with or in anticipation of a Change of Control, then for all purposes of this Agreement, a Change of Control shall be deemed to have occurred the date immediately prior to the date of such termination.

7. This Agreement shall be binding upon and inure to the benefit of you, your estate and the Corporation and any successor or assign of the Corporation, but

5

<PAGE>    6

neither this Agreement nor any rights arising hereunder may be assigned or pledged by you.

8. For purposes of this Agreement, notices and all other communications provided for in the Agreement shall be in writing and shall be deemed to have been duly given when delivered or mailed by United States registered mail, return receipt requested, postage prepaid, addressed to the respective addresses set forth on the first page of this Agreement (all notices to the Corporation to be directed to the attention of the Chief Financial Officer of the Corporation with a copy to the Secretary of the Corporation) or to such other address as either party may have furnished to the other in writing in accordance herewith, except that notices of change of address shall be effective only upon receipt.

9. No provisions of this Agreement may be modified, waived or discharged unless such waiver, modification or discharge is agreed to in writing signed by you and such officer as may be specifically designed by the Board of Directors of the Corporation (which shall in any event include the Corporation's Chief Financial Officer). No waiver by either party hereto at any time of any breach by the other party hereto of, or compliance with, any

condition or provision of this Agreement to be performed by such other party shall be deemed a waiver of similar or dissimilar provisions or conditions at the time or at any prior or subsequent time. No agreements or representations, oral or otherwise, express or implied, with respect to the subject matter hereof have been made by either party which are not set forth expressly in this Agreement. The validity, interpretation, construction and performance of this Agreement shall be governed by the laws of the Commonwealth of Massachusetts without regard to principles of conflicts of laws.

     10.  The Corporation will require any successor (whether direct or indirect, by purchase, merger, consolidation or otherwise) to all or substantially all of the business and/or assets of the Corporation to expressly assume and agree to perform this Agreement in the same manner and to the same extent that the Corporation would be required to perform it if no such succession had taken place. As used in this Agreement, "Corporation" shall mean the Corporation as hereinbefore defined and any successor to its business and/or assets as aforesaid which assumes and agrees to perform this Agreement by operation of law, or otherwise.

     11.  Nothing in this Agreement shall prevent or limit your continuing or future participation in any benefit, bonus, incentive or other plan or program provided by the Corporation and for which you may qualify. Amounts which are vested benefits or which you are otherwise entitled to receive under any plan or program of the Corporation at or subsequent to any Change of Control shall be payable in

<div align="center">-6-</div>

&lt;PAGE&gt;   7

accordance with such plan or program. Any payments or other benefits to which you may be entitled under this Agreement shall be in addition to any payments or other benefits to which you may be entitled under any employment contract you may have with the Corporation.

     12.  The invalidity or unenforceability of any provisions of this Agreement shall not affect the validity or enforceability of any other provision of this Agreement, which shall remain in full force and effect.

     13.  This Agreement may be executed in one or more counterparts, each of which shall be deemed to be an original but all of which together will constitute one and the same instrument.

     If you are in agreement with the foregoing, please so indicate by signing and returning to the Corporation the enclosed copy of this letter, whereupon this letter shall constitute a binding agreement under seal between you and the Corporation.

Very truly yours,

GROUND ROUND RESTAURANTS, INC.

By /s/ Michael R. Jorgensen
---------------------------
Michael R. Jorgensen

7/13/2004

Agreed:


/s/ Michael P. O'Donnell
- - ------------------------
Michael P. O'Donnell




                              -7-


</TEXT>
</DOCUMENT>
<DOCUMENT>
<TYPE>EX-10.36
<SEQUENCE>6
<DESCRIPTION>AGREEMENT OF PETER J. BEAUDRAULT & COMPANY
<TEXT>

<PAGE>    1                                    Exhibit 10.36



                         July 26, 1994


Peter J. Beaudrault
10 Marian Circle
Chalfont, PA  18914

Dear Mr. Beaudrault:

        The Board of Directors of Ground Round Restaurants, Inc. (the
"Corporation") and the Compensation Committee (the "Committee") of the Board
have determined that it is in the best interests of the Corporation and its
shareholders for the Corporation to agree, as provided herein, to pay you
compensation, including termination compensation in the event you should leave
the employ of the Corporation under the circumstances described below.

        The Board and the Committee recognize that the continuing possibility
of a sale or change of control of the Corporation is unsettling to you and
other senior executives of the Corporation.  Therefore, these arrangements are
being made to help assure a continuing dedication by you to your duties to the
Corporation by diminishing the inevitable distraction to you from the personal
uncertainties and risks created by a pending sale or change of control of the
Corporation.  In particular, the Board and the Committee believe it important,
should the Corporation receive proposals from third parties with respect to its
future, to enable you, without being influenced by the uncertainties of your
own situation, to assess and advise the Board whether such proposals would be
in the best interests of the Corporation and its shareholders and to take such
other action regarding such proposals as the Board might determine to be